## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CHARLES R. LUTTRELL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 17-2137** |
| | ) | |
| JAMES K. BRANNON, M.D., | ) | |
| ORTHOPEDIC SCIENCES, INC., | ) | **Jury Trial Demanded** |
| JOINT PRESERVATION INSTITUTE | ) | |
| OF KANSAS, L.L.C., | ) | |
| DOCTORS HOSPITAL, L.L.C. | ) | |
| MAURICIO GARCIA, M.D., | ) | |
| THE HEADACHE & PAIN CENTER, P.A. | ) | |
| and PATIENTFIRST HEALTHCARE | ) | |
| ALLIANCE, P.A. | ) | |

### FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, by and through his attorneys of record, and for his causes of action against Defendants, alleges and states as follows:

### PARTIES

1.      Plaintiff is over the age of 18 years and a citizen of Missouri.

2.      Defendant James K. Brannon, M.D. (**"Brannon"**) is over the age of 18 years and a citizen of Kansas.

3.      Defendant Mauricio Garcia, M.D. (**"Garcia"**) is over the age of 18 years and a citizen of Kansas. Garcia can be served at 10107 West 152nd Terrace, Overland Park, KS 66221.

4.      Defendant Orthopedic Sciences, Inc. (**"OSI"**) is a California corporation whose registered agent in Kansas is James K. Brannon, M.D., 11220 Meadow Lane, Leawood, Kansas 66211.

1

5.      Defendant Joint Preservation Institute of Kansas, L.L.C. (**"JPI"**) is a Kansas limited liability company whose registered agent in Kansas is James K. Brannon, M.D., 11220 Meadow Lane, Leawood, Kansas 66211.

6.      Defendant Doctors Hospital, L.L.C. (**"Doctors Hospital"**) is a Kansas limited liability company whose registered agent is Phillip S. Harness, 4901 College Boulevard, Leawood, Kansas 66211.

7.      Defendant The Headache & Pain Center, P.A. (**"Pain Center"**) is a Kansas Professional Association whose registered agent is Phillip S. Harness 7800 College Blvd, Ste, 200, Overland Park, KS 66210.

8.      Defendant PatientFirst Healthcare Alliance, P.A. (**"PatientFirst"**) is a Kansas Professional Association whose registered agent is PW&S Agent Services of Kansas, Inc., 6201 College Blvd., Ste. 500, Overland Park, KS  66211.

## <u>VENUE AND JURISDICTION</u>

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

9.      This court possesses jurisdiction under 28 U.S.C. §1332 as Plaintiff is a citizen of Missouri, Defendants Brannon, JPI, PatientFirst, Pain Center and Doctors Hospital are citizens of Kansas, and Defendant OSI is a citizen of California or Kansas.  As such, there is complete diversity among Plaintiff and Defendants.  Venue is proper under 28 U.S.C. §1391(b)(1) because a substantial part of the events or omissions giving rise to these claims occurred within this judicial district.

## COMMON ALLEGATIONS

Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges every paragraph hereafter based upon and information and belief:

10.    Brannon is a medical doctor licensed to practice medicine in Kansas, Missouri and California.   Dr. Brannon is the President and majority owner of OSI.  He is the sole member and owner of JPI.

11.    OSI manufactures, markets, sells and distributes surgical devices for profit.  These devices include the "**Titanium Hip Tool Locking Plate Bone Graft Stabilization System" (BGSS).** The products OSI manufactures, markets, sells and distributes are "single use" products.  Brannon and/or OSI designs the devices it manufactures, markets, sells and distributes, and considers them proprietary in nature.  Defendants claim that they have obtained approval from the federal government to use and market these products.   JPI actively markets, advertises and promotes these devices and the procedures associated with them.   On information and belief, Defendants have engaged in a systematic and widespread promotion of the use of these products that are "off-label" and are inconsistent with, and contrary to, any alleged use and marketing authorized under applicable rules and regulations pertaining to such products.  This marketing reached persons across the country.

12.    OSI represents on its website and elsewhere that the Hip Tool "is specifically designed to prevent or delay a total hip replacement in patients with a disease called osteonecrosis (dead bone in the hip joint)." OSI further represents that the Hip Tool device and procedure were invented by Dr. Brannon. OSI further represents that the Hip Tool and procedure offers patients "a chance to save their hip, while using a minimally-invasive surgical technique that allows for a relatively speedy (and less painful) recovery."

13. Brannon derives a personal financial benefit from OSI's and JPI's commercial activities, including the sale of devices to physicians and other health care providers. Brannon claims that the exclusive use of the OSI devices he develops and designs allegedly enables patients to avoid or postpone joint replacement surgeries, and are superior to other medical procedures for the same condition. Defendants actively market these claims. These procedures are performed at Doctors Hospital, which profits from them.

14. Doctors Hospital is owned by PatientFirst. Brannon has an ownership interest in PatientFirst and is a member of the board of directors.

15. The Plaintiff has been routinely obtaining prescriptions for narcotic medications from the Pain Center, Dr. Brannon and/or Dr. Garcia since 2012, including but not limited to Fentanyl, Oxycodone, Hydrocodone, Tramadol and Morphine Sulfate.

16. At some point in time, plaintiff became addicted to pain medications which has permanently physically damaged plaintiff. As a result of plaintiff's addiction to pain medications, the fact of plaintiff sustaining certain injuries arising from various occurrences was not reasonably ascertainable by plaintiff until sometime after certain initial acts and/or omissions.

17. From 2012 until early Spring of 2015, Garcia, and Brannon, were the primary physicians prescribing the Plaintiff with prescription narcotics.

18. The Pain Center is owned by PatientFirst. Garcia and Brannon are members of the board of directors for both the Pain Center and PatientFirst and have an ownership interest in PatientFirst.

19. Prior to March 4, 2015, Plaintiff suffered from right hip pain. Prior to March 4, 2015, Plaintiff was seen and evaluated by Brannon for that pain, and a physician-patient relationship was established.

4

20.     Brannon represented to Plaintiff that the cause of his right hip pain was caused, in part, by avascular necrosis within the hip joint and/or within the right femoral head.  Brannon represented to Plaintiff that while the traditional treatment for his condition was a total hip arthroplasty (total hip replacement), such a procedure for Plaintiff was unnecessarily invasive and complicated.  Instead, Brannon recommended a "joint preservation" procedure, which involved procedures "invented" by Brannon, and involved the use of devices solely available through OSI.  Brannon specifically represented to Plaintiff that the existence of avascular necrosis in Plaintiff's hip joint/right femoral head was the predominating indication and justification for the "joint preservation".  Brannon convinced Plaintiff not to undergo a total hip arthroplasty, representing to him that such a procedure was unnecessary and inferior to the "joint preservation" procedure, which included the use of OSI's products that Brannon allegedly innovated.

21.     On or about February 18, 2015, Plaintiff underwent an x-ray of his right hip.  The x-ray was performed at and by Doctors Hospital and was interpreted by Dr. Patricia McFarlane.  The images taken on February 18, 2015 revealed, among other things, that the "right femoral head, femoral neck, and intertrochanteric and subtrochanteric right femur are normal in appearance;" that there were "no osteolytic or osteoblastic lesions" seen; and that there were "no radiographic findings of avascular necrosis of the femoral head."  In addition, there were no findings of an interosseous fracture of the femoral head or femur. In short, the x-ray demonstrated Plaintiff did not have any necrosis in his right hip.

22.     Prior to March 4, 2015, the results of the February 18, 2015 x-ray were communicated to and known by Brannon.  Prior to March 4, 2015, Brannon had actual knowledge that there was no radiologic evidence that Plaintiff had avascular necrosis.  At no time did Brannon communicate the results of the February 18, 2015 x-ray to Plaintiff.

23.     On March 4, 2015, Plaintiff underwent surgery at Doctors Hospital.  The surgery was performed by Brannon.  Brannon's pre-operative diagnosis included "avascular necrosis" of the right hip.  Brannon's post-operative diagnosis included "avascular necrosis" of the right hip.  At the time Brannon made these entries in his report, he knew that Plaintiff did not have avascular necrosis of the right hip.

24.     Brannon's operative notes refer to a pre-operative MRI of Plaintiff's right hip, which allegedly revealed the existence of avascular necrosis.  A pre-operative MRI of Plaintiff's right hip was never taken.  When Brannon made these entries in his report, he knew that there had been no pre-operative MRI findings that Plaintiff had avascular necrosis in his right hip.

25.     During the March 4, 2015 surgical procedure, Brannon used surgical instruments designed, manufactured and sold by Brannon and/or OSI.  During the procedure, surgical devices designed, manufactured and sold by Brannon and/or OSI were implanted into Plaintiff's body, including a hip tool locking plate and compression screw.  Doctors Hospital charged Plaintiff $131,371.56 for surgical equipment and devices designed, manufactured and sold by Brannon and/or OSI, for which Brannon and/or OSI received financial compensation.  In addition, Doctors Hospital charged Plaintiff an additional $115,097.96 for the "joint preservation" procedure Brannon allegedly performed and for which he takes credit as its inventor.   On information and belief, Brannon personally profited from these charges.

26.     During the March 4, 2015 surgical procedure, bone samples were taken from Plaintiff's right hip, including his femoral head.  These samples were taken to pathology, where they were examined after the surgery by John R. Dobson, M.D.  The examination revealed viable bone, fat and marrow, and "argued against avascular necrosis."

27.    Following the March 4, 2015 surgery, Plaintiff experienced severe pain and discomfort in his right hip.  He elected to see David W. Anderson, M.D.  After examination and consultation, Dr. Anderson ascertained that Plaintiff had a displaced right femoral head fracture that had been caused by the surgical devices implanted by Brannon.  Dr. Anderson determined that the March 4, 2015 surgery, including the surgical hardware used by Brannon, had failed. He also diagnosed that Plaintiff suffered from severe osteoarthritis of the right hip, a clear contraindication for the surgery performed days before by Dr. Brannon.

28.    On March 9, 2015, Dr. Anderson performed a surgical procedure on Plaintiff at the University of Kansas Hospital.  The surgery was a conversion of Plaintiff's prior hip surgery to a right total hip arthroplasty.  During the surgery, a bone core sample was taken of Plaintiff's right femoral head and sent to pathology.  The pathology results confirmed that there was no evidence of any avascular necrosis within the femoral head.  Pre- and post-operative imaging studies ordered by Dr. Anderson likewise revealed the absence of avascular necrosis.

29.    Following the March 9, 2015 procedure, Plaintiff continued to suffer from pain and discomfort in his right hip.  Multiple procedures were necessary in an attempt to alleviate and treat Plaintiff's pain.  Plaintiff continues to experience pain and discomfort in his right hip.

30.    Defendants perpetrated a complex and intricate fraud which required 1.) a patient and 2.) a readily available source of revenue.

31.    In order to extract as much money as possible from Plaintiff and Plaintiff's Medicaid, Defendants undertook a common enterprise to supply Plaintiff with powerful narcotic pain medications and convince him that he required a highly unusual and overly expensive medical procedure to correct a non-existent problem.

32.     Defendants executed this plan and once Plaintiff had served his intended purpose, Defendants severed ties leaving Plaintiff physically disabled and financially crippled.

33.     To accomplish this fraud, Defendants created an entangled set of medical practices which include a Physician-Owned Distributorship ("POD") and a physician-owned ambulatory surgical center ("ASC") and physician-owned pain management clinic.

34.     As will be discussed below, POD's present an inherent conflict of interests that put a physician's medical judgment at odds with the patient's best interests.

35.     Dr. Brannon began his POD development while practicing medicine in Los Angeles, California at the Martin Luther King Jr./Drew Medical Center, a county hospital in Los Angeles, CA. The Martin Luther King/Drew's purchases of products distributed by Dr. Brannon's POD empire were questioned as potential violations of county conflict-of-interest laws, much the same way the March 2013 Special Fraud Alert is questioning POD arrangements.

36.     Dr. Brannon then reopened shop in Kansas City on February 28, 2005.  Dr. Brannon landed a Directorship of the Joint Preservation Center (JPC) at Truman Medical Centers wherein all of the products invented by Dr. Brannon were utilized.  At the JPC, Dr. Brannon served as the director and medically treated patients from areas extending far beyond TMC's catchment area.  He claims these activities were the result of his inventions and substantially increased his academic, social, political and financial wealth.   Dr. Brannon further stated that "these activities are identical to those performed by him in California prior to relocating to Kansas On February 28, 2005."

37.     Dr. Brannon has now moved his POD away from TMC and into his own operations.

**PODs Compromise Patient Safety as Patients Receive High-Risk Treatment
Beyond What is Medically Warranted**

38.     A Physician-Owned Distributorship or "POD" derives revenue from selling or arranging for the sale of implantable medical devices ordered by their physician-owners for use in procedures performed by the physician-owner.

39.     The Office of Inspector General for the U.S. Department of Health and Human Services (the "OIG" and "HHS") issued a Special Fraud Alert on March 26, 2013 stating that "PODs are inherently suspect under the anti-kickback statute [Section 1128B(b) of the Social Security Act]" and that "[f]inancial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the devices the PODs sell in lieu of other, potentially more clinically appropriate, devices." Department of Health and Human Services, Office of Inspector General, Special Fraud Alert: Physician-Owned Entities (March 26, 2013)(Exhibit A).

40.     Among other findings, the OIG stated:

a.  "Longstanding OIG guidance makes clear that the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute."  *Id at pg. 2*

b.  "This Special Fraud Alert reiterates our longstanding position that the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute." *Id at pg. 4*

c.  "Because the investment risk associated with PODs is often minimal, a high rate of return increases both the likelihood that one purpose of the arrangement is to enable the physician-owners to profit from their ability to dictate the implantable devices to be purchased for their patients and the potential that the physician-owner's medical judgment will be distorted by financial incentives." *Id at pg. 4*

d.  "The risk of fraud and abuse is particularly high in circumstances when such physicians-owners are the sole (or nearly the sole) users of the devices sold or manufactured by their PODs."  *Id at pg. 4*

e. "We are particularly concerned about the presence of such financial incentives in the implantable medical device context because such devices typically are 'physician preference items,' meaning that both the choice of brand and the type of device may be made or strongly influenced by the physician, rather than being controlled by the hospital or ASC where the procedure is performed." *Id at pg. 2*

f. "We do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns." *Id at pg. 2*

41.    The United States Senate Finance Committee endorsed these findings in a report detailing its concerns regarding Physician Owned Distributorships and further stated that "SFAs [Special Fraud Alerts (*supra*)] are extremely significant warning HHS OIG only releases for particularly egregious issues, as illustrated by the fact that only five SFAs have been issued in the past 15 years."  Staff of S. Finance Committee, Report on Physician Owned Distributorships: An Update on Key Issues and Areas of Congressional Concern (February 2016)(Exhibit B).

42.    Among other findings, the Committee stated:

a. "POD physicians have been on notice about the illegality of POD arrangements for a long time." *Id. at pg. 13*

b. "PODs present an inherent conflict of interest that can put the physician's medical judgment at odds with the patient's best interests." *Id. at pg. 19*

c. "As stated by the HHS OIG in the 2013 SFA, financial transactions involving PODs may violate the Anti-Kickback Statute, Stark Law, or both." *Id. at pg. 2*

d. "Overutilization may occur if physicians perform additional, more complex, or medically unnecessary surgeries to garner POD financial incentives." *Id. at pg. 2*

e. "As a result of potential conflicts of interest and overutilization, PODs compromise patient safety as patients receive high-risk treatment beyond what is medically warranted. Any unnecessary medical procedure increases the risk that the patient may be harmed." *Id. at pg. 3*

f. "The Anti-Kickback Statute (AKS) prohibits offering, paying, soliciting, or receiving anything of value to induce or reward referrals or generate federal health care program business. The prohibition applies not only to traditional

10

forms of remuneration, such as cash payments, but also to indirect payments, which could include investment opportunities, especially when terms of the investment are extremely advantageous for a physician, or where the physician-investor has a financial interest in generating business for the company." *Id. at pg. 4.*

g. "Because of the AKS ascribes criminal liability to both parties in an impermissible kickback, hospitals and health care facilities that work PODs may also be criminally liable under the AKS." *Id. at pg. 7*

h. "The Physician Self-Referral Law (42 U.S.C. § 1395nn), also known as the Stark Law, prohibits a physician from referring Medicare patients for designated health services to an entity with which the physician (or immediate family member) has a financial relationship, unless an exception applies. It also prohibits the designated health services entity, often a hospital, from submitting claims to Medicare for services resulting from a prohibited referral." *Id. at pg. 4*

i. "When physicians have a financial incentive to recommend and perform a surgery, a potential conflict of interest can occur and jeopardize the health of patients." *Id. at pg. 6*

j. "It appears that PODs are no longer concentrated in large hospital chains, many of which have adopted policies forbidding or strictly curtailing business with PODs. Perhaps to avoid strict compliance environments, PODs appear to be migrating to smaller and more rural hospitals, which have not yet developed POD-specific policies." *Id. at pg. 16*

k. "The Committee is particularly concerned about the POD model spreading to other types of medical implants, including hip, knee, and other joint replacements as well as in prosthetics and orthotics." *Id. at pg. 17*

43. On August 13, 2015, the OIG issued a Memorandum Report titled: Overlap between Physician-Owned Hospitals and Physician-Owned Distributors. (Exhibit C)

44. The purpose of the report was to analyze to what extent there is overlap between owners of physician-owned hospitals and physician-owned distributorships with regards to spinal fusion surgeries.

45. The memorandum concluded that, "[t]ransparency of ownership is important for the Department of Health and Human Services to ensure that providers do not violate the referral and

billing prohibitions of the Stark Law (also known as the Physician Self-Referral Law) and that they comply with OIG exclusion and the Anti-Kickback Statute.  Additionally, the transparency of ownership information may have implications for patient safety and quality of care."  Memorandum from the Department of Health and Human Services Office of Inspector General, to Andrew Slavitt, Acting Administrator Centers for Medicare and Medicaid Services (August 13, 2015).

## Defendants Entangled Medical Practices Were Designed to Defraud Plaintiff

46.     The entangled and interconnected medical practices owned by Defendants facilitated and did defraud Plaintiff.

47.     Without these interwoven relationships, Plaintiff's medical care would have been overseen by independent medical practitioners who could have stepped in and halted this fraudulent course.

48.     But because Defendants owned or had interest in all aspects of the medical practices which served Plaintiff before and through his surgery, Defendants were able to conceal their fraud.

49.     The following is a brief description of how Defendants enterprise and associations-in-fact was organized to facilitate the fraud perpetrated upon Plaintiff.

### *PatientFirst*

50.     Brannon has an ownership interest in PatientFirst and is on its Board of Directors.

51.     Garcia has an ownership interest in PatientFirst and is on its Board of Directors.

52.     Upon information and belief, Brannon and Garcia are the sole owners of PatientFirst.

53.     PatientFirst is the sole shareholder of the Pain Center.

54.     PatientFirst is 100% owner of Doctor's Hospital.

*Pain Center*

55.     Upon information and belief, Brannon and Garcia are the sole two members of the Board of Directors for the Pain Center.

56.     The Pain Center over medicated Plaintiff for years through prescriptions written by Brannon and Garcia.

*Doctor's Hospital*

57.     PatientFirst is a shareholder of Doctor's Hospital which is an ambulatory surgical center ("ASC").

58.     PatientFirst is 100% owner of Doctor's Hospital.

59.     Doctor's Hospital is the ASC where Plaintiff's hip surgery was performed.

*JPI*

60.     Brannon is the vested designated manager of JPI which markets the Titanium Hip Tool for interstate commerce.

61.     Brannon 100% owner of JPI.

*OSI*

62.     Brannon is the president and 90% owner of OSI.

63.     OSI manufactures the Titanium Hip Tool for sale.

64.     OSI sold the Titanium Hip Tool to Doctor's Hospital, at Brannon's behest, for Plaintiff's surgery.

65.     Brannon implanted the Titanium Hip Tool, sold by OSI to Doctor's Hospital, into Plaintiff.

## COUNT I – PROFESSIONAL NEGLIGENCE
### (Against Defendant Brannon, MD)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

66.     In performing services for Plaintiff, Dr. Brannon had a duty to use that degree of learning and skill ordinarily possessed by members of his profession and that school of medicine in the community in which he practiced, or in similar communities, and in the application of that skill and learning, Dr. Brannon was obligated to use ordinary care and diligence.

67.     On or about March 4, 2015 Defendant Brannon performed a right hip preservation procedure on plaintiff.

68.     In performing the March 4, 2015 procedure, Dr. Brannon violated his duty, and was thereby negligent, in the following ways, among others:

    a.  Recommending and performing a procedure that was not medically-indicated or appropriate under the circumstances;

    b.  Utilizing procedures, instruments and devices that were not appropriate or suitable to treat the patient;

    c.  Proceeding with the hip preservation procedure and the use of the BGSS when he knew or should have known that plaintiff was not an appropriate candidate for this procedure and that the procedure was contraindicated as stated in documents personally submitted by Defendant Brannon to the FDA. (See  Draft Package Insert submitted to the FDA as part of the 510K approval process, Exhibit O) The procedure was contraindicated for the following reasons, among others:

        i.  Plaintiff's age did not make him a viable candidate;

14

      ii.   Plaintiff suffered from medical conditions which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, including but not limited suffering from severe osteoarthritis of his right hip joint;

      iii.   Plaintiff was addicted to pain medications and suffered from mental, physical and/or neurological conditions which would foreseeably impair his ability to cooperate with the postoperative regimen.

      iv.   Plaintiff did not need core decompression/debridement of femoral head and neck followed by bone grafting.

d.  In performing an alleged labral repair without the prior consent of Plaintiff and without his knowledge and without a diagnosis of such.

e.  Failing to order appropriate pre-operative tests and studies to accurately ascertain Plaintiff's true medical condition;

f.  Disregarding the results of pre-operative tests and studies;

g.  Representing to Plaintiff that he had avascular necrosis in his right hip when Dr. Brannon knew or should have known that he did not;

h.  Persuading Plaintiff to forego a total hip arthroplasty and/or other treatment options and to instead undergo a procedure that was not appropriate under the circumstances;

i.  By performing the joint preservation procedure and by utilizing the BGSS, Dr. Brannon drilled material out of plaintiff's right hip bone and femoral head, thereby weakening the bone.  As a direct and proximate result of this procedure, plaintiff

sustained a right hip fracture only days following the alleged "hip preservation" procedure performed by Defendant Brannon.

j.   Failing to use the appropriate degree of learning and skill, and failing to use ordinary care and diligence in performing the March 4, 2015 procedure which thereafter resulted in a failed deep implant of his hip and a displaced right femoral neck fracture, requiring emergent surgery only days after the alleged joint preservation.

k.   Utilizing techniques and devices for a purpose and to treat a condition that had not been approved under appropriate and applicable regulations, and which constituted an "off-label" use that was inappropriate and negligent under the circumstances; and

l.   At all times mentioned in this complaint, Brannon, negligently and carelessly failed to document and properly ensure that Plaintiff had been adequately informed and advised of the dangers, risks, alternatives, benefits, and hazards of the course of treatment to be performed on Plaintiff. Brannon negligently and carelessly concealed, withheld, and failed to disclose to plaintiff the dangers, risks, alternatives and hazards and negligently and carelessly minimized these dangers, risks and hazards. Brannon induced and obtained the consent of Luttrell to perform the right hip procedure on March 4, 2015 by concealing, withholding and minimizing the dangers and risks, hazards, and alternatives. Brannon negligently and carelessly concealed, withheld and failed to disclose and/or to adequately disclose to Plaintiff his financial interests in the Pain Center, PatientFirst, JPI, OSI,

and Doctors Hospital. Brannon further negligently and carelessly failed to inform

Plaintiff of the contraindications for the procedure.

m.  In other respects, not specifically listed, but which may arise throughout the course

of discovery.

69.     As a direct and proximate result of such negligence, Plaintiff suffered and incurred

both past and future economic and non-economic damages, including but not limited to medical

expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for judgment in Count I against Defendant Brannon,

MD for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and

reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys'

fees, for punitive damages to punish and deter any such conduct in the future and for any such other

relief as the Court deems just and proper under the circumstances.

## COUNT II – LACK OF INFORMED CONSENT
### (Against Defendant Brannon, MD)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth

herein at length, and further alleges:

70.     In performing services for Plaintiff, Dr. Brannon had a duty to use that degree of

learning and skill ordinarily possessed by members of his profession and that school of medicine in

the community in which he practiced, or in similar communities, and in the application of that skill

and learning, Dr. Brannon was obligated to use ordinary care and diligence.

71.     In performing the March 4, 2015 procedure, Dr. Brannon violated his duty, and was

thereby negligent, by failing to make a reasonable disclosure to plaintiff of the nature and probable

consequences of the suggested hip preservation procedure, including the dangers within his

knowledge, the many contraindications of the procedure, the multitude of conflicts he had, among other things.

72. Defendant Brannon failed to disclose, among other things, the following:

    a. That the procedure and use of the Hip Tool Implant/system "invented" by Defendant Brannon was contraindicated by documents he personally submitted to the FDA for the following reasons, among others:

        i. Plaintiff's age did not make him a viable candidate;

        ii. Plaintiff suffered from medical conditions which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, including but not limited suffering from severe osteoarthritis of his right hip joint;

        iii. Plaintiff was addicted to pain medications and suffered from mental, physical and/or neurological conditions which would foreseeably impair his ability to cooperate with the postoperative regimen.

        iv. Plaintiff did not need core decompression/debridement of femoral head and neck followed by bone grafting.

    b. That Defendant Branon had created a Physician Owned Distributorship (aka a "POD") which created conflicts that he did not disclose nor that Plaintiff could fully understand.

    c. That PODs, such as the very one created by Dr. Brannon, are the subject of investigation and extreme concern by The Department of Health and Human Services Office of Inspector General (HHS OIG) and the subject of a Special Fraud Alert from the HHS OIG.

d.  That the creation of his POD allowed Dr. Brannon the opportunity to grant himself a steady stream of income by increasing the use of his invented products manufactured, distributed and/or sold by entities he completely owns, creating an inherent conflict of interest that could put his medical judgment at odds with plaintiff's best interests.

e.  That the OIG Special Fraud Alert states that "we do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns."

f.  That the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he generates business, could constitute illegal remuneration under the anti-kickback statute, as specially stated in the Special Fraud Alert.

g.  That pre-surgery radiology reports reflected Plaintiff did NOT suffer from AVN, the very thing Dr. Brannon convinced plaintiff necessitated his hip preservation procedure.

h.  Failing to advise plaintiff that if he underwent the Brannon Recommend hip preservation procedure that in the event he needed a full hip replacement at any time in the future (which he ended up enduring only days later), there could be additional complications and risks because of the procedure performed by Dr. Brannon.

i.  That the hip preservation procedure recommended by Dr. Brannon is not widely accepted in the medical community.

     j.   the dangers, risks, alternatives, and hazards of the course of treatment to be performed on Plaintiff.

     k.   In other respects not specifically listed, but which may arise throughout the course of discovery.

73.    Brannon, negligently and carelessly failed to document and properly ensure that Plaintiff had been informed and advised as set forth herein, and carelessly minimized these dangers, risks hazards and other information.  Had Dr. Brannon made a reasonable disclosure to plaintiff, Plaintiff would not have undergone the hip preservation procedure performed by Dr. Brannon.

74.    As a direct and proximate result of such negligence, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for judgment in Count II against Defendant Brannon, for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT III - VIOLATIONS OF THE RICO STATUTE 18 U.S.C. § 1962 (a) & (c)
### (Against All Defendants)

### A. Introduction

75.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

76.    Defendants perpetrated a complex and intricate fraud which required 1.) a patient and 2.) a readily available source of revenue.

77.     In order to extract as much money as possible from Plaintiff and Plaintiff's Medicaid, Defendants undertook a common enterprise to supply Plaintiff with powerful narcotic pain medications and convince him that he required a highly unusual and overly expensive medical procedure to correct a non-existent problem.

78.     Defendants executed this plan and once Plaintiff had served his intended purpose, Defendants severed ties leaving Plaintiff physically disabled and financially crippled.

79.     To accomplish this fraud, Defendants created an entangled set of medical practices which include a Physician-Owned Distributorship ("POD") and a physician-owned ambulatory surgical center ("ASC") and physician-owned pain management clinic.

80.     As will be discussed below, POD's present an inherent conflict of interests that put a physician's medical judgment at odds with the patient's best interests.

81.     Defendants engaged in conduct which is prohibited by 18 U.S.C. § 1962.

82.     Plaintiff was economically injured by reason of Defendants pattern of racketeering activity which violated 18 U.S.C. § 1962.

83.     Plaintiff has standing to bring these RICO claims because Plaintiff was economically injured and experienced violations of Plaintiff's property in the following included, but not limited to ways: co-pays, out-of-pocket medical costs, increased Medicaid liens, reduced earning capacity, lost wages, incidental costs and future medical costs including drug rehabilitation treatment, therapy, orthopedic surgery, among other economic damages to be proved at trial.

84.     At all times pertinent to this suit, Defendants formed an enterprise and associations-in-fact with each other or exerted direct control over each.

85.     Defendant's enterprise and/or associations-in-fact were and are involved in interstate commerce.

86.     Defendant's enterprise and/or associations-in-fact conspired to and did engage in "racketeering activity" in violation of 18 U.S.C. § 1961 by committing and/or engaging in:

   a.   Mail fraud in violation of the United States Mail Fraud Act, 18 U.S.C. § 1341;

   b.   Wire fraud in violation of 18 U.S.C. § 1343;

   c.   Dealing in a controlled substance in violation of 18 U.S.C. § 1961, 18 U.S.C. § 841, 21 C.F.R. § 1306.04(a), K.S.A. § 65-4123 and K.S.A. § 65-1626; and

   d.   Laundering of Monetary Instruments in Violation of 18 U.S.C. § 1956:

      i.   CMS reporting requirements under the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h.);

      ii.   The Anti-Kickback Statute (42 U.S.C. § 1320a-7b);

      iii.   The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn); and

      iv.   Health care fraud under 18 U.S.C § 1347.

87.     Defendants committed at least two "predicate acts" of "racketeering activity" within ten years.

88.     The enterprise and associations-in-fact were run through and by these racketeering activities.

89.     Plaintiff was directly and proximately harmed by the predicate acts of racketeering activity as more fully described below.

### B.  PODs Compromise Patient Safety as Patients Receive High-Risk Treatment Beyond What is Medically Warranted

90.     A Physician-Owned Distributorship or "POD" derives revenue from selling or arranging for the sale of implantable medical devices ordered by their physician-owners for use in procedures performed by the physician-owner.

91.     The Office of Inspector General for the U.S. Department of Health and Human Services (the "OIG" and "HHS") issued a Special Fraud Alert on March 26, 2013 stating that "PODs

are inherently suspect under the anti-kickback statute [Section 1128B(b) of the Social Security Act]"

and that "[f]inancial incentives PODs offer to their physician-owners may induce the physicians both

to perform more procedures (or more extensive procedures) than are medically necessary and to use

the devices the PODs sell in lieu of other, potentially more clinically appropriate, devices."

Department of Health and Human Services, Office of Inspector General, Special Fraud Alert:

Physician-Owned Entities (March 26, 2013)(Exhibit A).

92.     Among other findings, the OIG stated:

a.  "Longstanding OIG guidance makes clear that the opportunity for a referring
    physician to earn a profit, including through an investment in an entity for
    which he or she generates business, could constitute illegal remuneration under
    the anti-kickback statute." *Id at pg. 2*

b.  "This Special Fraud Alert reiterates our longstanding position that the
    opportunity for a referring physician to earn a profit, including through an
    investment in an entity for which he or she generates business, could constitute
    illegal remuneration under the anti-kickback statute." *Id at pg. 4*

c.  "Because the investment risk associated with PODs is often minimal, a high
    rate of return increases both the likelihood that one purpose of the arrangement
    is to enable the physician-owners to profit from their ability to dictate the
    implantable devices to be purchased for their patients and the potential that the
    physician-owner's medical judgment will be distorted by financial incentives."
    *Id at pg. 4*

d.  "The risk of fraud and abuse is particularly high in circumstances when such
    physicians-owners are the sole (or nearly the sole) users of the devices sold or
    manufactured by their PODs." *Id at pg. 4*

e.  "We are particularly concerned about the presence of such financial incentives
    in the implantable medical device context because such devices typically are
    'physician preference items,' meaning that both the choice of brand and the
    type of device may be made or strongly influenced by the physician, rather than
    being controlled by the hospital or ASC where the procedure is performed." *Id
    at pg. 2*

f.  "We do not believe that disclosure to a patient of the physician's financial
    interest in a POD is sufficient to address these concerns." *Id at pg. 2*

93.     The United States Senate Finance Committee endorsed these findings in a report detailing its concerns regarding Physician Owned Distributorships and further stated that "SFAs [Special Fraud Alerts (*supra*)] are extremely significant warning HHS OIG only releases for particularly egregious issues, as illustrated by the fact that only five SFAs have been issued in the past 15 years."  Staff of S. Finance Committee, Report on Physician Owned Distributorships: An Update on Key Issues and Areas of Congressional Concern (February 2016)(Exhibit B).

94.     Among other findings, the Committee stated:

a.  "POD physicians have been on notice about the illegality of POD arrangements for a long time." *Id. at pg. 13*

b.  "PODs present an inherent conflict of interest that can put the physician's medical judgment at odds with the patient's best interests." *Id. at pg. 19*

c.  "As stated by the HHS OIG in the 2013 SFA, financial transactions involving PODs may violate the Anti-Kickback Statute, Stark Law, or both." *Id. at pg. 2*

d.  "Overutilization may occur if physicians perform additional, more complex, or medically unnecessary surgeries to garner POD financial incentives." *Id. at pg. 2*

e.  "As a result of potential conflicts of interest and overutilization, PODs compromise patient safety as patients receive high-risk treatment beyond what is medically warranted. Any unnecessary medical procedure increases the risk that the patient may be harmed." *Id. at pg. 3*

f.  "The Anti-Kickback Statute (AKS) prohibits offering, paying, soliciting, or receiving anything of value to induce or reward referrals or generate federal health care program business. The prohibition applies not only to traditional forms of remuneration, such as cash payments, but also to indirect payments, which could include investment opportunities, especially when terms of the investment are extremely advantageous for a physician, or where the physician-investor has a financial interest in generating business for the company." *Id. at pg. 4.*

g.  "Because of the AKS ascribes criminal liability to both parties in an impermissible kickback, hospitals and health care facilities that work PODs may also be criminally liable under the AKS." *Id. at pg. 7*

h.  "The Physician Self-Referral Law (42 U.S.C. § 1395nn), also known as the Stark Law, prohibits a physician from referring Medicare patients for

designated health services to an entity with which the physician (or immediate family member) has a financial relationship, unless an exception applies. It also prohibits the designated health services entity, often a hospital, from submitting claims to Medicare for services resulting from a prohibited referral." *Id. at pg. 4*

i.   "When physicians have a financial incentive to recommend and perform a surgery, a potential conflict of interest can occur and jeopardize the health of patients." *Id. at pg. 6*

j.   "It appears that PODs are no longer concentrated in large hospital chains, many of which have adopted policies forbidding or strictly curtailing business with PODs. Perhaps to avoid strict compliance environments, PODs appear to be migrating to smaller and more rural hospitals, which have not yet developed POD-specific policies." *Id. at pg. 16*

k.   "The Committee is particularly concerned about the POD model spreading to other types of medical implants, including hip, knee, and other joint replacements as well as in prosthetics and orthotics." *Id. at pg. 17*

95.   On August 13, 2015, the OIG issued a Memorandum Report titled: Overlap between Physician-Owned Hospitals and Physician-Owned Distributors.  (Exhibit C)

96.   The purpose of the report was to analyze to what extent there is overlap between owners of physician-owned hospitals and physician-owned distributorships with regards to spinal fusion surgeries.

97.   The memorandum concluded that, "[t]ransparency of ownership is important for the Department of Health and Human Services to ensure that providers do not violate the referral and billing prohibitions of the Stark Law (also known as the Physician Self-Referral Law) and that they comply with OIG exclusion and the Anti-Kickback Statute.  Additionally, the transparency of ownership information may have implications for patient safety and quality of care."  Memorandum from the Department of Health and Human Services Office of Inspector General, to Andrew Slavitt, Acting Administrator Centers for Medicare and Medicaid Services (August 13, 2015).

### C.  Defendants Entangled Medical Practices Were Designed to Defraud Plaintiff

98.     The entangled and interconnected medical practices owned by Defendants facilitated and did defraud Plaintiff.

99.     Without these interwoven relationships, Plaintiff's medical care would have been overseen by independent medical practitioners who could have stepped in and halted this fraudulent course.

100.    But because Defendants owned or had interest in all aspects of the medical practices which served Plaintiff before and through his surgery, Defendants were able to conceal their fraud.

101.    The following is a brief description of how Defendants enterprise and associations-in-fact was organized to facilitate the fraud perpetrated upon Plaintiff.

*PatientFirst*

102.    Brannon has an ownership interest in PatientFirst and is on its Board of Directors.

103.    Garcia has an ownership interest in PatientFirst and is on its Board of Directors.

104.    Upon information and belief, Brannon and Garcia are the sole owners of PatientFirst.

105.    PatientFirst is the sole shareholder of the Pain Center.

106.    PatientFirst is 100% owner of Doctor's Hospital.

*Pain Center*

107.    Upon information and belief, Brannon and Garcia are the sole two members of the Board of Directors for the Pain Center.

108.    The Pain Center over medicated Plaintiff for years through prescriptions written by Brannon and Garcia.

26

*Doctor's Hospital*

109.    PatientFirst is a shareholder of Doctor's Hospital which is an ambulatory surgical center ("ASC").

110.    PatientFirst is 100% owner of Doctor's Hospital.

111.    Doctor's Hospital is the ASC where Plaintiff's hip surgery was performed.

*JPI*

112.    Brannon is the vested designated manager of JPI which markets the Titanium Hip Tool for interstate commerce.

113.    Brannon 100% owner of JPI.

*OSI*

114.    Brannon is the president and 90% owner of OSI.

115.    OSI manufactures the Titanium Hip Tool for sale.

116.    OSI sold the Titanium Hip Tool to Doctor's Hospital, at Brannon's behest, for Plaintiff's surgery.

117.    Brannon implanted the Titanium Hip Tool, sold by OSI to Doctor's Hospital, into Plaintiff.

## D. Culpable "Persons"

118.    Each and every Defendant is a culpable person under the RICO statute, 18 U.S.C. § 1962.

119.    Brannon is a citizen of Kansas and a medical doctor.  Brannon is considered a person for the purposes of 18 U.S.C. § 1962.

120.    Garcia is a citizen of Kansas and a medical doctor.  Garcia is considered a person for the purposes of 18 U.S.C. § 1962.

121.    PatientFirst is a registered Kansas Professional Association which transacts business in interstate commerce and which is wholly owned by Bannon and Garcia. PatientFirst is considered a person for the purposes of 18 U.S.C. § 1962.

122.    Pain Center is a registered Kansas Professional Association which transacts business in interstate commerce and which is wholly owned by Bannon and Garcia, who both sit as the Board of Directors. Pain Center is considered a person for the purposes of 18 U.S.C. § 1962.

123.    Doctors Hospital is a Kansas limited liability company which transacts business in interstate commerce and to which PatientFirst is a shareholder. Doctors Hospital is considered a person for the purposes of 18 U.S.C. § 1962.

124.    JPI is a Kansas limited liability company which transacts business in interstate commerce and which Brannon is the vested designated manager. JPI is considered a person for the purposes of 18 U.S.C. § 1962.

125.    OSI is a California corporation which transacts business in interstate commerce and which Brannon is the president and 90% owner. OSI is considered a person for the purposes of 18 U.S.C. § 1962.

### E.  Mental State

126.    Each and every Defendant intended to engage in and did engage in illegal activities which qualify as predicate acts under the RICO statute, 18 U.S.C. § 1962.

127.    Each and every Defendant engaged in these predicate illegal acts willfully and with full knowledge of the illegality of their common scheme.

128.    Plaintiff was directly and proximately injured by Defendants predicate acts.

### F.  Racketeering Activity

129.    Defendants engaged in the following activity in violation of 18 U.S.C. § 1961:

a.  Mail fraud in violation of the United States Mail Fraud Act, 18 U.S.C. § 1341;

b.  Wire fraud in violation of 18 U.S.C. § 1343;

c.  Dealing in a controlled substance in violation of 18 U.S.C. § 1961, 18 U.S.C. § 841, 21 C.F.R. § 1306.04(a), K.S.A. § 65-4123 and K.S.A. § 65-1626; and

d.  Laundering of Monetary Instruments in Violation of 18 U.S.C. § 1956:

   i.   CMS reporting requirements under the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h.);

   ii.  The Anti-Kickback Statute (42 U.S.C. § 1320a-7b);

   iii. The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn); and

   iv.  Health care fraud under 18 U.S.C § 1347.

130.    These violations were a pattern of racketeering evidencing more than two predicate acts over the span of 10 years.  Below, Plaintiff identifies dozens of predicate acts of racketeering activity over the span of roughly four years.

131.    All of these predicate acts of racketeering activity had an economic motive, specifically to syphon as much money as possible from patients and patients' health insurance providers and to convert profits from the sale of implantable medical devices or the long-term patient usage of narcotics.

132.    Upon information and belief, a portion of the profits derived from the predicate acts of racketeering activity were invested back into OSI, JPI, PatientFirst and Doctors Hospital.

133.    But for these reinvestments, Brannon and OSI would not have been in a position to continue to operate and sell the Titanium Hip Tool which directly and proximately harmed Plaintiff.

*Mail Fraud in Violation of United States Mail Fraud Act, 18 U.S.C. § 1341*

*Pain Management Treatment*

134.    The Defendants formed a scheme to defraud Plaintiff and Plaintiff's Medicaid Insurance by which Brannon, Garcia and Pain Center issued prescriptions for narcotic pain medication which were not medically indicated and beyond prescribing practices.

135.    These unnecessary prescriptions facilitated two goals:

    a.  Each office visit provided an opportunity for Brannon, Garcia and Pain Center to bill Plaintiff and Plaintiff's Medicaid Insurance

    b.  Plaintiff became hopelessly addicted to pain medication which over time reduced his pain threshold and made him more willing to proceed with a risky and unnecessary surgery for a non-existent condition.

136.    Brannon, Garcia and Pain Center supplied narcotic medication to Plaintiff, including but not necessarily limited to the following:

| Date | Prescribing Physician | Facility | Drug Name | Dosage |
|---|---|---|---|---|
| 9/25/2012 | Mauricio Garcia | Doctors Hospital | Oxycodone Robaxin | 10mg, x1 every 8 hours for 10 days 750mg, 1x every 6 hours for 15 days |
| 11/13/2012 | James Brannon | Doctors Hospital | Oxycodone | 15mg, x1 every 6-8 hours for 15 days |
| 12/18/2012 | Mauricio Garcia James Brannon | Doctors Hospital | Oxycodone | 20mg, x1 every 4-6 hours for 7 days |
| 12/28/2012 | James Brannon | Doctors Hospital | No narcotics | N/a |
| 2/7/2013 | Mauricio Garcia Michael Lowrey | Doctors Hospital | Oxycodone | 20mg, x1 every 6 hours for 20 days |

| | | | | |
|---|---|---|---|---|
| 2/27/2013 | Mauricio Garcia Michael Lowrey | Doctors Hospital | N/A | N/A |
| 3/7/2013 | Mauricio Garcia Michael Lowrey | Doctors Hospital | Alprazolam Oxycodone | 1mg, 1 as needed for 5 days 15mg, x1 every 6 hours for 10 days |
| 3/29/2013 | Mauricio Garcia | Doctors Hospital | Clonazepam Oxycodone | 1mg, x1 every 8 for 15 days 15mg, x1 every 6 hours for 15 days |
| 4/9/2013 | Mauricio Garcia | Doctors Hospital | Clonazepam Oxycodone | 1mg, x1 every 8 for 21 days 15mg, x1 every 8 hours for 21 days |
| 4/30/2013 | Mauricio Garcia | Doctors Hospital | Clonazepam Oxycodone Robaxin | 1 mg, x1 every 12 hours for 21 days 15mg, x1 every 4-6 hours 750 mg, x1 every 12 hours for 21 days |
| 5/9/2013 | Mauricio Garcia | Doctors Hospital | Tramadol Hydrocodone | 50mg, #40, x 10 days          10-325mg, #24, x 6 days |
| 5/15/2013 | Mauricio Garcia James Brannon | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #10, x 10 days #30, x 10 days |
| 5/24/2013 | Mauricio Garcia James Brannon | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #10, x 10 days #30, x 10 days |
| 6/3/2013 | Mauricio Garcia James Brannon | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #21, x 21 days #60, x 21 days |
| 6/24/2013 | Mauricio Garcia | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #21, x 21 days #60, x 21 days |
| 7/15/2013 | Mauricio Garcia | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #21, x 21 days #60, x 21 days |

31

| | | | | |
|---|---|---|---|---|
| 8/2/2013 | James Brannon | Doctors Hospital | Morphine Sulfate Cap | 30mg, #7, x 7 days |
| 8/5/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #45, x 21 days<br>30mg, #42, x 21 days |
| 8/26/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #84, x 21 days<br>30mg, #42, x 21 days |
| 8/30/2013 | James Brannon | Doctors Hospital | Doryx | 100mg, #28, x 14 days |
| 9/16/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #100, x 30 days<br>30mg, #60, x 30 days |
| 10/14/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #100, x 30 days<br>30mg, #60, x 30 days |
| 11/6/2013 | James Brannon | Doctors Hospital | Oxycodone | 15mg, #28, x7 days |
| 11/11/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone | 15mg, #125, x 30 days |
| 11/27/2013 | James Brannon | Doctors Hospital | Doryx | 100 mg, #28, x 4 days |
| 12/9/2013 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone | 25mcg, 10 patches, x 30 days<br>15mg, #125, x 30 days |
| 12/27/2013 | James Brannon | Doctors Hospital | Oxycodone | 15mg, #12, x4 days |
| 12/30/2013 | James Brannon | Doctors Hospital | Oxycodone | 15mg, #28, x7 days |
| 1/6/2014 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone Alprazolam | 50mcg, 10 patches, x 30 days<br>15mg, #180, x 30 days<br>1mg, #60, x30 days |
| 2/3/2014 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone Metoprolol | 50mcg, 10 patches, x 30 days<br>15mg, #180, x30 days          50mg, #60, x 30 days |
| 3/3/2014 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone Alprazolam | 50mcg, 10 patches, x 30 days<br>15mg, #120, x 30 days<br>1mg, #60, x30 days |

| | | | | |
|---|---|---|---|---|
| 3/7/2014 | Mauricio Garcia | Pain Center | Fentanyl | 50mcg, 3 patches, x 7 days |
| 4/4/2014 | Mauricio Garcia | Pain Center | Fentanyl Oxycodone | 50mcg, 3 patches, x7 days 10mg, #28, x7 days |
| 4/10/2014 | Mauricio Garcia | Pain Center | Fentanyl Oxycodone | 50mcg, 3 patches, x7 days 10mg, #28, x7 days |
| 2/4/2015 | Mauricio Garcia | Pain Center | Oxycodone | 10mg, x1 week |
| 2/18/2015 | Mauricio Garcia | Pain Center | Oxycodone | 10mg, #45 |
| 11/11/2015 | Roger Misasi | Pain Center | Refill of current medications | Not Stated |
| 12/1/2015 | Roger Misasi | Pain Center | Did not Refill | n/a |

137.    The Defendants, through Pain Center, used the United States mails in furtherance of this scheme by submitting Health Insurance Claims Forms to Missouri Medicaid.

138.    The scheme used acts of artifice or deceit (Health Insurance Claim Forms) which are intended to deprive an owner of his property or money.

139.    These Health Insurance Claim Forms furthered the scheme.

140.    The Defendants, through Pain Center, did so with specific intent to defraud Missouri Medicaid by receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

141.    On December 8, 2015, after supplying Plaintiff with years of narcotic pain medication and subjecting Plaintiff to a wholly unnecessary surgery for a non-existent condition, PatientFirst's corporate counsel, Philip Harness, on behalf of PatientFirst, Doctors Hospital and Pain Center advised

Plaintiff by letter that Defendants would no longer prescribe narcotics to Plaintiff, despite doing so on a weekly basis for years.  (Exhibit D).

142.    Defendants submitted Health Insurance Claim Forms (attached) to Missouri Medicaid on the following dates and attached as Exhibit E:

   a.   On 10/4/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   b.   On 10/5/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   c.   On 10/5/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   d.   On 10/29/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   e.   On 10/29/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   f.   On 11/28/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   g.   On 11/28/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   h.   On 12/12/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   i.   On 12/12/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   j.   On 12/12/12 The Headache and Pain Center, PA submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   k.   On 12/12/12 The Headache and Pain Center, PA submitted a fourth bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   l.   On 1/4/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

   m.   On 1/4/13 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

n.   On 1/4/13 The Headache and Pain Center, PA submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

o.   On 1/9/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

p.   On 1/9/13 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

q.   On 1/18/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

r.   On 3/7/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

s.   On 3/7/13 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

t.   On 3/7/13 The Headache and Pain Center, PA submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

u.   On 4/8/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

v.   On 4/4/14 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

w.   On 4/4/14 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

x.   On 4/10/14 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

y.   On 3/6/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

z.   On 3/21/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

aa.   On 3/25/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

bb.   On 4/30/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

cc.   On 4/30/15 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

      dd.  On 12/7/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

      ee.  On 1/10/16 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

143.    This mail crossed state lines and is considered interstate commerce.

*Hip Surgery*

144.    The Defendants formed a scheme to defraud Plaintiff and Plaintiff's Medicaid Insurance by which Brannon, performed a highly unusual and overly expensive medical procedure to correct a non-existent problem.

145.    JPI and OSI provided the marketing and hardware for that procedure.

146.    PatientFirst and Doctors Hospital provided the facilities to perform that produce.

147.    The Titanium Hip Tool has only been cleared to treat patients with avascular necrosis. Treatment outside of that indication is not FDA approved nor is it medically indicated.

148.    On February 18, 2015, Plaintiff underwent a radiologic exam at Doctors Hospital which found among other things, "**[t]here are no radiographic findings of avascular necrosis of the femoral head.**" (Exhibit F).

149.    Despite this finding, and in contravention of its indicated purpose, Brannon used the Titanium Hip Tool as sold and delivered by his Physician Owned Distributorship, OSI.

150.    Even more telling of the lack of avascular necrosis, the intraoperative pathology which was taken during the procedure stated, **"[t]he intact bone and marrow components would argue against avascular necrosis.**" (Exhibit G).

151.    The Defendants, through Brannon, JPI, OSI, PatientFirst and Doctors Hospital, did so with specific intent to defraud Missouri Medicaid by seeking payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

36

152.     Defendants submitted Health Insurance Claim Forms to Missouri Medicaid on the following dates and attached as Exhibit H:

    a.  On 9/25/12 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    b.  On 11/13/12 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    c.  On 3/5/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    d.  On 3/7/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    e.  On 3/7/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    f.  On 3/12/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    g.  On 4/2/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    h.  On 4/15/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    i.  On 5/9/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    j.  On 5/10/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    k.  On 5/21/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    l.  On 5/22/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    m.  On 6/6/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    n.  On 6/6/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

    o.  On 6/6/13 Doctors Hospital, LLC submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

p.  On 6/6/13 Doctors Hospital, LLC submitted a fourth bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

q.  On 6/26/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

r.  On 6/26/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

s.  On 7/17/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

t.  On 7/17/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

u.  On 7/26/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

v.  On 8/2/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

w.  On 8/9/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

x.  On 8/28/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

y.  On 9/5/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

z.  On 9/10/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

aa. On 9/19/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

bb. On 10/17/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

cc. On 10/30/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

dd. On 10/30/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ee. On 11/13/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ff.   On 11/14/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

gg.   On 12/12/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

hh.   On 12/31/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ii.   On 1/3/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

jj.   On 1/10/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

kk.   On 2/6/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ll.   On 3/21/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

mm.   On 4/25/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

nn.   On 2/18/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

oo.   On 3/9/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

pp.   On 3/26/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

qq.   On 3/26/15 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

rr.   On 12/17/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

153.   This mail crossed state lines and is considered interstate commerce.

*Wire Fraud in Violation of 18 U.S.C. § 1343*

### *Pain Management Treatment*

154.     The Defendants formed a scheme to defraud Plaintiff and Plaintiff's Medicaid Insurance by which Brannon, Garcia and Pain Center issued prescriptions for narcotic pain medication which were not medically indicated and beyond prescribing practices.

155.     Receipt of money from the Plaintiff and Plaintiff's Medicaid Insurance was the object of the scheme as described above with the fraudulent Health Insurance Claims Forms.

156.     The use of the mails (as described above) furthered this scheme.

157.     Defendants intended to and did receive money from Missouri Medicaid Insurance by wire.

### *Hip Surgery*

158.     The Defendants formed a scheme to defraud Plaintiff and Plaintiff's Medicaid Insurance by which Brannon, performed a highly unusual and overly expensive medical procedure to correct a non-existent problem.

159.     JPI and OSI provided the marketing and hardware for that procedure.

160.     PatientFirst and Doctors Hospital provided the facilities to perform that produce.

161.     Receipt of money from the Plaintiff and Plaintiff's Medicaid Insurance was the object of the scheme as described above with the fraudulent Health Insurance Claims Forms.

162.     The use of the mails (as described above) furthered this scheme.

163.     Defendants intended to and did receive money from Missouri Medicaid Insurance by wire.

*Fraudulent Advertising Claims*

164.    The Defendants formed a scheme to defraud potential patients and the insurance carriers for those potential patients by disseminating patently false information regarding the cost of the Titanium Hip Tool as compared to a standard total hip arthroplasty.

165.    Specifically, Dr. Brannon, et al represent that the Hip Tool and BGSS were priced comparably to hip replacement surgery. (See Kansas City Business Journal article dated April 23, 2006, Ex N).

166.    This claim is patently false.

167.    Plaintiff's Titanium Hip Tool surgery cost $253,674.06. (*See* Exhibit H).

168.    Five days later, plaintiff underwent a total hip arthroplasty to correct the failed surgery performed by Brannon, Doctors and PatientFirst which only cost approximately $45,000.

169.    These marketing claims were transmitted over the wire (via internet) to induce unsuspecting patients and patient's insurance providers that the costs between the Titanium Hip Tool and standard total hip arthroplasty were comparable, which they are not.

170.    The object of this scheme was to obtain exponentially more money than could be recouped through a standard total hip arthroplasty.

171.    Defendants' scheme induced Missouri Medicaid Insurance to pay over 5 times more for Plaintiff's Titanium Hip Tool surgery than would have been required if Brannon, Doctors and PatientFirst simply performed a standard total hip arthroplasty.

***Dealing in a Controlled Substance in Violation of 21 U.S.C. 802 (Section 102 of the Controlled Substances Act)***

*Federal Law Violation*

172.    "'Racketeering activity' means . . . (D) any offense involving fraud connected with . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States."  18 U.S.C. § 1961.

173.    18 U.S.C. § 841 of the CSA provides: "it shall be unlawful for any person knowingly or intentionally […] to manufacture, distribute, or dispense a controlled substance by issuing a "prescription." which is "an order for medication which is dispensed to or for an ultimate user[.]"  21 C.F.R. § 1300.01.

174.    21 C.F.R. § 1306.04(a) sets forth the parameters for the lawful issuance of a controlled substance pursuant to a prescription and provides: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

175.    Brannon, Garcia and Pain Center conspired to and did violate 18 U.S.C. § 1961, 18 U.S.C. § 21 and 21 C.R.F. 1306.04(a) by writing narcotic prescriptions for Plaintiff that lacked a legitimate medical purpose and outside the usual course of their practice.

176.    Specifically, Brannon, Garcia and Pain Center had a duty to use that degree of learning and skill ordinarily possessed by members of their profession and that school of medicine in the community in which he practiced, or in similar communities, and in the application of that skill and learning, Brannon and Garcia were obligated to use ordinary care and diligence, in performing services for Plaintiff.

177.    During the many respective consultations with plaintiff, Brannon, Garcia and Pain Center knew or should have known that Plaintiff had previously utilized schedule II narcotics and/or

other drugs such that he was at an increased risk for abusing and/or becoming addicted to opioids and/or other schedule II narcotics or was already an "addict".

178.   Brannon, Garcia and Pain Center knew or should have known that once an individual becomes an "addict" they lose the "power of self-control with reference to his addiction."  21 U.S.C. § 802.

179.   Fentanyl, Oxycodone and Morphine are Schedule II narcotics.

180.   During the period of September 25, 2012 through December 1, 2015, Brannon, Garcia and Pain Center routinely prescribed to Plaintiff Schedule II narcotics, including but not limited to opioids, Oxycodone, Fentanyl and Morphine. During this same period of time, Brannon, Garcia and Pain Center were aware that these drugs are extremely addictive and that they have both an addiction-forming and an addiction-sustaining effect.

181.   Brannon, Garcia and Pain Center willfully violated their respective duties, in, among other things:

  a. Repeatedly and routinely prescribing Oxycodone, Fentanyl and Morphine and/or other schedule II narcotics to plaintiff when they were not medically necessary or justified under the circumstances.

  b. Continuing to prescribe schedule II narcotics for an extended period of time outside of their respective professional practices.

  c. Prescribing schedule II narcotics for no legitimate medical purpose.

  d. At all times mentioned in this complaint, Brannon, Garcia and Pain Center failed to document and ensure the Plaintiff had been informed and advised of the dangers, risks, alternatives, and hazards of the course of treatment or routinely prescribing extremely addictive schedule II narcotics to plaintiff.

  e. Withheld and failed to disclose to plaintiff the dangers, risks, alternatives and hazards and minimized these dangers, risks and hazards.

  f. Withheld and failed to disclose to Plaintiff financial interests in the Pain Center, PatientFirst, and the Doctors Hospital.

g.  Failed to inform Plaintiff of the contraindications for drugs he was being prescribed.

h.  Failed to recognize Plaintiff's mental, physical or neurological condition impaired the Plaintiff's ability to understand the risks he was taking by filling the prescriptions improperly written by Brannon, Garcia and Pain Center and in other respects not specifically listed, but which may arise throughout the course of discovery.

182.    As a direct and proximate result of such negligence, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

*Kansas State Law Violation*

183.    "'Racketeering activity' means . . . (D) any offense involving fraud connected with . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961.

184.    "A controlled substance shall not be distributed or dispensed except by a valid prescription order as defined in K.S.A. § 65-1626." K.S.A. § 65-4123.

185.    "'Valid prescription order' means a prescription that is issued for a legitimate medical purpose by an individual prescriber licensed by law to administer and prescribe drugs and acting in the usual course of such a prescriber's professional practice." K.S.A. § 65-4123.

186.    Brannon, Garcia and Pain Center conspired to and did violate K.S.A. § 65-4123 and K.S.A. § 65-1626 by writing narcotic prescriptions for Plaintiff that lacked a legitimate medical purpose and outside the usual course of their professional practice.

187.    Specifically, Brannon, Garcia and Pain Center had a duty to use that degree of learning and skill ordinarily possessed by members of their profession and that school of medicine in the community in which he practiced, or in similar communities, and in the application of that skill and

learning, Brannon and Garcia were obligated to use ordinary care and diligence, in performing services for Plaintiff.

188.    During the many respective consultations with plaintiff, Brannon, Garcia and Pain Center knew or should have known that Plaintiff had previously utilized schedule II narcotics and/or other drugs such that he was at an increased risk for abusing and/or becoming addicted to opioids and/or other schedule II narcotics or was already an "addict".

189.    Brannon, Garcia and Pain Center knew or should have known that once an individual becomes an "addict" they lose the "power of self-control with reference to his addiction."  21 U.S.C. § 802.

190.     Fentanyl, Oxycodone and Morphine are Schedule II narcotics.

191.    During the period of September 25, 2012 through December 1, 2015, Brannon, Garcia and Pain Center routinely prescribed to Plaintiff Schedule II narcotics, including but not limited to opioids, Oxycodone, Fentanyl and Morphine. During this same period of time, Brannon, Garcia and Pain Center were aware that these drugs are extremely addictive and that they have both an addiction-forming and an addiction-sustaining effect.

192.    Brannon, Garcia and Pain Center willfully violated their respective duties, in, among other things:

    a.  Repeatedly and routinely prescribing Oxycodone, Fentanyl and Morphine and/or other schedule II narcotics to plaintiff when they were not medically necessary or justified under the circumstances.

    b.  Continuing to prescribe schedule II narcotics for an extended period of time outside of their respective professional practices.

    c.  Prescribing schedule II narcotics for no legitimate medical purpose.

    d.  At all times mentioned in this complaint, Brannon, Garcia and Pain Center failed to document and ensure the Plaintiff had been informed and advised of the dangers, risks, alternatives, and hazards of the course of treatment or routinely prescribing extremely addictive schedule II narcotics to plaintiff.

45

e.   Withheld, and failed to disclose to plaintiff the dangers, risks, alternatives and hazards and negligently and carelessly minimized these dangers, risks and hazards.

f.   Withheld and failed to disclose to Plaintiff financial interests in the Pain Center, PatientFirst, and the Doctors Hospital.

g.   Failed to inform Plaintiff of the contraindications for drugs he was being prescribed.

h.   Failed to recognize Plaintiff's mental, physical or neurological condition impaired the Plaintiff's ability to understand the risks he was taking by filling the prescriptions improperly written by Brannon, Garcia and Pain Center and in other respects not specifically listed, but which may arise throughout the course of discovery.

193.   As a direct and proximate result of such negligence, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

***Laundering of Monetary Instruments in Violation of 18 U.S.C. § 1956***

194.   " Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-- . . . knowing that the transaction is designed in whole or in part-- . . . to avoid a transaction reporting requirement under State or Federal law . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both." 18 U.S.C.A. § 1956(a)(1)(B)(ii).

195.   The Senate Finance Committee Report on Physician Owned Distributorships noted that, "[o]verall, PODs operate in a very opaque environment and some PODs have taken steps to conceal their financial relationships." (Exhibit B at pg. 24).

196.   The enmeshed relationships between Brannon, OSI, PatientFirst and Doctors were created in order to avoid or under report obligations created by The Physician's Payments Sunshine

(Act 42 U.S.C. § 1320a-7h), The Anti-Kickback Statute (42 U.S.C. § 1320a-7b) and The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn).

197.    Such acts and omissions directly and proximately caused Plaintiff harm and also violated 18 U.S.C. § 1347, by willingly executing a scheme to defraud a healthcare benefit program, namely Plaintiff's Missouri Medicaid.

198.    As more fully described below, Brannon and OSI, and by extension, PatientFirst, Garcia and Doctors undertook a common scheme to syphon money from Missouri Medicaid under false pretenses that Plaintiff required an unusual and exorbitantly expensive procedure to correct a non-existent problem.

*The Physician's Payments Sunshine Act (42 U.S.C. § 1320a-7h)*

199.    The Physician's Payments Sunshine Act requires medical device manufacturers that are covered under Medicare, Medicaid or the Children's Health Insurance Program (CHIP) to report to CMS any payments made to physicians.

200.    Upon information and belief Brannon has failed to fully report his interests and ownership of OSI and/or payments received from OSI.

201.    Brannon has categorized himself as an employee of OSI as opposed to 90% owner.

202.    For 2015 (the year of Plaintiff's surgery), Brannon disclosed three payments from OSI totaling $315,093.21 from three separate payments.  CMS Open Payments Data (Exhibit I).

    a.    On December 15, 2015 Brannon disclosed a payment of $50,689.73 from OSI for Travel and Lodging. (Exhibit J)

    b.    On December 30, 2015 Brannon disclosed a payment of $143,851.61 from OSI which stated, "Dr. Brannon is a bona fide employee of OSI he is CEO [sic].  Dr. Brannon is not a Covered Recipient.  Nevertheless, OSI has publically reported his salary and benefits as CEO as a payment or other transfer of value since he is also a physician, owner and investor.  OSI has made a reasonable determination that the nature of the payment is most appropriately categorized as Compensation for Services Other than Consulting. (Exhibit K).

    c.   Also on December 30, 2015 Brannon disclosed a payment of $120,551.87 from OSI which stated, "Repayable loan from Orthopedic Sciences, Inc. to Dr. James K. Brannon, the President and CEO of Orthopedic Sciences." The entry does not indicate if the loan was repaid. (Exhibit L).

203.    For reference, CMS lists Brannon's received payments as $311,921.35 above the national mean for all physicians and $299,585.43 above the national mean for his specialty. (Exhibit M).

204.    Paradoxically, Brannon's total <u>number</u> of transactions (5) is 13 below the national mean for all physicians and 8 below the national mean for his specialty. *Id.*

205.    Brannon disclosed his total investment in OSI as $1,790.00 which earned him a total value of interest of $273,870.00 in 2015. *Id.*

206.    OSI and Brannon knowingly covered up the true nature of the funds paid by OSI to Brannon to avoid the transaction reporting requirements required under the CMS reporting requirements under the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h.).

207.    Such a cover ups are violations of 18 U.S.C. § 1956(a)(1)(B)(ii) and qualify as predicate acts under the RICO statutes, 18 U.S.C. § 1962 (a) & (c) and 18 U.S.C. § 1961.

208.    Plaintiff was directly and proximately harmed by these predicate acts and by the omissions of required disclosures by Brannon and OSI.

209.    Had Plaintiff known that Brannon and OSI were so intertwined he would have sought a second opinion regarding the appropriateness of treatment offered by Brannon, OSI, PatientFirst and Doctors Hospital.

210.    As such, Brannon and OSI's obfuscation of the true nature of their relationship by omission in public reporting duties under The Physician's Payments Sunshine Act 42 U.S.C. § 1320a-7h and by Brannon's direct omissions to Plaintiff misled Plaintiff into the belief that the recommended care provided by Brannon was free of inherent conflicts of interest as described above.

211.    Plaintiff relied upon these representations and omissions and directly and proximately

harmed.

*The Anti-Kickback Statute (42 U.S.C. § 1320a-7b)*

212.    The Senate Finance Committee Report (*supra*) characterized the Anti-Kickback

Statue with relation to PODs as follows:

> The Anti-Kickback Statute (AKS) prohibits offering, paying, soliciting, or
> receiving anything of value to induce or reward referrals or generate
> federal health care program business. The prohibition applies not only to
> traditional forms of remuneration, such as cash payments, but also to
> indirect payments, which could include investment opportunities,
> especially when terms of the investment are extremely advantageous for a
> physician, or where the physician-investor has a financial interest in
> generating business for the company. Criminal, civil, and administrative
> remedies may be imposed for violations of the AKS. Changes to the AKS
> in 2010 clarify that any "claim that includes items or services resulting
> from a violation of [the AKS] constitutes a false or fraudulent claim for
> purposes of [the False Claims Act]."

Staff of S. Finance Committee, Report on Physician Owned Distributorships: An Update on Key

Issues and Areas of Congressional Concern (February 2016)(citing HHS OIG, OIG Advisory Op.,

No. 97-5 (Oct. 6, 1997); HHS OIG, Special Advisory Bulletin: Contractual Joint Ventures, 68 Fed.

Reg. 23,148, 23,150 (Apr. 30, 2003) and 42 U.S.C. § 1320-a-7b(g).

213.    The Anti-Kickback Statute prohibits illegal remunerations, specifically it states:

"(b) Illegal remunerations (1) whoever knowingly and willfully solicits or receives any remuneration

(including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind-

-(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing

of any item or service for which payment may be made in whole or in part under a Federal health care

program."  42 U.S.C. § 1320(b)(1)(A).

214.    The HHS OIG Special Fraud Alert on Physician-Owned Entities reiterated HHS's

"longstanding position that the opportunity for a referring physician to earn a profit, including through

an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute. OIG views PODs as inherently suspect under the anti-kickback statute." (Exhibit A at pg. 4).

215.    OSI and Brannon knowingly covered up the true the relationship between OSI and Brannon and concealed such facts from Plaintiff.

216.    Payments received by Brannon from OSI were both directly and indirectly furnished by the cost of Plaintiff's hip surgery and the culmination of the fraud perpetrated upon Plaintiff and Plaintiff's Missouri Medicaid.

217.    A majority of the cost of the hip surgery was paid from a Federal healthcare program, namely Missouri Medicaid which is supported, in part, by Federal dollars.

218.    The money paid to OSI for Plaintiffs implantable hip product, which ultimately funneled back to Brannon, can be characterized an impermissible kickback under the Anti-Kickback Law, 42 U.S.C. § 1320(b)(1)(A).

219.    Plaintiff was directly and proximately harmed by these predicate acts and by the kickbacks received by Brannon from OSI for using the OSI manufactured hip product in Plaintiff's surgery.

220.    Had Plaintiff known that Brannon was receiving impermissible kickbacks from OSI he would have sought a second opinion regarding the appropriateness of treatment offered by Brannon, OSI and Doctors Hospital.

221.    Brannon and OSI's obfuscation of the true nature of their relationship violated the Anti-Kickback Law, 42 U.S.C. § 1320(b)(1)(A).

222.    Such kickbacks are violations of 18 U.S.C. § 1956(a)(1)(B)(ii) and qualify as predicate acts under the RICO statutes, 18 U.S.C. § 1962 (a) & (c) and 18 U.S.C. § 1961.

50

*The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn)*

223.    Senate Finance Committee Report characterized the Stark Law with relation to PODs as follows:" The Physician Self-Referral Law (42 U.S.C. § 1395nn), also known as the Stark Law, prohibits a physician from referring Medicare patients for designated health services to an entity with which the physician (or immediate family member) has a financial relationship, unless an exception applies. It also prohibits the designated health services entity, often a hospital, from submitting claims to Medicare for services resulting from a prohibited referral."  (Exhibit B at pg. 4).

224.    The Stark Law prohibits physicians from making referrals to entities for which the physician has a financial relationship, specifically it states:

> Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then--
>
>> (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>>
>> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a).

225.    Brannon had complete control over Plaintiff regarding the choice of hip implant to use during Plaintiff's surgery.

226.    Brannon referred Plaintiff to OSI's Titanium Hip Tool, for which, Brannon received compensation as the inventor and as OSI's 90% owner and president.

227.    Such conflicts of interest were not disclosed to Plaintiff and/or Brannon did not fully apprise Plaintiff regarding the extent that such a relationship created an inherent conflict of interest and in violation of 42 U.S.C. § 1395nn(a).

228.     Plaintiff was directly and proximately harmed by these predicate acts and by the self-referral payments received by Brannon from OSI for using the OSI manufactured hip product in Plaintiff's surgery.

229.     Had Plaintiff known that Brannon was receiving impermissible self-referral payments from OSI he would have sought a second opinion regarding the appropriateness of treatment offered by Brannon, OSI, PatientFirst and Doctors Hospital.

230.     Brannon and OSI knowingly violated The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn) and billed a third party payer, namely Missouri Medicaid, for the purchase and use of the Titanium Hip Tool.

231.     These violations of the Stark Law and obfuscations of the nature of the transaction between Brannon and OSI was not reported to Missouri Medicaid, which ultimately paid for the Titanium Hip Tool.

232.     These violations of the Stark Law are violations of 18 U.S.C. § 1956(a)(1)(B)(ii) and qualify as predicate acts under the RICO statutes, 18 U.S.C. § 1962 (a) & (c) and 18 U.S.C. § 1961.

## G. Damages

233.     Plaintiff has been economically damaged by Defendants violation of the RICO statute and is entitled to treble damages of his economic injuries.

234.     Plaintiff's economic damages include, but are not limited to, co-pays, out-of-pocket medical costs, increased Medicaid liens, reduced earning capacity, lost wages, incidental costs and future medical costs including drug rehabilitation treatment, therapy, orthopedic surgery, among other economic damages to be proved at trial.

235.     Plaintiff seeks his attorney's fees for this action pursuant to the RICO statute.

WHEREFORE, Plaintiff prays for judgment in Count III against All Defendants for treble economic damages, to be proved at trial, for his attorney's fees as allowed under the RICO statute, and for such other relief as the Court deems just and proper under the circumstances.

## COUNT IV – CIVIL CONSPIRACY
### (Against All Defendants)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

236.     Defendants acted with a full meeting of the minds, and with the object of deceiving Plaintiff into undergoing the March 4, 2015 surgical procedure and in engaging in the Schedule II narcotics distribution plan.   On information and belief, Defendants' conduct transcended their interactions with Plaintiff, and extended to a systematic and widespread course of conduct which involved other patients across the country as more fully set forth above.

237.     Defendants acted in order to accomplish the object of financially profiting from the unnecessary and inappropriate March 4, 2015 surgical procedure, widespread dispensing of schedule II narcotics and did in fact profit from it.

238.     As a direct result of Defendant's conspiracy, and the overt unlawful acts committed in furtherance of it, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

WHEREFORE, Plaintiff prays for judgment in Count IV against Defendants Brannon, Garcia, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter

any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT V – FRAUD
### (Against All Defendants)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

239.   Dr. Brannon made false or untrue representations as a statement of existing and material fact, including but not limited to the following:

   a.   That Plaintiff was not an appropriate candidate for total hip arthroplasty;

   b.   That Plaintiff suffered from avascular necrosis in his right hip;

   c.   That Plaintiff's condition could be appropriately treated by undergoing a procedure utilizing the Titanium Hip Tool Locking Plate Bone Graft Stabilization System;

   d.   That conservative, non-operative treatment was inappropriate for Plaintiff and would not be beneficial;

   e.   That the BGSS and HipTool and benefits that they do not have, including that they were suitable for plaintiff.

   f.    That the Hip Tool and BGSS were better, safer, and less invasive than other treatments, including but not limited to a full hip replacement, knowingly or with reason to know that such representations were exaggerated and false.

   g.    that the Hip Tool and BGSS were priced comparably to hip replacement surgery, knowingly or with reason to know that such representations were exaggerated and false. (See Kansas City Business Journal article dated April 23, 2006, Ex N).

240.   Dr. Brannon willfully failed to state material facts, and/or willfully concealed, suppressed or omitted material facts including but not limited to the following:

a.   That the procedure and use of Hip Tool Implant/system "invented" by Defendant Brannon was contraindicated by documents he personally submitted to the FDA for the following reasons, among others:

   i.   Plaintiff's age did not make him a viable candidate;

   ii.   Plaintiff suffered from medical conditions which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, including but not limited suffering from severe osteoarthritis of his right hip joint;

   iii.   Plaintiff was addicted to pain medications and suffered from mental, physical and/or neurological conditions which would foreseeably impair his ability to cooperate with the postoperative regimen.

   iv.   Plaintiff did not need core decompression/debridement of femoral head and neck followed by bone grafting.

b.   That Defendant Branon had created a Physician Owned Distributorship (aka a "POD") which created conflicts that he did not disclose nor that Plaintiff could fully understand.

c.   That PODs, such as the very one created by Dr. Brannon, are the subject of investigation and extreme concern by The Department of Health and Human Services Office of Inspector General (HHS OIG) and the subject of a Special Fraud Alert from the HHS OIG.

d.  That the creation of his POD allowed Dr. Brannon the opportunity to grant himself a steady stream of income by increasing the use of his invented products manufactured, distributed and/or sold by entities he completely owns, creating an inherent conflict of interest that could put his medical judgment at odds with plaintiff's best interests.

e.  That the OIG Special Fraud Alert states that "we do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns."

f.  That the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he generates business, could constitute illegal remuneration under the anti-kickback statute, as specially stated in the Special Fraud Alert.

g.  That pre-surgery radiology reports reflected Plaintiff did NOT suffer from AVN, the very thing Dr. Brannon convinced plaintiff necessitated his hip preservation procedure.

h.  Failing to advise plaintiff that if he underwent the Brannon Recommend hip preservation procedure that in the event he needed a full hip replacement at any time in the future (which he ended up enduring only days later), there could be additional complications and risks because of the procedure performed by Dr. Brannon.

   i.   That the hip preservation procedure recommended by Dr. Brannon is not widely accepted in the medical community.

   ii.  the dangers, risks, alternatives, and hazards of the course of treatment to be performed on Plaintiff.

      i.    In other respects not specifically listed, but which may arise throughout the course of discovery.

241.    Dr. Brannon knew that these representations and/or omissions were false or untrue, or were recklessly made without knowledge concerning them.

242.    Dr. Brannon made these representations and/or the omissions intentionally and for the purpose of inducing Plaintiff to act upon them.

243.    Plaintiff reasonably relied and acted upon the representations and/or omissions made by Dr. Brannon.

244.    In relying upon Dr. Brannon's representations and/or omissions, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

245.    When Dr. Brannon made these representations and/or omissions, he was acting individually and as an agent, employee and/or representative of Defendants OSI, JPI, PatientFirst, Pain Center and Doctors Hospital.

246.    The representations were made within the course and scope of Dr. Brannon's agency or employment with Defendants OSI, JPI, PatientFirst, Pain Center and Doctors Hospital.

247.    Upon information and belief, all defendants engaged in the fraudulent distribution of Schedule II narcotics without any legitimate purpose as more fully set forth elsewhere in this Complaint.

**WHEREFORE**, Plaintiff prays for judgment in Count V against Defendants Brannon, Garcia, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter

any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

### COUNT VI – KANSAS CONSUMER PROTECTION ACT
**(Against Defendants Brannon, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital)**

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

248.    Defendant Brannon, as the inventor of the Titanium Hip Tool Locking Plate Bone Graft Stabilization System (BGSS) engaged in the manufacture, sale and distribution of products within the state of Kansas and elsewhere.  Defendant Brannon, individually and through his various entities including OSI, JPI, PatientFirst, Pain Center and Doctors Hospital manufactured, marketed and ultimately sold to Plaintiff its BGSS product.

249.    These defendants, with respect to their interactions and transactions with Plaintiffs, were "suppliers" under K.S.A. 50-624(l).

250.    Defendants engaged in one or more deceptive acts or practices in connection with their consumer transactions with Plaintiff, including but not limited to:

    a.    Making representations knowingly or with reason to know that the BGSS and HipTool and benefits that they do not have, including that they were suitable for plaintiff.

    b.    Willfully making representations that the Hip Tool and BGSS were better, safer, and less invasive than other treatments, including but not limited to a full hip replacement, knowingly or with reason to know that such representations were exaggerated and false.

    c.    Willfully making representations that the Hip Tool and BGSS were priced comparably to hip replacement surgery, knowingly or with reason to know that such

representations were exaggerated and false. (See Kansas City Business Journal article dated April 23, 2006, Ex N).

d.  Willfully failing to state material facts, and/or willfully concealing, suppressing or omitting material facts including but not limited to the following:

    i.  That the procedure and use of Hip Tool Implant/system "invented" by Defendant Brannon was contraindicated by documents he personally submitted to the FDA for the following reasons, among others:

        1.  Plaintiff's age did not make him a viable candidate;

        2.  Plaintiff suffered from medical conditions which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, including but not limited suffering from severe osteoarthritis of his right hip joint;

        3.  Plaintiff was addicted to pain medications and suffered from mental, physical and/or neurological conditions which would foreseeably impair his ability to cooperate with the postoperative regimen.

        4.  Plaintiff did not need core decompression/debridement of femoral head and neck followed by bone grafting.

    ii.  That Defendant Branon had created a Physician Owned Distributorship (aka a "POD") which created conflicts that he did not disclose nor that Plaintiff could fully understand.

    iii.  That PODs, such as the very one created by Dr. Brannon, are the subject of investigation and extreme concern by The Department of Health and Human

Services Office of Inspector General (HHS OIG) and the subject of a Special Fraud Alert from the HHS OIG.

iv. That the creation of his POD allowed Dr. Brannon the opportunity to grant himself a steady stream of income by increasing the use of his invented products manufactured, distributed and/or sold by entities he completely owns, creating an inherent conflict of interest that could put his medical judgment at odds with plaintiff's best interests.

v. That the OIG Special Fraud Alert states that "we do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns."

vi. That the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he generates business, could constitute illegal remuneration under the anti-kickback statute, as specially stated in the Special Fraud Alert.

vii. That pre-surgery radiology reports reflected Plaintiff did NOT suffer from AVN, the very thing Dr. Brannon convinced plaintiff necessitated his hip preservation procedure.

viii. Failing to advise plaintiff that if he underwent the Brannon Recommend hip preservation procedure that in the event he needed a full hip replacement at any time in the future (which he ended up enduring only days later), there could be additional complications and risks because of the procedure performed by Dr. Brannon.

ix.     That the hip preservation procedure recommended by Dr. Brannon is not widely accepted in the medical community.

x.     the dangers, risks, alternatives, and hazards of the course of treatment to be performed on Plaintiff.

xi.     In other respects not specifically listed, but which may arise throughout the course of discovery.

e.     Pursuant to KSA 50-627(b)(2), the price of the BGSS products and procedure charged by the Defendants grossly exceeded the price at which similar products and/or procedures were obtainable in similar transactions by similar consumers

f.     In addition, plaintiff was unable to receive a material benefit from the subject of the sale of the BGSS to him.

251.     Defendants' conduct constituted "unconscionable acts and practices" under K.S.A. 50-627, in that:

a.     Defendants took advantage of Plaintiff's inability to reasonably protect his interests due to Plaintiff's physical and mental condition, ignorance and/or other similar factors; and

b.     Defendants made misleading statements of opinion on which Plaintiff was likely to rely to his detriment.

252.     As a result of Defendants' deceptive and unconscionable acts and practices, defendants unfairly and improperly profited. Pursuant to K.S.A. 50-634(b) plaintiff is entitled to the greater of damages sustained by plaintiff as determined by the jury or a civil penalty as provided by 50-636(a) each defendant is liable to plaintiff for the payment of civil penalties in a sum to be set by

the court in an amount up to $10,000.00 per violation per defendant and under either provision defendants must pay all of plaintiff's attorney's fees and expenses.

253.    Plaintiff is not asserting this cause of action against Dr. Brannon personally for personal injuries alleged to have resulted from medical negligence but is restricting this claim to those damages arising from the sale of the Product not sounding in personal injury (i.e. price gauging, etc). To the extent Dr. Brannon was acting as an employee and/or agent of the other defendants, however, plaintiff is seeking all damages against the other defendants to which he is entitled under the Kansas Consumer Protection Act.

**WHEREFORE**, Plaintiff prays for judgment in Count VI against Defendants Brannon, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

<u>**COUNT VII – BREACH OF IMPLIED WARRANTY OF FITNESS**</u>
**(Against Defendants Brannon, MD, OSI, JPI, PatientFirst and Doctors Hospital)**

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

254.    At the time of the transaction between Defendants and Plaintiff, which involved, among other things, the sale of the subject surgical products, Defendants knew or had reason to know of the particular purpose for which the products were required.

255.    Defendants knew or had reason to know that Plaintiff was relying on Defendants' skill or judgment to select or furnish suitable products for such particular purpose.

256.    Defendants' actions and conduct created an implied warranty that the products would be suitable and fit for such purpose.

257.    The products were not suitable for such purpose, and as a result, Defendants breached such warranty.

258.    As a direct result of this breach, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for judgment in Count VII against Defendants Brannon, MD, OSI, JPI, PatientFirst and Doctors Hospital for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT VIII – STRICT LIABILITY FAILURE TO WARN
### (Against Defendants Brannon, MD, OSI, JPI, P and Doctors Hospital)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

259.    Defendants sold the Hip Tool Bone Graft Stabilization System (BGSS) (The Product) in a defective condition that was unreasonably dangerous to Plaintiff and caused physical harm to Plaintiff.

260.    Defendants were in the business of making, selling, and marketing the subject product.

261.    Defendants expected that the product would, and the product did in fact, reach Plaintiff, the consumer, without substantial change in the condition in which it was sold.

262.     The subject product was defective due to inadequate warnings, and such defect existed at the time it left Defendants' hands.  Lack of warnings include, but are not limited to, failing to warn that the use of the Product is contraindicated for individuals as follows:

   a.   Individuals over the age of 50

   b.   Any medical or surgical condition which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, such as advance arthritis….

   c.   Any case not needing core decompression/debridement of the femoral head and neck followed by bone grafting.

   d.   Mental, physical or neurological conditions which may impair the patient's ability to cooperate with the postoperative regimen.

263.     The product was used by Plaintiff in an ordinary manner considering the product's characteristics and common usage, yet was dangerous to an extent beyond which would be contemplated by an ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics.

264.     The Product failed of its intended purpose and plaintiff was required to undergo a full hip replacement. As a result of the sale of Defendants' defective and unreasonably dangerous product, and its failure, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for judgment in Count VIII against Defendants Brannon, MD, OSI, JPI, PatientFirst and Doctors Hospital for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-

judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT IX:  VICARIOUS LIABILITY
### (Against Defendants OSI, JPI, and PatientFirst)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

265.    At all relevant times, Dr. Brannon was acting individually and as an agent, employee and/or representative of Defendants OSI, JPI, and PatientFirst. The acts and/or omissions committed by Dr. Brannon arose out of the course and scope of his agency or employment with Defendants OSI, JPI, PatientFirst, Pain Center and Doctors Hospital.

266.    As a direct and proximate result of such acts and/or omissions set forth in more detail elsewhere in this Complaint, for which Defendants OSI, JPI, PatientFirst, Pain Center and Doctors Hospital are vicariously liable, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for in Count IX against Defendants OSI, JPI, PatientFirst, Pain Center and Doctors Hospital for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT X: ALTER EGO LIABILITY
### (Against Defendant PatientFirst Healthcare Alliance, P.A.)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

267.    At all relevant times mentioned in this complaint defendant PatientFirst Healthcare Alliance, P.A. controlled and dominated its wholly-owned subsidiaries, defendants Pain Center and Doctors Hospital, through multiple means, including but not limited to (a) ownership of 100% of control of both The Headache & Pain Center, P.A. and Doctors Hospital, L.L.C. (b) sharing the same location at 7800 College Blvd, Overland Park, KS 66210 as The Headache & Pain Center, P.A.; (c) upon information and belief, failure to observe corporate formalities, such as sharing common employees.

268.    Upon information and belief, at all relevant times mentioned in this complaint, defendants The Pain Center, and Doctor's Hospital, were mere instrumentalities or agents of defendant PatientFirst.

269.    At all relevant times mentioned in this complaint defendant PatientFirst Healthcare Alliance, P.A. exercised such complete domination and control over defendants The Headache & Pain Center, P.A. and Doctor's Hospital, L.L.C., who were an enterprise and/or associations-in-fact engaged in predicate acts of racketeering activity.

270.    Defendant PatientFirst Healthcare Alliance, P.A.'s control and breach of duty proximately caused the injuries and unjust losses complained of in this case.

271.    Accordingly, the Court should disregard the formal corporate structures in this case and treat defendant PatientFirst Healthcare Alliance, P.A. as the alter ego of its subsidiaries and affiliates, including defendants The Headache & Pain Center, P.A. and Doctor's Hospital, L.L.C.

**WHEREFORE,** Plaintiff prays for an award of damages against defendant PatientFirst Healthcare Alliance, P.A. as the alter ego of defendants The Headache & Pain Center, P.A. and Doctor's Hospital, L.L.C., in an amount in excess of $75,000 to be determined by the jury, and for punitive damages, together with interest and costs of suit and for such other relief as is just and proper.

### COUNT XI – PUNITIVE DAMAGES
### (Against All Defendants)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

272.    Defendants' conduct herein was willful, wanton, fraudulent, grossly negligent and/or malicious, justifying the imposition of punitive or exemplary damages to punish Defendants and to deter them, and others, from engaging in like conduct.

**WHEREFORE**, Plaintiff prays for judgment in Count XI against All Defendants for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## DESIGNATION FOR PLACE OF TRIAL AND JURY DEMAND

Plaintiff hereby requests a jury trial in the United States District Court for the District of Kansas at Kansas City, Kansas, Wyandotte County.

Respectfully Submitted,

**PETERSON & ASSOCIATES, P.C.**

 /s/ David M. Peterson
David M. Peterson           #70317
Jeffery L. Norman, II       #78690
Nicholas S. Clevenger       #78230
dmp@petersonlawfirm.com
jln@petersonlawfirm.com
nsc@petersonlawfirm.com
801 W. 47th Street, Suite 107
Kansas City, Missouri 64112
(816) 531-4440
Fax: (816) 531-0660

**ATTORNEYS FOR PLAINTIFF**