## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CHARLES R. LUTTRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-2137 |
| | ) | |
| JAMES K. BRANNON, M.D., | ) | |
| ORTHOPEDIC SCIENCES, INC., | ) | Jury Trial Demanded |
| JOINT PRESERVATION INSTITUTE | ) | |
| OF KANSAS, L.L.C., | ) | |
| DOCTORS HOSPITAL, L.L.C. | ) | |
| MAURICIO GARCIA, M.D., | ) | |
| THE HEADACHE & PAIN CENTER, P.A. | ) | |
| and PATIENTFIRST HEALTHCARE | ) | |
| ALLIANCE, P.A. | ) | |

### SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, by and through his attorneys of record, and for his causes of action

against Defendants, alleges and states as follows:

### PARTIES

1.      Plaintiff is over the age of 18 years and a citizen of Missouri.

2.      Defendant James K. Brannon, M.D. **("Brannon")** is over the age of 18 years and a

citizen of Kansas.

3.      Defendant Mauricio Garcia, M.D. **("Garcia")** is over the age of 18 years and a citizen

of Kansas. Garcia can be served at 10107 West 152nd Terrace, Overland Park, KS 66221.

4.      Defendant Orthopedic Sciences, Inc. **("OSI")** is a California corporation whose

registered agent in Kansas is James K. Brannon, M.D., 11220 Meadow Lane, Leawood, Kansas

66211.

1

5.      Defendant Joint Preservation Institute of Kansas, L.L.C. **("JPI")** is a Kansas limited liability company whose registered agent in Kansas is James K. Brannon, M.D., 11220 Meadow Lane, Leawood, Kansas 66211.

6.      Defendant Doctors Hospital, L.L.C. **("Doctors Hospital")** is a Kansas limited liability company whose registered agent is Phillip S. Harness, 4901 College Boulevard, Leawood, Kansas 66211.

7.      Defendant The Headache & Pain Center, P.A. **("Pain Center")** is a Kansas Professional Association whose registered agent is Phillip S. Harness 7800 College Blvd, Ste, 200, Overland Park, KS 66210.

8.      Defendant PatientFirst Healthcare Alliance, P.A. **("PatientFirst")** is a Kansas Professional Association whose registered agent is PW&S Agent Services of Kansas, Inc., 6201 College Blvd., Ste. 500, Overland Park, KS 66211.

## **VENUE AND JURISDICTION**

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

9.      This court possesses jurisdiction under 28 U.S.C. §1332 as Plaintiff is a citizen of Missouri, Defendants Brannon, Garcia, JPI, PatientFirst, Pain Center and Doctors Hospital are citizens of Kansas, and Defendant OSI is a citizen of California or Kansas.  As such, there is complete diversity among Plaintiff and Defendants.  Venue is proper under 28 U.S.C. §1391(b)(1) because a substantial part of the events or omissions giving rise to these claims occurred within this judicial district.

## COMMON ALLEGATIONS

Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges every paragraph hereafter based upon information and belief:

10.     Brannon is a medical doctor licensed to practice medicine in Kansas, Missouri and California.

11.     Brannon is the President and majority owner of OSI.

12.     Brannon is a sales representative of OSI.

13.     Brannon is the sole member and owner of JPI.

14.     Brannon acts as an agent and sales representative of JPI.

15.     OSI manufactures, markets, sells and distributes surgical devices for profit.  These devices include the "**Titanium Hip Tool Locking Plate Bone Graft Stabilization System" (BGSS).** The products OSI manufactures, markets, sells and distributes are "single use" products.  Brannon and/or OSI designs the devices it manufactures, markets, sells and distributes, and considers them proprietary in nature.  Defendants claim that they have obtained approval from the federal government to use and market these products.  JPI actively markets, advertises and promotes these devices and the procedures associated with them.  On information and belief, Defendants have engaged in a systematic and widespread promotion of the use of these products that are "off-label" and are inconsistent with, and contrary to, any alleged use and marketing authorized under applicable rules and regulations pertaining to such products.  This marketing reached persons across the country.

16.     OSI represents on its website and elsewhere that the Hip Tool "is specifically designed to prevent or delay a total hip replacement in patients with a disease called osteonecrosis (dead bone in the hip joint)." OSI further represents that the Hip Tool device and procedure were invented by

Brannon. OSI further represents that the Hip Tool and procedure offers patients "a chance to save their hip, while using a minimally-invasive surgical technique that allows for a relatively speedy (and less painful) recovery."

17.     Brannon derives a personal financial benefit from OSI's commercial activities, including the sale of devices to physicians, facilities, patients and other health care providers.

18.     Brannon claims that the exclusive use of the OSI devices he developed and designs allegedly enables patients to avoid or postpone joint replacement surgeries, and are superior to other medical procedures for the same condition.  OSI, Brannon & JPI actively market these claims.  These procedures are performed at Pain Center and Doctors Hospital (which are owned by PatientFirst), who profit from them.

19.     Doctors Hospital and Pain Center are owned by PatientFirst. Garcia and Brannon are members of the board of directors for both the Pain Center and PatientFirst and have an ownership interest in PatientFirst.  Brannon is JPI's owner, joint preservation surgery surgeon, and the sole doctor listed on its website.

20.     JPI has a contract with Pain Center to provide joint preservation surgery at Pain Center and Doctors Hospital.  This contract is signed by Brannon as "CEO and Managing Member" of JPI.

21.     JPI is engaged part-time to actively practice only orthopedic joint preservation surgery on behalf of Pain Center and Doctors Hospital.  These surgeries are then billed by Pain Center regardless if they are performed at Doctors Hospital or Pain Center.  JPI is then paid by Pain Center and/or Doctors Hospital specifically for every joint preservation surgery performed.  JPI is also expected to provide other care to patients at Doctors Hospital and Pain Center, but upon information and belief JPI is compensated at a significantly increased rate for all joint preservation surgeries.

22.     Upon information and belief, JPI, Doctors Hospital, and/or Pain Center obtain products and devices from OSI for use in joint preservation surgeries.  Once a joint preservation surgery is performed at either Doctors Hospital or Pain Center, Doctors Hospital or Pain Center bill a patient and Missouri Medicaid for the surgery and the devices/medical supplies.  A significant majority of those payments received by Doctors Hospital and/or Pain Center for both the joint preservation procedure and the OSI supplies and devices used therein is then passed to JPI.

23.     Pain Center and/or Doctors Hospital bills for the services provided by JPI at Pain Center and Doctors Hospital.

24.     Brannon, as the "CEO and Managing Member" of JPI receives significant financial benefit from each joint preservation surgery performed at Pain Center and Doctors Hospital.

25.     Each joint preservation surgery performed by Brannon on behalf of JPI at Doctors Hospital and Pain Center uses devices manufactured and marketed by OSI.

26.     Brannon receives a financial benefit from OSI for each joint preservation surgery performed by Brannon on behalf of JPI at Doctors Hospital and Pain Center.

27.     The Plaintiff has been routinely obtaining prescriptions for narcotic medications from Pain Center, Dr. Brannon and/or Dr. Garcia since 2012, including but not limited to Fentanyl, Oxycodone, Hydrocodone, Tramadol and Morphine Sulfate.

28.     At some point in time, Plaintiff became addicted to pain medications which has permanently physically damaged Plaintiff. As a result of Plaintiff's addiction to pain medications, the fact of Plaintiff sustaining certain injuries arising from various occurrences was not reasonably ascertainable by Plaintiff until sometime after certain initial acts and/or omissions.

29.     From 2012 until early Spring of 2015, Garcia, and Brannon, were the primary physicians prescribing the Plaintiff with prescription narcotics.

30. Prescriptions for narcotic pain medications to Plaintiff from Garcia and Brannon were not medically necessary and Plaintiff paid co-pays for each office visit directly to Garcia, Brannon, Doctors Hospital, Pain Center & PatientFirst for this unnecessary medical treatment.

31. Prior to March 4, 2015, Plaintiff suffered from right hip pain. Prior to March 4, 2015, Plaintiff was seen and evaluated by Brannon for that pain, and a physician-patient relationship was established.

32. Brannon represented to Plaintiff that the cause of his right hip pain was caused, in part, by avascular necrosis (also stated as "AVN" herein) within the hip joint and/or within the right femoral head. Brannon represented to Plaintiff that while the traditional treatment for his condition was a total hip arthroplasty (total hip replacement), such a procedure for Plaintiff was unnecessarily invasive and complicated. Instead, Brannon recommended a "joint preservation" surgery, "invented" by Brannon. Brannon specifically represented to Plaintiff that the existence of avascular necrosis in Plaintiff's hip joint/right femoral head was the predominating indication and justification for the "joint preservation" surgery.

33. Brannon used his position of power and influence as Plaintiff's doctor and as a sales representative of OSI and of JPI to convince Plaintiff to undergo the joint preservation surgery for the avascular necrosis diagnosed by Brannon rather than a total hip arthroplasty. In so doing, Brannon represented to Plaintiff that a total hip arthroplasty was unnecessary and inferior to the "joint preservation" surgery.

34. On or about February 18, 2015, Plaintiff underwent an x-ray of his right hip. The x-ray was performed at and by Doctors Hospital and was interpreted by Dr. Patricia McFarlane. The images taken on February 18, 2015 revealed, among other things, that the "right femoral head, femoral neck, and intertrochanteric and subtrochanteric right femur are normal in appearance;" that there were

"no osteolytic or osteoblastic lesions" seen; and that there were "no radiographic findings of avascular necrosis of the femoral head." In addition, there were no findings of an intraosseous fracture of the femoral head or femur. In short, the x-ray demonstrated Plaintiff did not have any necrosis in his right hip.

35.     Prior to March 4, 2015, the results of the February 18, 2015 x-ray were communicated to and known by Brannon who was acting as Plaintiff's doctor and as a sales representative of OSI and JPI. Prior to March 4, 2015, Brannon had actual knowledge that there was no radiologic evidence that Plaintiff had avascular necrosis. At no time did Brannon communicate the results of the February 18, 2015 x-ray to Plaintiff.

36.     On March 4, 2015, Plaintiff underwent "joint preservation" surgery at Doctors Hospital. The surgery was performed by Brannon. Brannon's pre-operative diagnosis included "avascular necrosis" of the right hip. Brannon's post-operative diagnosis included "avascular necrosis" of the right hip. At the time Brannon made these entries in his report, he knew that Plaintiff did not have avascular necrosis of the right hip.

37.     Brannon's operative notes refer to a pre-operative MRI of Plaintiff's right hip, which allegedly revealed the existence of avascular necrosis. A pre-operative MRI of Plaintiff's right hip was never taken. When Brannon made these entries in his report, he knew that there had been no pre-operative MRI findings that Plaintiff had avascular necrosis in his right hip.

38.     Acting as a sales representative for OSI and JPI, Brannon convinced Plaintiff to purchase the BGSS and the related joint preservation surgery.

39.     During the March 4, 2015 surgical procedure, bone samples were taken from Plaintiff's right hip, including his femoral head. These samples were taken to pathology, where they

were examined after the surgery by John R. Dobson, M.D.  The examination revealed viable bone, fat and marrow, and "argued against avascular necrosis."

40.     During the March 4, 2015 surgical procedure, Brannon used surgical instruments designed, manufactured and sold by OSI and its sales representative, Brannon.  During the procedure, surgical devices designed, manufactured and sold by Brannon and/or OSI were implanted into Plaintiff's body, including a hip tool locking plate and compression screw.  Doctors Hospital charged Plaintiff $131,371.56 for surgical equipment and devices designed, manufactured and sold by Brannon and/or OSI, for which Brannon and/or OSI received financial compensation.  In addition, Doctors Hospital charged Plaintiff an additional $115,097.96 for the "joint preservation" surgery sold by Brannon as agent and sales representative of JPI which Brannon allegedly performed on behalf of JPI and for which he takes credit as its inventor.

41.     Upon information and belief JPI received significant payments for both the procedure and the associated OSI devices and supplies as a result of the joint preservation surgery ordered and performed by Brannon at Doctors Hospital on Plaintiff.

42.     Upon information and belief the significant contractual payments made to JPI due to Brannon's performance of a joint preservation surgery on Plaintiff ultimately were distributed, at least in part, to Brannon.

43.     Upon information and belief the significant contractual payments made to JPI as a result of Brannon's performance of a joint preservation surgery on Plaintiff ultimately were distributed, at least in part, to OSI.

44.     Upon information and belief OSI received significant payments for supplies used during the joint preservation surgery ordered and performed by Brannon on Plaintiff and for sale of the BGSS by OSI's sales representative, Brannon, to Plaintiff.

45.     Upon information and belief, the significant portions of the payments made to OSI by Missouri Medicaid and Plaintiff through Doctors Hospital, Pain Center, Patient First, and JPI for implantation of the BGSS were distributed, to Brannon in the form of both above the table payments and periodic "loans" from OSI to Brannon.

46.     Upon information and belief, Missouri Medicaid patients were selected, at least in part, for joint preservation surgery because Doctors Hospital and Pain Center could bill separately for the surgery and for supplies used in the surgery.  This allowed separate billing for the OSI products, for which Plaintiff was billed $131,371.56 following the March 4, 2015 joint preservation surgery. Plaintiff and Missouri Medicaid both directly paid for the unnecessary medical treatment of the BGSS surgery Plaintiff received from Brannon, JPI, OSI, Doctors Hospital, Pain Center and PatientFirst.

47.     Plaintiff and Missouri Medicaid both directly paid for the unnecessary medical treatment of prolonged narcotic pain medication prescriptions (which included the cost of numerous office visits) as supplied by Brannon, Garcia, Doctors Hospital, Pain Center and PatientFirst

48.     Upon information and belief, Brannon, Garcia, Doctors Hospital, Pain Center, and PatientFirst specifically sought out Missouri Medicaid patients in order to maximize their personal financial gains.

49.     Upon information and belief Brannon received significantly higher personal profit for performing the joint preservation surgery as opposed to any other treatment he could have provided.

50.     Upon information and belief Brannon, Garcia, Doctors Hospital, Pain Center and PatientFirst routinely charge patients and patient's health insurance for services or products not provided to that patient.

51.     Upon information and belief Brannon ordered the joint preservation surgery, and deterred Plaintiff from obtaining other treatment for his own personal financial gain.

52.     Upon information and belief, Brannon performed the joint preservation surgery on Plaintiff for his own personal financial gain.

53.     Upon information and belief Brannon has ordered and performed multiple joint preservation surgeries which were not medically necessary for his own personal financial gain on Plaintiff.

54.     Upon information and belief Brannon has ordered and performed joint preservation surgeries along with JPI, OSI, Doctors Hospital, Pain Center and PatientFirst which were and are not medically necessary on multiple patients for his own personal financial gain and continue to do so to this day.

55.     Upon information and belief Garcia, Brannon, Pain Center, Doctors Hospital, OSI, PatientFirst and JPI continue to conspire to seek out and retain as patients persons that are on Missouri Medicaid to overprescribe narcotic pain medications to those persons and perform unnecessary medical treatment and surgeries for financial gain which flows from receiving payments for that unnecessary medical treatment.

56.     Following the March 4, 2015 surgery, Plaintiff experienced severe pain and discomfort in his right hip.  He elected to see David W. Anderson, M.D.  After examination and consultation, Dr. Anderson ascertained that Plaintiff had a displaced right femoral head fracture that had been caused by the surgical devices implanted by Brannon.  Dr. Anderson determined that the March 4, 2015 surgery, including the surgical hardware used by Brannon, had failed. He also diagnosed that Plaintiff suffered from severe osteoarthritis of the right hip, a clear contraindication for the surgery performed days before by Dr. Brannon.

57.     On March 9, 2015, Dr. Anderson performed a surgical procedure on Plaintiff at the University of Kansas Hospital.  The surgery was a conversion of Plaintiff's prior hip surgery to a right

total hip arthroplasty.  During the surgery, a bone core sample was taken of Plaintiff's right femoral head and sent to pathology.  The pathology results confirmed that there was no evidence of any avascular necrosis within the femoral head.  Pre- and post-operative imaging studies ordered by Dr. Anderson likewise revealed the absence of avascular necrosis.

58.     Following the March 9, 2015 procedure, Plaintiff continued to suffer from pain and discomfort in his right hip.  Multiple procedures were necessary in an attempt to alleviate and treat Plaintiff's pain.  Plaintiff continues to experience pain and discomfort in his right hip.

59.     Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst perpetrated a complex and intricate fraud which required 1.) a patient and 2.) a readily available source of revenue.

60.     In order to extract as much money as possible from Plaintiff and Plaintiff's Medicaid, Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst undertook a common enterprise to supply Plaintiff with powerful narcotic pain medications and convince him that he required a highly unusual and overly expensive medical procedure to correct a non-existent problem.

61.     Brannon and Garcia overprescribed narcotic pain medications to Plaintiff which was unnecessary medical treatment.

62.     Doctors Hospital and Pain Center billed Plaintiff and Plaintiff's Missouri Medicaid for the unnecessary medical treatment of over-prescription of unnecessary narcotic pain medications.

63.     Plaintiff and Plaintiff's Missouri Medicaid paid for the unnecessary medical treatment of office visits.

64.     PatientFirst oversaw and directed and/or is vicariously liable for the actions of its agents and employees concerning the allocation of the illicitly received funds for the unnecessary medical treatment of over-prescription of unnecessary narcotic pain medications and funneled those funds to Brannon, Garcia, JPI, Doctors Hospital and Pain Center.  Brannon, as Plaintiff's doctor,

purposefully misdiagnosed Plaintiff with various medical problems which purportedly required surgical intervention, including but not limited to surgeries which occurred as follows:

    a.   December 18, 2012 right shoulder surgery at a billed cost of $213,478.07;

    b.   July 23, 2013 left shoulder surgery at a billed cost of $422,761.12;

    c.   November 6, 2013 right hip surgery at a billed cost of $125,787.18;

    d.   December 30, 2013 left hip surgery at a billed cost of $76,695.71; and

    e.   March 4, 2015 right hip surgery at a billed cost of $253,674.07.

65.    Plaintiff and Plaintiff's Missouri Medicaid paid for each of these medically unnecessary surgeries.

66.    Specifically with reference to Plaintiff's March 4, 2015 right hip surgery, Brannon, as Plaintiff's doctor, purposefully misdiagnosed Plaintiff with AVN.

67.    Then Brannon, as OSI's sales representative, convinced Plaintiff to purchase the BGSS to treat his non-existent AVN.

68.    Brannon ordered the BGSS from OSI through its sales representative, Brannon.

69.    OSI sent the BGSS to JPI and billed Doctors Hospital and Pain Center for the device with full knowledge and intention that the cost of the BGSS would be billed to Plaintiff and Plaintiff's Missouri Medicaid through the mail.

70.    Doctors Hospital and Pain Center billed Plaintiff and Plaintiff's Missouri Medicaid for the March 4, 2015 surgery, which included costs for services provided by Brannon as the surgeon for JPI and for the BGSS as supplied by OSI to Doctors Hospital and Pain Center.

71.    Doctors Hospital and Pain Center received payment from Plaintiff and Plaintiff's Missouri Medicaid for services and materials for the March 4, 2015 surgery and distributed those

funds to Brannon (as surgeon), JPI (as Brannon's practice group), OSI for the "cost" of the BGSS, and PatientFirst as the owner of Doctors Hospital and Pain Center.

72.     PatientFirst then distributed profits for the unnecessary medical treatment to Brannon and Garcia.

73.     OSI then funneled the profits for the unnecessary medical treatment back to Brannon as the sales representative of OSI and implanting doctor for the BGSS in the form of a "loan."

74.     Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst executed this plan and once Plaintiff had served his intended purpose, Defendants severed ties leaving Plaintiff physically disabled and financially crippled.

75.     To accomplish this fraud, Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst created an entangled set of medical practices which include a Physician-Owned Distributorship ("POD") and a physician-owned ambulatory surgical center ("ASC") and physician-owned pain management clinic.

76.     As will be discussed below, POD's present an inherent conflict of interests that put a physician's medical judgment at odds with the patient's best interests.

77.     Dr. Brannon began his POD development while practicing medicine in Los Angeles, California at the Martin Luther King Jr./Drew Medical Center, a county hospital in Los Angeles, CA. The Martin Luther King/Drew Medical Center's purchases of products distributed by Dr. Brannon's POD empire were questioned as potential violations of county conflict-of-interest laws, much the same way the March 2013 Special Fraud Alert is questioning POD arrangements.

78.     Dr. Brannon then reopened shop in Kansas City on February 28, 2005. Dr. Brannon landed a Directorship of the Joint Preservation Center (JPC) at Truman Medical Centers wherein all of the products invented by Dr. Brannon were utilized. At the JPC, Dr. Brannon served as the director

13

and medically treated patients from areas extending far beyond TMC's catchment area.  He claims these activities were the result of his inventions and substantially increased his academic, social, political and financial wealth.   Dr. Brannon further stated that "these activities are identical to those performed by him in California prior to relocating to Kansas On February 28, 2005."

79.     Dr. Brannon has now moved his POD away from TMC and into his own operations.

### PODs Compromise Patient Safety as Patients Receive High-Risk Treatment Beyond What is Medically Warranted

80.     A Physician-Owned Distributorship or "POD" derives revenue from selling or arranging for the sale of implantable medical devices ordered by their physician-owners for use in procedures performed by the physician-owner.

81.     The Office of Inspector General for the U.S. Department of Health and Human Services (the "OIG" and "HHS") issued a Special Fraud Alert on March 26, 2013 stating that "PODs are inherently suspect under the anti-kickback statute [Section 1128B(b) of the Social Security Act]" and that "[f]inancial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the devices the PODs sell in lieu of other, potentially more clinically appropriate, devices." Department of Health and Human Services, Office of Inspector General, Special Fraud Alert: Physician-Owned Entities (March 26, 2013)(Exhibit A).

82.     Among other findings, the OIG stated:

a.  "Longstanding OIG guidance makes clear that the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute." *Id at pg. 2*

b.  "This Special Fraud Alert reiterates our longstanding position that the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute." *Id at pg. 4*

14

c. "Because the investment risk associated with PODs is often minimal, a high rate of return increases both the likelihood that one purpose of the arrangement is to enable the physician-owners to profit from their ability to dictate the implantable devices to be purchased for their patients and the potential that the physician-owner's medical judgment will be distorted by financial incentives." *Id at pg. 4*

d. "The risk of fraud and abuse is particularly high in circumstances when such physicians-owners are the sole (or nearly the sole) users of the devices sold or manufactured by their PODs." *Id at pg. 4*

e. "We are particularly concerned about the presence of such financial incentives in the implantable medical device context because such devices typically are 'physician preference items,' meaning that both the choice of brand and the type of device may be made or strongly influenced by the physician, rather than being controlled by the hospital or ASC where the procedure is performed." *Id at pg. 2*

f. "We do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns." *Id at pg. 2*

83.    The United States Senate Finance Committee endorsed these findings in a report detailing its concerns regarding Physician Owned Distributorships and further stated that "SFAs [Special Fraud Alerts (*supra*)] are extremely significant warning HHS OIG only releases for particularly egregious issues, as illustrated by the fact that only five SFAs have been issued in the past 15 years." Staff of S. Finance Committee, Report on Physician Owned Distributorships: An Update on Key Issues and Areas of Congressional Concern (February 2016)(Exhibit B).

84.    Among other findings, the Committee stated:

a. "POD physicians have been on notice about the illegality of POD arrangements for a long time." *Id. at pg. 13*

b. "PODs present an inherent conflict of interest that can put the physician's medical judgment at odds with the patient's best interests." *Id. at pg. 19*

c. "As stated by the HHS OIG in the 2013 SFA, financial transactions involving PODs may violate the Anti-Kickback Statute, Stark Law, or both." *Id. at pg. 2*

d.  "Overutilization may occur if physicians perform additional, more complex, or medically unnecessary surgeries to garner POD financial incentives." *Id. at pg. 2*

e.  "As a result of potential conflicts of interest and overutilization, PODs compromise patient safety as patients receive high-risk treatment beyond what is medically warranted. Any unnecessary medical procedure increases the risk that the patient may be harmed." *Id. at pg. 3*

f.  "The Anti-Kickback Statute (AKS) prohibits offering, paying, soliciting, or receiving anything of value to induce or reward referrals or generate federal health care program business. The prohibition applies not only to traditional forms of remuneration, such as cash payments, but also to indirect payments, which could include investment opportunities, especially when terms of the investment are extremely advantageous for a physician, or where the physician-investor has a financial interest in generating business for the company." *Id. at pg. 4.*

g.  "Because of the AKS ascribes criminal liability to both parties in an impermissible kickback, hospitals and health care facilities that work PODs may also be criminally liable under the AKS." *Id. at pg. 7*

h.  "The Physician Self-Referral Law (42 U.S.C. § 1395nn), also known as the Stark Law, prohibits a physician from referring Medicare patients for designated health services to an entity with which the physician (or immediate family member) has a financial relationship, unless an exception applies. It also prohibits the designated health services entity, often a hospital, from submitting claims to Medicare for services resulting from a prohibited referral." *Id. at pg. 4*

i.  "When physicians have a financial incentive to recommend and perform a surgery, a potential conflict of interest can occur and jeopardize the health of patients." *Id. at pg. 6*

j.  "It appears that PODs are no longer concentrated in large hospital chains, many of which have adopted policies forbidding or strictly curtailing business with PODs. Perhaps to avoid strict compliance environments, PODs appear to be migrating to smaller and more rural hospitals, which have not yet developed POD-specific policies." *Id. at pg. 16*

k.  "The Committee is particularly concerned about the POD model spreading to other types of medical implants, including hip, knee, and other joint replacements as well as in prosthetics and orthotics." *Id. at pg. 17*

16

85.     On August 13, 2015, the OIG issued a Memorandum Report titled: Overlap between Physician-Owned Hospitals and Physician-Owned Distributors.  (Exhibit C)

86.     The purpose of the report was to analyze to what extent there is overlap between owners of physician-owned hospitals and physician-owned distributorships with regards to spinal fusion surgeries.

87.     The memorandum concluded that, "[t]ransparency of ownership is important for the Department of Health and Human Services to ensure that providers do not violate the referral and billing prohibitions of the Stark Law (also known as the Physician Self-Referral Law) and that they comply with OIG exclusion and the Anti-Kickback Statute.   Additionally, the transparency of ownership information may have implications for patient safety and quality of care."  Memorandum from the Department of Health and Human Services Office of Inspector General, to Andrew Slavitt, Acting Administrator Centers for Medicare and Medicaid Services (August 13, 2015).

**Defendants Entangled Medical Practices Were Designed to Defraud Plaintiff**

88.     The entangled and interconnected medical practices owned by Defendants facilitated and did defraud Plaintiff.

89.     Without these interwoven relationships, Plaintiff's medical care would have been overseen by independent medical practitioners who could have stepped in and halted this fraudulent course.

90.     But because Defendants' interwoven ownership relationships each had interest in all aspects of the medical practices which served Plaintiff before and through his surgery, Defendants were able to conceal their fraud from detection from any outside third party.

91.     The following is a brief description of how Defendants' enterprise and associations-in-fact were and are organized to facilitate the fraud perpetrated upon Plaintiff and continuing frauds perpetrated on other patients in a similar fashion.

*PatientFirst*

a.   Brannon has an ownership interest in PatientFirst and is on its Board of Directors.

b.   Garcia has an ownership interest in PatientFirst and is on its Board of Directors.

c.   Upon information and belief, Brannon and Garcia are the sole owners of PatientFirst.

d.   PatientFirst is the sole shareholder of the Pain Center.

e.   PatientFirst is 100% owner of Doctor's Hospital.

*Pain Center*

f.   Upon information and belief, Brannon and Garcia are the sole two members of the Board of Directors for the Pain Center.

g.   The Pain Center over medicated Plaintiff for years through prescriptions written by Brannon and Garcia.

h.   Pain center is owned by PatientFirst.

i.   Pain Center contracted with JPI to pay JPI significantly more for each joint preservation surgery performed by Brannon at Pain Center than it would for any other surgery performed by JPI or Brannon.

*Doctors Hospital*

j.   PatientFirst is a shareholder of Doctors Hospital which is an ambulatory surgical center ("ASC").

k.   PatientFirst is 100% owner of Doctors Hospital.

l.  Within the contract between Pain Center and JPI, it was agreed that JPI would be paid significantly more for each joint preservation surgery performed by Brannon/JPI at Doctors Hospital than it would for any other treatment JPI would provide at Doctors Hospital.

m.  Doctors Hospital is the ASC where Plaintiff's joint preservation surgery was performed.

n.  Doctors Hospital could bill for any services performed at Pain Center.

o.  Pain Center could bill for any services performed at Doctors Hospital

### *JPI*

p.  Brannon is the vested designated manager of JPI which markets the BGSS for interstate commerce.

q.  Brannon 100% owner of JPI.

r.  JPI has a contract to be compensated significantly more for each joint preservation surgery performed at Doctors Hospital or Pain Center by Brannon than for any other treatment performed by JPI at these facilities.

s.  Brannon acts as a sales representative for the joint preservation surgery on behalf of JPI.

### *OSI*

t.  Brannon is the president and 90% owner of OSI.

u.  Brannon is a sales representative of OSI and markets OSI's products directly to the public, including Plaintiff.

v.  OSI manufactures the BGSS for sale.

w.  OSI sold the BGSS to Doctors Hospital, Pain Center and/or JPI at Brannon's behest, for Plaintiff's surgery.

x.  Brannon implanted the BGSS, sold by OSI to Doctors Hospital, into Plaintiff.

92.     Brannon is the co-owner of PatientFirst, which is the sole shareholder of Doctors Hospital and fully owns Pain Center.  Brannon is the owner and operator of JPI, and a 90% owner of OSI.

93.     Upon information and belief Doctors Hospital and Pain Center actively recruit Missouri Medicaid recipients, such as Plaintiff, at the instruction or with the knowledge of PatientFirst.

94.     These Missouri Medicaid patients, such as Plaintiff, are then grossly overprescribed unnecessary opioid pain medications by Pain Center and Doctors Hospital creating an addiction and a biological need for the prescription opioid pain medications which keeps the patients, such as Plaintiff, returning to Doctors Hospital and Pain Center for "treatment."

95.     Once the Missouri Medicaid patients, such as Plaintiff, have a biological need for the prescribed opioid pain medications, Brannon then orders medically unnecessary joint preservation surgeries which are performed by JPI who is compensated through its contract with Pain Center.

96.     These joint preservation surgeries use supplies and devices manufactured and provided by OSI for which OSI is compensated and for which Brannon is a sales representative.

97.     A significant majority of patient and insurance payments for joint preservation surgeries performed by Brannon at Doctors Hospital and Pain Center is provided to JPI by Pain Center/Doctors Hospital. Brannon acts as an agent and sales representative of JPI in advocating to patients, such as Plaintiff, for the joint preservation surgery and against other options.

20

98.     OSI and JPI have direct knowledge that these procedures are medically unnecessary and have direct knowledge that these procedures will be billed through the mail to Missouri Medicaid and patients, and paid through the mail by Missouri Medicaid and patients.

99.     Doctors Hospital and Pain Center know these procedures are medically unnecessary, yet cause bills for this unnecessary treatment to be provided through the mail to patients, such as Plaintiff, and insurers, such as Missouri Medicaid, for payment through the mail.  This is all done with the knowledge and at the behest of PatientFirst.

100.    Further, JPI and OSI have direct knowledge that Plaintiff will incur a co-pay and other expenses as a result of the medically unnecessary treatment.

101.    Plaintiff is billed a co-pay by Doctors Hospital and Pain Center for the medically unnecessary treatment.

102.    PatientFirst, Brannon and Garcia are each individually directly aware of the medically unnecessary treatment being provided to Missouri Medicaid patients, including Plaintiff, of the billing sent to Missouri Medicaid through the mail for the medically unnecessary treatment, for the payments received through the mail from Missouri Medicaid for the medically unnecessary treatment, and of the co-pays and other expenses incurred by patients, including Plaintiff, as a result of this medically unnecessary treatment.

103.    This is done for the personal financial benefit of the individuals and entities involved at the expense of their Missouri Medicaid patients, including Plaintiff.

104.    The structure of the web of entities is laid out in such a manner such as to avoid various government reporting requirements in place to prevent schemes such as this.

## COUNT I – PROFESSIONAL NEGLIGENCE
### (Against Defendant Brannon, MD)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

105.   In performing services for Plaintiff, Dr. Brannon had a duty to use that degree of learning and skill ordinarily possessed by members of his profession and that school of medicine in the community in which he practiced, or in similar communities, and in the application of that skill and learning, Dr. Brannon was obligated to use ordinary care and diligence.

106.   On or about March 4, 2015 Defendant Brannon performed a right hip preservation procedure on Plaintiff.

107.   In performing the March 4, 2015 procedure, Dr. Brannon violated his duty, and was thereby negligent, in the following ways, among others:

   a.   Recommending and performing a procedure that was not medically-indicated or appropriate under the circumstances;

   b.   Utilizing procedures, instruments and devices that were not appropriate or suitable to treat the patient;

   c.   Proceeding with the hip preservation procedure and the use of the BGSS when he knew or should have known that plaintiff was not an appropriate candidate for this procedure and that the procedure was contraindicated as stated in documents personally submitted by Defendant Brannon to the FDA. (See  Draft Package Insert submitted to the FDA as part of the 510K approval process, Exhibit O) The procedure was contraindicated for the following reasons, among others:

      i.   Plaintiff's age did not make him a viable candidate;

      ii.    Plaintiff suffered from medical conditions which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, including but not limited to suffering from severe osteoarthritis of his right hip joint;

      iii.   Plaintiff was addicted to pain medications and suffered from mental, physical and/or neurological conditions which would foreseeably impair his ability to cooperate with the postoperative regimen.

      iv.   Plaintiff did not need core decompression/debridement of femoral head and neck followed by bone grafting.

d.   In performing an alleged labral repair without the prior consent of Plaintiff and without his knowledge and without a diagnosis of such.

e.   Failing to order appropriate pre-operative tests and studies to accurately ascertain Plaintiff's true medical condition;

f.   Disregarding the results of pre-operative tests and studies;

g.   Representing to Plaintiff that he had avascular necrosis in his right hip when Dr. Brannon knew or should have known that he did not;

h.   Persuading Plaintiff to forego a total hip arthroplasty and/or other treatment options and to instead undergo a procedure that was not appropriate under the circumstances;

i.   By performing the joint preservation procedure and by utilizing the BGSS, Dr. Brannon drilled material out of plaintiff's right hip bone and femoral head, thereby weakening the bone.  As a direct and proximate result of this procedure, Plaintiff

sustained a right hip fracture only days following the alleged "hip preservation" procedure performed by Defendant Brannon.

j.   Failing to use the appropriate degree of learning and skill, and failing to use ordinary care and diligence in performing the March 4, 2015 procedure which thereafter resulted in a failed deep implant of his hip and a displaced right femoral neck fracture, requiring emergency surgery only days after the alleged joint preservation.

k.   Utilizing techniques and devices for a purpose and to treat a condition that had not been approved under appropriate and applicable regulations, and which constituted an "off-label" use that was inappropriate and negligent under the circumstances; and

l.   At all times mentioned in this complaint, Brannon, negligently and carelessly failed to document and properly ensure that Plaintiff had been adequately informed and advised of the dangers, risks, alternatives, benefits, and hazards of the course of treatment to be performed on Plaintiff. Brannon negligently and carelessly concealed, withheld, and failed to disclose to Plaintiff the dangers, risks, alternatives and hazards and negligently and carelessly minimized these dangers, risks and hazards. Brannon induced and obtained the consent of Plaintiff to perform the right hip procedure on March 4, 2015 by concealing, withholding and minimizing the dangers and risks, hazards, and alternatives. Brannon negligently and carelessly concealed, withheld and failed to disclose and/or to adequately disclose to Plaintiff his financial interests in the Pain Center, PatientFirst, JPI, OSI,

24

and Doctors Hospital. Brannon further negligently and carelessly failed to inform Plaintiff of the contraindications for the procedure.

m. In other respects, not specifically listed, but which may arise throughout the course of discovery.

108. As a direct and proximate result of such negligence, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for judgment in Count I against Defendant Brannon, MD for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT II – LACK OF INFORMED CONSENT
### (Against Defendant Brannon, MD)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

109. In performing services for Plaintiff, Dr. Brannon had a duty to use that degree of learning and skill ordinarily possessed by members of his profession and that school of medicine in the community in which he practiced, or in similar communities, and in the application of that skill and learning, Dr. Brannon was obligated to use ordinary care and diligence.

110. In performing the March 4, 2015 procedure, Dr. Brannon violated his duty, and was thereby negligent, by failing to make a reasonable disclosure to Plaintiff of the nature and probable consequences of the suggested hip preservation procedure, including the dangers within his

knowledge, the many contraindications of the procedure, the multitude of conflicts he had, among other things.

111. Defendant Brannon failed to disclose, among other things, the following:

a. That the procedure and use of the Hip Tool Implant/system and BGSS "invented" by Defendant Brannon was contraindicated by documents he personally submitted to the FDA for the following reasons, among others:

i. Plaintiff's age did not make him a viable candidate;

ii. Plaintiff suffered from medical conditions which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, including but not limited to suffering from severe osteoarthritis of his right hip joint;

iii. Plaintiff was addicted to pain medications and suffered from mental, physical and/or neurological conditions which would foreseeably impair his ability to cooperate with the postoperative regimen.

iv. Plaintiff did not need core decompression/debridement of femoral head and neck followed by bone grafting.

b. That Defendant Brannon had created a Physician Owned Distributorship (aka a "POD") which created conflicts that he did not disclose nor that Plaintiff could fully understand.

c. That PODs, such as the very one created by Dr. Brannon, are the subject of investigation and extreme concern by The Department of Health and Human Services Office of Inspector General (HHS OIG) and the subject of a Special Fraud Alert from the HHS OIG.

d.  That the creation of his POD allowed Dr. Brannon the opportunity to grant himself a steady stream of income by increasing the use of his invented products manufactured, distributed and/or sold by entities he completely owns, creating an inherent conflict of interest that could put his medical judgment at odds with plaintiff's best interests.

e.  That the OIG Special Fraud Alert states that "we do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns."

f.  That the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he generates business, could constitute illegal remuneration under the anti-kickback statute, as specially stated in the Special Fraud Alert.

g.  That pre-surgery radiology reports reflected Plaintiff did NOT suffer from AVN, the very thing Dr. Brannon convinced plaintiff necessitated his hip preservation procedure.

h.  Failing to advise Plaintiff that if he underwent the Brannon recommend hip preservation procedure that in the event he needed a full hip replacement at any time in the future (which he ended up enduring only days later), there could be additional complications and risks because of the procedure performed by Dr. Brannon.

i.  That the hip preservation procedure recommended by Dr. Brannon is not widely accepted in the medical community.

j.   The dangers, risks, alternatives, and hazards of the course of treatment to be performed on Plaintiff.

k.   In other respects not specifically listed, but which may arise throughout the course of discovery.

112.    Brannon, negligently and carelessly failed to document and properly ensure that Plaintiff had been informed and advised as set forth herein, and carelessly minimized these dangers, risks, hazards and other information.  Had Dr. Brannon made a reasonable disclosure to Plaintiff, Plaintiff would not have undergone the hip preservation procedure performed by Dr. Brannon.

113.    As a direct and proximate result of such negligence, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

WHEREFORE, Plaintiff prays for judgment in Count II against Defendant Brannon, for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT III - VIOLATIONS OF THE RICO STATUTE 18 U.S.C. § 1962(c)
### (Against All Defendants)

### A. Introduction

114.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

115.    Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst perpetrated a complex and intricate fraud which required 1.) a patient and 2.) a readily available source of revenue.

116.    To be clear, Plaintiff's RICO allegation damages are strictly limited to the money that he directly paid out-of-pocket to Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst for unnecessary medical treatment.

117.    In the context of the RICO allegations, money paid by Missouri Medicaid to Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst are additional predicate acts under RICO.

118.    In order to extract as much money as possible from Plaintiff and Plaintiff's Missouri Medicaid, Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst undertook a common enterprise to supply Plaintiff with powerful narcotic pain medications and convince him that he required a highly unusual and overly expensive medical procedures to correct a non-existent problem.

119.    Brannon and Garcia overprescribed narcotic pain medications to Plaintiff which was unnecessary medical treatment.

120.    Doctors Hospital and Pain Center billed Plaintiff and Plaintiff's Missouri Medicaid for the unnecessary medical treatment of over-prescription of unnecessary narcotic pain medications.

121.    Plaintiff and Plaintiff's Missouri Medicaid paid for the unnecessary medical treatment of office visits.

122.    PatientFirst oversaw and directed and/or is vicariously liable for the actions of its agents and employees concerning the allocation of the illicitly received funds for the unnecessary medical treatment of over-prescription of unnecessary narcotic pain medications and funneled those funds to Brannon, Garcia, JPI, Doctors Hospital and Pain Center.

123.     Brannon, as Plaintiff's doctor, purposefully misdiagnosed Plaintiff with various medical problems which purportedly required surgical intervention, including but not limited to surgeries which occurred as follows:

a.    December 18, 2012 right shoulder surgery at a billed cost of $213,478.07;

b.    July 23, 2013 left shoulder surgery at a billed cost of $422,761.12;

c.    November 6, 2013 right hip surgery at a billed cost of $125,787.18;

d.    December 30, 2013 left hip surgery at a billed cost of $76,695.71; and

e.    March 4, 2015 right hip surgery at a billed cost of $253,674.07.

124.     Plaintiff and Plaintiff's Missouri Medicaid paid for each of these medically unnecessary surgeries.

125.     Specifically with reference to Plaintiff's March 4, 2015 right hip surgery, Brannon, as Plaintiff's doctor, purposefully misdiagnosed Plaintiff with AVN.

126.     Then Brannon, as OSI and JPI's sales representative, convinced Plaintiff to purchase the BGSS and have an unnecessary joint preservation surgery for his non-existent AVN.

127.     Brannon ordered the BGSS from OSI through its sales representative, Brannon.

128.     Plaintiff was sold the BGSS by OSI through its sales representative, Brannon.

129.     Plaintiff was sold the joint preservation surgery by JPI through its sales representative, Brannon.

130.     OSI sent the BGSS to JPI and billed JPI or Doctors Hospital/Pain Center for the device with full knowledge and intention that the cost of the BGSS would billed to Plaintiff and Plaintiff's Missouri Medicaid through the mail.

131.    Doctors Hospital and Pain Center billed Plaintiff and Plaintiff's Missouri Medicaid for the March 4, 2015 surgery, which included costs for services provided by Brannon/JPI as the surgeon and for the BGSS as supplied by OSI to JPI or Doctors Hospital or Pain Center.

132.    Doctors Hospital and Pain Center received payment from Plaintiff and Plaintiff's Missouri Medicaid for services and materials for the March 4, 2015 surgery and distributed those funds to Brannon (as surgeon), JPI (as Brannon's practice group), OSI for the "cost" of the BGSS, and PatientFirst as the owner of Doctors Hospital and Pain Center.

133.    PatientFirst then distributed profits for the unnecessary medical treatment to Brannon and Garcia.

134.    OSI funneled the profits for the unnecessary medical treatment back to Brannon as the sales representative of OSI and implanting doctor for the BGSS in the form of a "loan."

135.    Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst executed this plan and once Plaintiff had served his intended purpose, Defendants severed ties leaving Plaintiff financially crippled.


136.    To accomplish this fraud, Defendants created an entangled set of medical practices which include a Physician-Owned Distributorship ("POD") and a physician-owned ambulatory surgical center ("ASC") and physician-owned pain management clinic.

137.    As will be discussed below, POD's present an inherent conflict of interests that put a physician's medical judgment at odds with the patient's best interests.

138.    Defendants engaged in conduct which is prohibited by 18 U.S.C. § 1962.

139.    Plaintiff was economically injured by reason of Defendants pattern of racketeering activity which violated 18 U.S.C. § 1962.

31

140.     Plaintiff has standing to bring these RICO claims because Plaintiff was economically injured and experienced violations of Plaintiff's property by making payments to Brannon, Garcia, JPI, OSI, Doctors Hospital, Pain Center and PatientFirst for unnecessary medical treatment..

141.     At all times pertinent to this suit, Defendants formed an enterprise and associations-in-fact with each other or exerted direct control over each.

142.     Defendant's enterprise and/or associations-in-fact were and are involved in interstate commerce.

143.     Defendants' enterprise and/or associations-in-fact conspired to and did engage in "racketeering activity" in violation of 18 U.S.C. § 1961 by committing and/or engaging in:

  a.   Mail fraud in violation of the United States Mail Fraud Act, 18 U.S.C. § 1341;

  b.   Wire fraud in violation of 18 U.S.C. § 1343;

  c.   Dealing in a controlled substance in violation of 18 U.S.C. § 1961, 18 U.S.C. § 841, and 21 C.F.R. § 1306.04(a); and

  d.   Laundering of Monetary Instruments in Violation of 18 U.S.C. § 1956:

    i.   CMS reporting requirements under the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h.);

    ii.  The Anti-Kickback Statute (42 U.S.C. § 1320a-7b);

    iii. The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn); and

    iv.  Health care fraud under 18 U.S.C § 1347.

144.     Defendants committed at least two "predicate acts" of "racketeering activity" within ten years

145.     The enterprise and associations-in-fact were run through and by these racketeering activities.

146.     Plaintiff was directly and proximately harmed by the predicate acts of racketeering activity as more fully described below.

147.    Upon information and belief, Defendants predicate acts of racketeering as described more fully in this Complaint have been perpetrated against other patients beyond Plaintiff and continue to this day.

148.    Upon information and belief, Defendants continue to engage in a pattern of fraudulently billing patients and patients' health care for unnecessary medical treatment in the same manner as they defrauded Plaintiff as described herein.

### B.  PODs Compromise Patient Safety as Patients Receive High-Risk Treatment Beyond What is Medically Warranted

149.    A Physician-Owned Distributorship or "POD" derives revenue from selling or arranging for the sale of implantable medical devices ordered by their physician-owners for use in procedures performed by the physician-owner.

150.    The Office of Inspector General for the U.S. Department of Health and Human Services (the "OIG" and "HHS") issued a Special Fraud Alert on March 26, 2013 stating that "PODs are inherently suspect under the anti-kickback statute [Section 1128B(b) of the Social Security Act]" and that "[f]inancial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the devices the PODs sell in lieu of other, potentially more clinically appropriate, devices." Department of Health and Human Services, Office of Inspector General, Special Fraud Alert: Physician-Owned Entities (March 26, 2013)(Exhibit A).

151.    Among other findings, the OIG stated:

a.    "Longstanding OIG guidance makes clear that the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute." *Id at pg. 2*

b.    "This Special Fraud Alert reiterates our longstanding position that the opportunity for a referring physician to earn a profit, including through an

investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute." *Id at pg. 4*

c. "Because the investment risk associated with PODs is often minimal, a high rate of return increases both the likelihood that one purpose of the arrangement is to enable the physician-owners to profit from their ability to dictate the implantable devices to be purchased for their patients and the potential that the physician-owner's medical judgment will be distorted by financial incentives." *Id at pg. 4*

d. "The risk of fraud and abuse is particularly high in circumstances when such physicians-owners are the sole (or nearly the sole) users of the devices sold or manufactured by their PODs." *Id at pg. 4*

e. "We are particularly concerned about the presence of such financial incentives in the implantable medical device context because such devices typically are 'physician preference items,' meaning that both the choice of brand and the type of device may be made or strongly influenced by the physician, rather than being controlled by the hospital or ASC where the procedure is performed." *Id at pg. 2*

f. "We do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns." *Id at pg. 2*

152.    The United States Senate Finance Committee endorsed these findings in a report detailing its concerns regarding Physician Owned Distributorships and further stated that "SFAs [Special Fraud Alerts (*supra*)] are extremely significant warning HHS OIG only releases for particularly egregious issues, as illustrated by the fact that only five SFAs have been issued in the past 15 years." Staff of S. Finance Committee, Report on Physician Owned Distributorships: An Update on Key Issues and Areas of Congressional Concern (February 2016)(Exhibit B).

153.    Among other findings, the Committee stated:

a. "POD physicians have been on notice about the illegality of POD arrangements for a long time." *Id. at pg. 13*

b. "PODs present an inherent conflict of interest that can put the physician's medical judgment at odds with the patient's best interests." *Id. at pg. 19*

c. "As stated by the HHS OIG in the 2013 SFA, financial transactions involving PODs may violate the Anti-Kickback Statute, Stark Law, or both." *Id. at pg. 2*

d. "Overutilization may occur if physicians perform additional, more complex, or medically unnecessary surgeries to garner POD financial incentives." *Id. at pg. 2*

e. "As a result of potential conflicts of interest and overutilization, PODs compromise patient safety as patients receive high-risk treatment beyond what is medically warranted. Any unnecessary medical procedure increases the risk that the patient may be harmed." *Id. at pg. 3*

f. "The Anti-Kickback Statute (AKS) prohibits offering, paying, soliciting, or receiving anything of value to induce or reward referrals or generate federal health care program business. The prohibition applies not only to traditional forms of remuneration, such as cash payments, but also to indirect payments, which could include investment opportunities, especially when terms of the investment are extremely advantageous for a physician, or where the physician-investor has a financial interest in generating business for the company." *Id. at pg. 4.*

g. "Because of the AKS ascribes criminal liability to both parties in an impermissible kickback, hospitals and health care facilities that work PODs may also be criminally liable under the AKS." *Id. at pg. 7*

h. "The Physician Self-Referral Law (42 U.S.C. § 1395nn), also known as the Stark Law, prohibits a physician from referring Medicare patients for designated health services to an entity with which the physician (or immediate family member) has a financial relationship, unless an exception applies. It also prohibits the designated health services entity, often a hospital, from submitting claims to Medicare for services resulting from a prohibited referral." *Id. at pg. 4*

i. "When physicians have a financial incentive to recommend and perform a surgery, a potential conflict of interest can occur and jeopardize the health of patients." *Id. at pg. 6*

j. "It appears that PODs are no longer concentrated in large hospital chains, many of which have adopted policies forbidding or strictly curtailing business with PODs. Perhaps to avoid strict compliance environments, PODs appear to be migrating to smaller and more rural hospitals, which have not yet developed POD-specific policies." *Id. at pg. 16*

k. "The Committee is particularly concerned about the POD model spreading to other types of medical implants, including hip, knee, and other joint replacements as well as in prosthetics and orthotics." *Id. at pg. 17*

154.   On August 13, 2015, the OIG issued a Memorandum Report titled: Overlap between Physician-Owned Hospitals and Physician-Owned Distributors.  (Exhibit C)

155.     The purpose of the report was to analyze to what extent there is overlap between owners of physician-owned hospitals and physician-owned distributorships with regards to spinal fusion surgeries.

156.     The memorandum concluded that, "[t]ransparency of ownership is important for the Department of Health and Human Services to ensure that providers do not violate the referral and billing prohibitions of the Stark Law (also known as the Physician Self-Referral Law) and that they comply with OIG exclusion and the Anti-Kickback Statute.   Additionally, the transparency of ownership information may have implications for patient safety and quality of care."  Memorandum from the Department of Health and Human Services Office of Inspector General, to Andrew Slavitt, Acting Administrator Centers for Medicare and Medicaid Services (August 13, 2015).

**C.  Defendants Entangled Medical Practices Were Designed to Defraud Plaintiff and Others**

157.     The entangled and interconnected medical practices owned by Defendants facilitated fraud and did defraud Plaintiff.

158.     Without these interwoven relationships, Plaintiff's medical care would have been overseen by independent medical practitioners who could have stepped in and halted this fraudulent course.

159.     But because of Defendants' interwoven ownership relationships each had interest in all aspects of the medical practices which served Plaintiff before and through his surgery, Defendants were able to conceal their fraud.

160.     The following is a brief description of how Defendants enterprise and associations-in-fact was organized to facilitate the fraud perpetrated upon Plaintiff.

*PatientFirst*

161.     Brannon has an ownership interest in PatientFirst and is on its Board of Directors.

36

162.     Garcia has an ownership interest in PatientFirst and is on its Board of Directors.

163.     Upon information and belief, Brannon and Garcia are the sole owners of PatientFirst.

164.     PatientFirst is the sole shareholder of the Pain Center.

*165.*     PatientFirst is 100% owner of Doctor's Hospital.

*Pain Center*

166.     Upon information and belief, Brannon and Garcia are the sole two members of the Board of Directors for the Pain Center.

167.     The Pain Center over medicated Plaintiff for years through prescriptions written by Brannon and Garcia.

168.     JPI has contracted with Pain Center to perform joint preservation surgeries Pain Center, and to be compensated significantly more for performing joint preservation surgeries than for other treatment it may provide.

169.     Pain Center was permitted to bill for any treatment performed at Doctors Hospital.

*Doctors Hospital*

170.     PatientFirst is a shareholder of Doctors Hospital which is an ambulatory surgical center ("ASC").

171.     PatientFirst is 100% owner of Doctors Hospital.

172.     Doctors Hospital is the ASC where Plaintiff's hip surgery was performed.

173.     Doctors Hospital is bound by the contract between Pain Center and JPI for JPI/Brannon to perform joint preservation surgeries at Doctors Hospital and to be compensated significantly more for joint preservation surgeries than for other treatment provided by Brannon at Doctors Hospital.

174.     Doctors Hospital could bill for any treatment performed at Pain Center.

*JPI*

175.    Brannon is the vested designated manager of JPI which markets the BGSS for interstate commerce.

176.    Brannon 100% owner of JPI.

177.    JPI has contracted to perform joint preservation surgeries at Doctors Hospital and Pain Center, and to be compensated significantly more for performing joint preservation surgeries than for other treatment it may provide.

178.    Brannon acts as an agent and sales representative to patients for joint preservation surgeries on behalf of JPI.

*OSI*

179.    Brannon is the president and 90% owner of OSI.

180.    Brannon is a sales representative for OSI and actively markets OSI's products, including the BGSS, directly to patients and did so with Plaintiff.

181.    OSI manufactures the BGSS for sale.

182.    OSI sold the BGSS directly to Plaintiff through its sales representative, Brannon.

183.    OSI sold the BGSS to JPI or Doctor's Hospital, at Brannon's behest, for Plaintiff's surgery.

184.    Brannon as an agent of JPI implanted the BGSS, sold by OSI to JPI or Doctor's Hospital, into Plaintiff.

185.    Brannon is an agent of OSI as its sales representative, and acts as its agent and sales representative in selling OSI devices to patients, including Plaintiff.

## D. Culpable "Persons"

186.    Each and every Defendant is a culpable person under the RICO statute, 18 U.S.C. § 1962.

187.    Brannon is a citizen of Kansas and a medical doctor.  Brannon is considered a person for the purposes of 18 U.S.C. § 1962.

188.    Garcia is a citizen of Kansas and a medical doctor.  Garcia is considered a person for the purposes of 18 U.S.C. § 1962.

189.    PatientFirst is a registered Kansas Professional Association which transacts business in interstate commerce and which is wholly owned by Bannon and Garcia.  PatientFirst is considered a person for the purposes of 18 U.S.C. § 1962.

190.    Pain Center is a registered Kansas Professional Association which transacts business in interstate commerce and which is wholly owned by Bannon and Garcia, who both sit as the Board of Directors.  Pain Center is considered a person for the purposes of 18 U.S.C. § 1962.

191.    Doctors Hospital is a Kansas limited liability company which transacts business in interstate commerce and to which PatientFirst is a shareholder.  Doctors Hospital is considered a person for the purposes of 18 U.S.C. § 1962.

192.    JPI is a Kansas limited liability company which transacts business in interstate commerce and which Brannon is the vested designated manager.  JPI is considered a person for the purposes of 18 U.S.C. § 1962.

193.    OSI is a California corporation which transacts business in interstate commerce and which Brannon is the president and 90% owner.  OSI is considered a person for the purposes of 18 U.S.C. § 1962.

### E.  Mental State

194.    Each and every Defendant intended to engage in and did engage in illegal activities which qualify as predicate acts under the RICO statute, 18 U.S.C. § 1962.

195.    Each and every Defendant engaged in these predicate illegal acts willfully and with full knowledge of the illegality of their common scheme.

196.    Plaintiff was directly and proximately injured by Defendants predicate acts.

### F.  Racketeering Activity

197.    Defendants engaged in the following activity in violation of 18 U.S.C. § 1961:

    a.  Mail fraud in violation of the United States Mail Fraud Act, 18 U.S.C. § 1341;

    b.  Wire fraud in violation of 18 U.S.C. § 1343;

    c.  Dealing in a controlled substance in violation of 18 U.S.C. § 1961, 18 U.S.C. § 841, 21 C.F.R. § 1306.04(a) ; and

    d.  Laundering of Monetary Instruments in Violation of 18 U.S.C. § 1956:

        i.  CMS reporting requirements under the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h.);

        ii.  The Anti-Kickback Statute (42 U.S.C. § 1320a-7b);

        iii.  The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn); and

        iv.  Health care fraud under 18 U.S.C § 1347.

198.    These violations were a pattern of racketeering evidencing more than two predicate acts over the span of 10 years.  Below, Plaintiff identifies dozens of predicate acts of racketeering activity over the span of roughly four years.

199.    All of these predicate acts of racketeering activity had an economic motive, specifically to syphon as much money as possible from patients and patients' health insurance providers and to convert profits from the sale of implantable medical devices or the long-term patient usage of narcotics.

200.    Upon information and belief, a portion of the profits derived from the predicate acts of racketeering activity were invested back into OSI, JPI, PatientFirst and Doctors Hospital.

201.    But for these reinvestments, Brannon and OSI would not have been in a position to continue to operate and sell the BGSS which directly and proximately harmed Plaintiff.

***Mail Fraud in Violation of United States Mail Fraud Act, 18 U.S.C. § 1341***

*Pain Management Treatment*

202.    The Defendants, each and every one, formed a scheme to defraud Plaintiff and Plaintiff's Missouri Medicaid by which Brannon, Garcia and Pain Center issued prescriptions for narcotic pain medication which were not medically indicated and beyond prescribing practices.

203.    These unnecessary prescriptions facilitated two goals:

    a.   Each office visit provided an opportunity for Brannon, Garcia and Pain Center to bill Plaintiff and Plaintiff's Medicaid Insurance

    b.   Plaintiff became hopelessly addicted to pain medication which over time reduced his pain threshold and made him more willing to proceed with a risky and unnecessary surgery for a non-existent condition.

204.    Brannon, Garcia, Doctors Hospital and Pain Center supplied narcotic medication to Plaintiff, including but not necessarily limited to the following:

| Date | Prescribing Physician | Facility | Drug Name | Dosage |
|------|----------------------|----------|-----------|--------|
| 9/25/2012 | Mauricio Garcia | Doctors Hospital | Oxycodone Robaxin | 10mg, x1 every 8 hours for 10 days 750mg, 1x every 6 hours for 15 days |
| 11/13/2012 | James Brannon | Doctors Hospital | Oxycodone | 15mg, x1 every 6-8 hours for 15 days |
| 12/18/2012 | Mauricio Garcia James Brannon | Doctors Hospital | Oxycodone | 20mg, x1 every 4-6 hours for 7 days |

41

| | | | | |
|---|---|---|---|---|
| 12/28/2012 | James Brannon | Doctors Hospital | No narcotics | N/a |
| 2/7/2013 | Mauricio Garcia Michael Lowrey | Doctors Hospital | Oxycodone | 20mg, x1 every 6 hours for 20 days |
| 2/27/2013 | Mauricio Garcia Michael Lowrey | Doctors Hospital | N/A | N/A |
| 3/7/2013 | Mauricio Garcia Michael Lowrey | Doctors Hospital | Alprazolam Oxycodone | 1mg, 1 as needed for 5 days 15mg, x1 every 6 hours for 10 days |
| 3/29/2013 | Mauricio Garcia | Doctors Hospital | Clonazepam Oxycodone | 1mg, x1 every 8 for 15 days 15mg, x1 every 6 hours for 15 days |
| 4/9/2013 | Mauricio Garcia | Doctors Hospital | Clonazepam Oxycodone | 1mg, x1 every 8 for 21 days 15mg, x1 every 8 hours for 21 days |
| 4/30/2013 | Mauricio Garcia | Doctors Hospital | Clonazepam Oxycodone Robaxin | 1 mg, x1 every 12 hours for 21 days 15mg, x1 every 4-6 hours 750 mg, x1 every 12 hours for 21 days |
| 5/9/2013 | Mauricio Garcia | Doctors Hospital | Tramadol Hydrocodone | 50mg, #40, x 10 days       10-325mg, #24, x 6 days |
| 5/15/2013 | Mauricio Garcia James Brannon | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #10, x 10 days #30, x 10 days |
| 5/24/2013 | Mauricio Garcia James Brannon | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #10, x 10 days #30, x 10 days |
| 6/3/2013 | Mauricio Garcia James Brannon | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #21, x 21 days #60, x 21 days |

| | | | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #21, x 21 days #60, x 21 days |
|---|---|---|---|---|
| 6/24/2013 | Mauricio Garcia | Doctors Hospital | | |
| 7/15/2013 | Mauricio Garcia | Doctors Hospital | Morphine Sulfate Cap Morphine Sulfate ER Tab | 30mg, #21, x 21 days #60, x 21 days |
| 8/2/2013 | James Brannon | Doctors Hospital | Morphine Sulfate Cap | 30mg, #7, x 7 days |
| 8/5/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #45, x 21 days 30mg, #42, x 21 days |
| 8/26/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #84, x 21 days 30mg, #42, x 21 days |
| 8/30/2013 | James Brannon | Doctors Hospital | Doryx | 100mg, #28, x 14 days |
| 9/16/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #100, x 30 days 30mg, #60, x 30 days |
| 10/14/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone MS Contin | 15mg, #100, x 30 days 30mg, #60, x 30 days |
| 11/6/2013 | James Brannon | Doctors Hospital | Oxycodone | 15mg, #28, x7 days |
| 11/11/2013 | Mauricio Garcia | Doctors Hospital | Oxycodone | 15mg, #125, x 30 days |
| 11/27/2013 | James Brannon | Doctors Hospital | Doryx | 100 mg, #28, x 4 days |
| 12/9/2013 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone | 25mcg, 10 patches, x 30 days 15mg, #125, x 30 days |
| 12/27/2013 | James Brannon | Doctors Hospital | Oxycodone | 15mg, #12, x4 days |
| 12/30/2013 | James Brannon | Doctors Hospital | Oxycodone | 15mg, #28, x7 days |

| | | | | |
|---|---|---|---|---|
| 1/6/2014 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone Alprazolam | 50mcg, 10 patches, x 30 days 15mg, #180, x 30 days 1mg, #60, x30 days |
| 2/3/2014 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone Metoprolol | 50mcg, 10 patches, x 30 days 15mg, #180, x30 days        50mg, #60, x 30 days |
| 3/3/2014 | Mauricio Garcia | Doctors Hospital | Fentanyl Oxycodone Alprazolam | 50mcg, 10 patches, x 30 days 15mg, #120, x 30 days 1mg, #60, x30 days |
| 3/7/2014 | Mauricio Garcia | Pain Center | Fentanyl | 50mcg, 3 patches, x 7 days |
| 4/4/2014 | Mauricio Garcia | Pain Center | Fentanyl Oxycodone | 50mcg, 3 patches, x7 days 10mg, #28, x7 days |
| 4/10/2014 | Mauricio Garcia | Pain Center | Fentanyl Oxycodone | 50mcg, 3 patches, x7 days 10mg, #28, x7 days |
| 2/4/2015 | Mauricio Garcia | Pain Center | Oxycodone | 10mg, x1 week |
| 2/18/2015 | Mauricio Garcia | Pain Center | Oxycodone | 10mg, #45 |
| 11/11/2015 | Roger Misasi | Pain Center | Refill of current medications | Not Stated |
| 12/1/2015 | Roger Misasi | Pain Center | Did not Refill | n/a |

205.    The scheme used acts of artifice or deceit (Health Insurance Claim Forms) which are intended to deprive an owner of his property or money.

206.    These Health Insurance Claim Forms furthered the scheme.

207.    The Defendants, through Pain Center, did so with specific intent to defraud Missouri Medicaid by receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

208.     On December 8, 2015, after supplying Plaintiff with years of narcotic pain medication and subjecting Plaintiff to a wholly unnecessary surgery for a non-existent condition, PatientFirst's corporate counsel, Philip Harness, on behalf of PatientFirst, Doctors Hospital and Pain Center advised Plaintiff by letter that Defendants would no longer prescribe narcotics to Plaintiff, despite doing so on a weekly basis for years.  (Exhibit D).

209.     Defendants submitted Health Insurance Claim Forms (attached) to Missouri Medicaid on the following dates and attached as Exhibit E:

a.  On 10/4/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

b.  On 10/5/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

c.  On 10/5/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

d.  On 10/29/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

e.  On 10/29/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

f.  On 11/28/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

g.  On 11/28/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

h.  On 12/12/12 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

i.  On 12/12/12 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

j.  On 12/12/12 The Headache and Pain Center, PA submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

k.  On 12/12/12 The Headache and Pain Center, PA submitted a fourth bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

l.   On 1/4/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

m.   On 1/4/13 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

n.   On 1/4/13 The Headache and Pain Center, PA submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

o.   On 1/9/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

p.   On 1/9/13 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

q.   On 1/18/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

r.   On 3/7/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

s.   On 3/7/13 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

t.   On 3/7/13 The Headache and Pain Center, PA submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

u.   On 4/8/13 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

v.   On 4/4/14 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

w.   On 4/4/14 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

x.   On 4/10/14 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

y.   On 3/6/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

z.   On 3/21/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

aa.  On 3/25/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

bb. On 4/30/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

cc. On 4/30/15 The Headache and Pain Center, PA submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

dd. On 12/7/15 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ee. On 1/10/16 The Headache and Pain Center, PA submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

210.    This mail crossed state lines and is considered interstate commerce.

211.    The Defendants, through Doctors Hospital and Pain Center, used the United States mails in furtherance of this scheme by submitting Health Insurance Claims Forms to Missouri Medicaid and bills directly to Plaintiff for office visits which concluded with prescriptions for narcotic pain medication which was not medically indicated and beyond prescribing practices.

a. PatientFirst

   i.   Upon information and belief PatientFirst, owned by Brannon and Garcia, is the owner of Pain Center and the sole shareholder of Doctors Hospital and Pain Center.

   ii.  Upon information and belief PatientFirst had knowledge that use of the mail by Doctors Hospital and Pain Center would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

   iii. Upon information and belief PatientFirst had knowledge that payment was being received by Doctors Hospital and Pain Center through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

   iv.  Upon information and belief, PatientFirst as the owner of Pain Center and sole shareholder of Doctors Hospital, received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

   v.   Upon information and belief, Pain Center and Doctors Hospital billing could be submitted by either entity regardless of where or by whom treatment was performed.

vi. Upon information and belief PatientFirst caused Doctors Hospital and Pain Center to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

b. Doctors Hospital

i. Upon information and belief Doctors Hospital used the mail to submit false claim forms to Missouri Medicaid and bills to Plaintiff for unnecessary medical treatment because the treatment was not indicated for Plaintiff's condition.

ii. Upon information and belief Doctors Hospital intended to use and did use the mail to submit fraudulent bills to Missouri Medicaid and Plaintiff for unnecessary medical treatment.

iii. Upon information and belief Doctors Hospital submitted fraudulent bills to Missouri Medicaid and Plaintiff for unnecessary medical treatment provided at Pain Center.

iv. Upon information and belief Doctors Hospital submitted such fraudulent bills with full knowledge that Brannon and Garcia were providing unnecessary medical treatment to Plaintiff because the treatment was not indicated by Plaintiff's condition.

v. Upon information and belief Doctors Hospital submitted such fraudulent bills with full knowledge that Brannon and Garcia were continuing to over-prescribe narcotic pain medication to Plaintiff to sell Plaintiff additional unnecessary and contraindicated medical procedures such as the March 4, 2015 right hip surgery where Plaintiff was implanted with the BGSS manufactured and sold by OSI and OSI's sales representative, Brannon.

c. Pain Center

i. Upon information and belief Pain Center used the mail to submit false claim forms to Missouri Medicaid and bills to Plaintiff for unnecessary medical treatment because the treatment was not indicated for Plaintiff's condition.

ii. Upon information and belief Pain Center intended to use and did use the mail to submit fraudulent bills to Missouri Medicaid and Plaintiff for unnecessary medical treatment.

iii. Upon information and belief Pain Center submitted fraudulent bills to Missouri Medicaid and Plaintiff for unnecessary medical treatment provided at Doctors Hospital.

iv.  Upon information and belief Pain Center submitted such fraudulent bills with full knowledge that Brannon and Garcia were providing unnecessary medical treatment to Plaintiff because the treatment was not indicated by Plaintiff's condition.

v.  Upon information and belief Pain Center submitted such fraudulent bills with full knowledge that Brannon and Garcia were continuing to over-prescribe narcotic pain medication to Plaintiff to sell Plaintiff additional unnecessary and contraindicated medical procedures such as the March 4, 2015 right hip surgery where Plaintiff was implanted with the BGSS manufactured and sold by OSI and OSI's sales representative, Brannon.

d.  Brannon

i.  Upon information and belief Brannon had knowledge that use of the mail by Doctors Hospital and Pain Center would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

ii.  Upon information and belief Brannon had knowledge that payment was being received by Doctors Hospital and Pain Center through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

iii.  Upon information and belief, Brannon as an owner of PatientFirst which owns Pain Center and sole shareholder of Doctors Hospital, received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

iv.  Upon information and belief Brannon, as sole owner of JPI and 90% owner of OSI, received financial benefit from these bills, intended to defraud, submitted and paid via the US Mail.

v.  Upon information and belief Brannon caused Doctors Hospital and Pain Center to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

e.  Garcia

i.  Upon information and belief Garcia had knowledge that use of the mail by Doctors Hospital and Pain Center would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

49

ii. Upon information and belief Garcia had knowledge that payment was being received by Doctors Hospital and Pain Center through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

iii. Upon information and belief, Garcia as an owner of PatientFirst which owns Pain Center and sole shareholder of Doctors Hospital, received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

iv. Upon information and belief Garcia caused Doctors Hospital and Pain Center to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

f. JPI

i. Upon information and belief JPI had knowledge that use of the mail by Doctors Hospital and Pain Center would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

ii. Upon information and belief JPI had knowledge that payment was being received by Doctors Hospital and Pain Center through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

iii. Upon information and belief, JPI as owned by Brannon, received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

iv. Upon information and belief, JPI stood to gain and did gain financial benefit from Brannon, Garcia, PatientFirst, Doctors Hospital and Pain Center's continued contraindicated and over-prescription of narcotic pain medications because Plaintiff was ultimately convinced to undergo expensive and unnecessary surgeries.

v. Upon information and belief JPI aided and abetted the mail fraud offenses committed by Doctors Hospital and Pain Center to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

g. OSI

    i. Upon information and belief OSI had knowledge that use of the mail by Doctors Hospital and Pain Center would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

    ii. Upon information and belief OSI had knowledge that payment was being received by Doctors Hospital and Pain Center through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

    iii. Upon information and belief, OSI as owned by Brannon, received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

    iv. Upon information and belief, OSI stood to gain and did gain financial benefit from Brannon, Garcia, PatientFirst, Doctors Hospital and Pain Center's continued contraindicated and over-prescription of narcotic pain medications because Plaintiff was ultimately convinced to undergo expensive and unnecessary surgeries.

    v. Upon information and belief OSI aided and abetted the mail fraud offenses committed by Doctors Hospital and Pain Center to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

### *Hip Surgery*

212.    The Defendants formed a scheme to defraud Plaintiff and Plaintiff's Medicaid Insurance by which Brannon, performed a highly unusual and overly expensive medical procedure to correct a non-existent problem.

213.    JPI and OSI provided the marketing, services and hardware for that procedure.

214.    PatientFirst and Doctors Hospital provided the facilities to perform that produce.

215.    The BGSS has only been cleared to treat patients with avascular necrosis. Treatment outside of that indication is not FDA approved nor is it medically indicated.

216.    On February 18, 2015, Plaintiff underwent a radiologic exam at Doctors Hospital which found among other things, "**[t]here are no radiographic findings of avascular necrosis of the femoral head.**" (Exhibit F).

217.    Despite this finding, and in contravention of its indicated purpose, Brannon used the BGSS as sold and delivered by his Physician Owned Distributorship, OSI.

218.    Even more telling of the lack of avascular necrosis, the intraoperative pathology which was taken during the procedure stated, **"[t]he intact bone and marrow components would argue against avascular necrosis.**" (Exhibit G).

219.    The Defendants, through Brannon, JPI, OSI, PatientFirst and Doctors Hospital, did so with specific intent to defraud Missouri Medicaid by seeking payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

220.    Defendants submitted Health Insurance Claim Forms to Missouri Medicaid on the following dates and attached as Exhibit H:

a.    On 9/25/12 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

b.    On 11/13/12 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

c.    On 3/5/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

d.    On 3/7/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

e.    On 3/7/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

f.    On 3/12/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

g.    On 4/2/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

h.   On 4/15/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

i.   On 5/9/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

j.   On 5/10/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

k.   On 5/21/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

l.   On 5/22/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

m.   On 6/6/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

n.   On 6/6/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

o.   On 6/6/13 Doctors Hospital, LLC submitted a third bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

p.   On 6/6/13 Doctors Hospital, LLC submitted a fourth bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

q.   On 6/26/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

r.   On 6/26/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

s.   On 7/17/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

t.   On 7/17/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

u.   On 7/26/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

v.   On 8/2/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

w.   On 8/9/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

x. On 8/28/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

y. On 9/5/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

z. On 9/10/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

aa. On 9/19/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

bb. On 10/17/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

cc. On 10/30/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

dd. On 10/30/13 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ee. On 11/13/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ff. On 11/14/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

gg. On 12/12/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

hh. On 12/31/13 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ii. On 1/3/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

jj. On 1/10/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

kk. On 2/6/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

ll. On 3/21/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

mm. On 4/25/14 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

nn. On 2/18/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

oo. On 3/9/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

pp. On 3/26/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

qq. On 3/26/15 Doctors Hospital, LLC submitted a second bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

rr. On 12/17/15 Doctors Hospital, LLC submitted a bill related to the care and treatment of Charles Luttrell to MO Healthnet Division.

221.    This mail crossed state lines and is considered interstate commerce.

222.    The Defendants, through Brannon, OSI, JPI, and Doctors Hospital, used the United States mails in furtherance of this scheme by submitting Health Insurance Claims Forms to Missouri Medicaid and bills directly to Plaintiff for the unnecessary medical treatment which ultimately culminated with the implantation of the BGSS.

a.   Brannon

i.   Upon information and belief Brannon had knowledge that use of the mail by Pain Center, Doctors Hospital and/or PatientFirst would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

ii.   Upon information and belief Brannon had knowledge that payment was being received by Pain Center, Doctors Hospital and/or PatientFirst through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

iii.   Upon information and belief, Brannon received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

iv.   Upon information and belief Brannon caused Pain Center, Doctors Hospital and/or PatientFirst to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

b.  OSI

    i.  Upon information and belief OSI had knowledge that use of the mail by Doctors Hospital, Pain Center and/or PatientFirst would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

    ii.  Upon information and belief OSI had knowledge that payment was being received by Doctors Hospital, Pain Center and/or PatientFirst through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

    iii.  Upon information and belief, OSI received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

    iv.  Upon information and belief OSI caused Doctors Hospital, Pain Center and/or PatientFirst to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

c.  JPI

    i.  Upon information and belief JPI had knowledge that use of the mail by Doctors Hospital, Pain Center and/or Patient First would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

    ii.  Upon information and belief JPI had knowledge that payment was being received by Doctors Hospital, Pain Center and/or PatientFirst through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

    iii.  Upon information and belief, JPI received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

    iv.  Upon information and belief JPI caused Doctors Hospital, Pain Center and/or PatientFirst to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

d.  PatientFirst

    i.  Upon information and belief PatientFirst, owned by Brannon and Garcia, is the sole shareholder of Doctors Hospital.

    ii.  Upon information and belief, PatientFirst, owned by Brannon and Garcia, is the owner of Pain Center.

    iii.  Upon information and belief PatientFirst had knowledge that use of the mail by Doctors Hospital and/or Pain Center would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

    iv.  Upon information and belief PatientFirst had knowledge that payment was being received by Doctors Hospital and/or Pain Center through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

    v.  Upon information and belief, PatientFirst as sole shareholder of Doctors Hospital and owner of Pain Center, received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

    vi.  Upon information and belief PatientFirst caused Doctors Hospital and/or Pain Center to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

e.  Doctors Hospital

    i.  Upon information and belief Doctors Hospital used the mail to submit false claim forms to Missouri Medicaid and bills to Plaintiff for unnecessary medical treatment because the treatment was not indicated for Plaintiff's condition.

    ii.  Upon information and belief Doctors Hospital intended to use and did use the mail to submit fraudulent bills to Missouri Medicaid and Plaintiff for unnecessary medical treatment.

    iii.  Upon information and belief Doctors Hospital submitted such fraudulent bills with full knowledge that Brannon and Garcia were providing unnecessary medical treatment to Plaintiff because the treatment was not indicated by Plaintiff's condition.

    iv.  Upon information and belief Doctors Hospital submitted such fraudulent bills with full knowledge that Brannon and Garcia were continuing to over-

prescribe narcotic pain medication to Plaintiff to sell Plaintiff additional unnecessary and contraindicated medical procedures such as the March 4, 2015 right hip surgery were Plaintiff was implanted with the BGSS manufactured and sold by OSI and OSI's sales representative, Brannon.

f.   Pain Center

    i.   Upon information and belief, Pain Center and Doctors Hospital billing could be submitted by either entity regardless of where or by whom treatment was performed.

    ii.   Upon information and belief Pain Center had knowledge that use of the mail by Doctors Hospital would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

    iii.   Upon information and belief Pain Center had knowledge that payment was being received by Doctors Hospital through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

    iv.   Upon information and belief, Pain Center received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

    v.   Upon information and belief, Pain Center stood to gain and did gain financial benefit from Brannon, PatientFirst, Doctors Hospital and JPI and OSI's unnecessary medical treatment of Plaintiff.

    vi.   Upon information and belief Pain Center aided and abetted the mail fraud offenses committed by  Doctors Hospital to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

g.   Garcia

    i.   Upon information and belief Garcia had knowledge that use of the mail by Doctors Hospital, Pain Center and/or PatientFirst would follow in the ordinary course of business to bill Plaintiff and Missouri Medicaid by requesting and receiving payment for medical treatment which was unnecessary and not indicated by Plaintiff's condition.

    ii.   Upon information and belief Garcia had knowledge that payment was being received by Doctors Hospital, Pain Center and/or PatientFirst through the mail for treatment which was medically unnecessary and performed with the specific intent to defraud those paying said bills, including Plaintiff.

    iii.   Upon information and belief, Garcia received financial benefit from these bills submitted via mail with the intent to defraud and the payment via mail of the same.

    iv.   Upon information and belief, Garcia stood to gain and did gain financial benefit from Brannon, PatientFirst, Doctors Hospital and JPI and OSI's unnecessary medical treatment of Plaintiff.

    v.   Upon information and belief Garcia aided and abetted the mail fraud offenses committed by Doctors Hospital, Pain Center and/or PatientFirst to use the mail to submit bills across state lines with specific intent to defraud Missouri Medicaid and Plaintiff by requesting and receiving payment for medical treatment which was medically unnecessary and not indicated by Plaintiff's condition.

***Wire Fraud in Violation of 18 U.S.C. § 1343***

<u>*Pain Management Treatment*</u>

223.    The Defendants formed a scheme to defraud Plaintiff and Plaintiff's Missouri Medicaid by which Brannon, Garcia, Doctors Hospital and Pain Center issued prescriptions for narcotic pain medication which were not medically indicated and beyond prescribing practices.

224.    Receipt of money from the Plaintiff and Plaintiff's Medicaid Insurance was the object of the scheme as described above with the fraudulent Health Insurance Claims Forms.

225.    The use of the mails (as described above) furthered this scheme.

226.    Upon information and belief, defendants PatientFirst, Doctors Hospital, JPI and OSI individually and/or through their agents, employees or owners, had knowledge of the over-prescription of opioid pain medications by Brannon, Garcia and Pain Center, and had knowledge, or should have reasonably foreseen, that bills would be submitted and paid by use of wire or the mail across state lines in the ordinary course of business as more fully described above.

227.    Defendants intended to and did receive money from Missouri Medicaid Insurance by wire.

*Hip Surgery*

228.    The Defendants formed a scheme to defraud Plaintiff and Plaintiff's Missouri Medicaid by which Brannon, performed a highly unusual and overly expensive medical procedure to correct a non-existent problem.

229.    JPI and OSI, directly and through their shared agent, Brannon, provided the marketing and hardware for that procedure.

230.    PatientFirst and Doctors Hospital provided the facilities to perform that produce.

231.    Receipt of money from the Plaintiff and Plaintiff's Medicaid Insurance was the object of the scheme as described above with the fraudulent Health Insurance Claims Forms.

232.    The use of the mails (as described above) furthered this scheme.

233.    Defendants intended to and did receive money from Missouri Medicaid by wire.

*Fraudulent Advertising Claims*

234.    The Defendants formed a scheme to defraud potential patients and the insurance carriers for those potential patients by disseminating patently false information regarding the cost of the BGSS as compared to a standard total hip arthroplasty.

235.    Specifically, Dr. Brannon, et al represent that the Hip Tool and BGSS were priced comparably to hip replacement surgery. (See Kansas City Business Journal article dated April 23, 2006, Ex N).

236.    This claim is patently false.

237.    Plaintiff's BGSS surgery cost $253,674.06. (*See* Exhibit H).

238.    Five days later, plaintiff underwent a total hip arthroplasty to correct the failed surgery performed by Brannon, Doctors and PatientFirst which only cost approximately $45,000.

239.    These marketing claims were transmitted over the wire (via internet) to induce unsuspecting patients and patient's insurance providers that the costs between the BGSS and standard total hip arthroplasty were comparable, which they are not.

240.    The object of this scheme was to obtain exponentially more money than could be recouped through a standard total hip arthroplasty.

241.    Defendants' scheme induced Missouri Medicaid to pay over 5 times more for Plaintiff's BGSS surgery than would have been required if Brannon, Doctors and PatientFirst simply performed a standard total hip arthroplasty.

***Dealing in a Controlled Substance in Violation of 21 U.S.C. 802 (Section 102 of the Controlled Substances Act)***
*Federal Law Violation*

242.    "'Racketeering activity' means . . . (D) any offense involving fraud connected with . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States."  18 U.S.C. § 1961.

243.    18 U.S.C. § 841 of the CSA provides: "it shall be unlawful for any person knowingly or intentionally […] to manufacture, distribute, or dispense a controlled substance by issuing a "prescription." which is "an order for medication which is dispensed to or for an ultimate user[.]"  21 C.F.R. § 1300.01.

244.    21 C.F.R. § 1306.04(a) sets forth the parameters for the lawful issuance of a controlled substance pursuant to a prescription and provides: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

245. Brannon, Garcia and Pain Center conspired to and did violate 18 U.S.C. § 1961, 18 U.S.C. § 21 and 21 C.R.F. 1306.04(a) by writing narcotic prescriptions for Plaintiff that lacked a legitimate medical purpose and outside the usual course of their practice.

246. Specifically, Brannon, Garcia and Pain Center had a duty to use that degree of learning and skill ordinarily possessed by members of their profession and that school of medicine in the community in which he practiced, or in similar communities, and in the application of that skill and learning, Brannon and Garcia were obligated to use ordinary care and diligence, in performing services for Plaintiff.

247. During the many respective consultations with plaintiff, Brannon, Garcia and Pain Center knew or should have known that Plaintiff had previously utilized schedule II narcotics and/or other drugs such that he was at an increased risk for abusing and/or becoming addicted to opioids and/or other schedule II narcotics or was already an "addict".

248. Brannon, Garcia and Pain Center knew or should have known that once an individual becomes an "addict" they lose the "power of self-control with reference to his addiction." 21 U.S.C. § 802.

249. Fentanyl, Oxycodone and Morphine are Schedule II narcotics.

250. During the period of September 25, 2012 through December 1, 2015, Brannon, Garcia and Pain Center routinely prescribed to Plaintiff Schedule II narcotics, including but not limited to opioids, Oxycodone, Fentanyl and Morphine. During this same period of time, Brannon, Garcia and Pain Center were aware that these drugs are extremely addictive and that they have both an addiction-forming and an addiction-sustaining effect.

251. Brannon, Garcia and Pain Center willfully violated their respective duties, in, among other things:

a. Repeatedly and routinely prescribing Oxycodone, Fentanyl and Morphine and/or other schedule II narcotics to plaintiff when they were not medically necessary or justified under the circumstances.

b. Continuing to prescribe schedule II narcotics for an extended period of time outside of their respective professional practices.

c. Prescribing schedule II narcotics for no legitimate medical purpose.

d. At all times mentioned in this complaint, Brannon, Garcia and Pain Center failed to document and ensure the Plaintiff had been informed and advised of the dangers, risks, alternatives, and hazards of the course of treatment or routinely prescribing extremely addictive schedule II narcotics to plaintiff.

e. Withheld and failed to disclose to plaintiff the dangers, risks, alternatives and hazards and minimized these dangers, risks and hazards.

f. Withheld and failed to disclose to Plaintiff financial interests in the Pain Center, PatientFirst, and the Doctors Hospital.

g. Failed to inform Plaintiff of the contraindications for drugs he was being prescribed.

h. Failed to recognize Plaintiff's mental, physical or neurological condition impaired the Plaintiff's ability to understand the risks he was taking by filling the prescriptions improperly written by Brannon, Garcia and Pain Center and in other respects not specifically listed, but which may arise throughout the course of discovery.

252.    As a direct and proximate result of such willful violations, Plaintiff suffered and incurred economic damages, including but not limited to directly paying for unnecessary medical treatment in the form of co-pays for office visits.

253.    Upon information and belief, defendants PatientFirst, Doctors Hospital, JPI and OSI individually and/or through their agents, employees or owners, had knowledge of the willful over-prescription of opioid pain medications by Brannon, Garcia and Pain Center, and had knowledge, that this over-prescription was unlawful and was performed for the purpose of submitting bills for unnecessary prescriptions with the intent to defraud, or for the purpose of receiving kick-back payments from various drug manufacturers.

254.    As more fully described in the mail fraud allegations portion of the RICO claim, PatientFirst, Doctors Hospital, JPI and OSI committed predicate acts in violation of federal controlled substance law by directly participating in the billing of Missouri Medicaid and Plaintiff for office visits where controlled substances were prescribed for a non-legitimate purpose, specifically excessively billing Plaintiff and Plaintiff's Missouri Medicaid and make Plaintiff more susceptible to pressure to undergo expensive and unnecessary surgeries.  Those allegations are hereby incorporated by reference.

255.    Brannon, Garcia, PatientFirst, Pain Center and Doctors Hospital's violations of federal controlled substance law are in reference to their direct involvement in the fraudulent billing for unnecessary medical treatment were narcotic medications were prescribed.  The allegations contained in the mail fraud section of this RICO claim are hereby incorporated by reference.

256.    JPI and OSI's violations of federal controlled substance law are in reference to their aiding and abetting of the fraudulent billing for unnecessary medical treatment were narcotic medications were prescribed.  The allegations contained in the mail fraud section of this RICO claim are hereby incorporated by reference.

### *Laundering of Monetary Instruments in Violation of 18 U.S.C. § 1956*

257.    "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-- . . . knowing that the transaction is designed in whole or in part-- . . .  to avoid a transaction reporting requirement under State or Federal law . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."  18 U.S.C.A. § 1956(a)(1)(B)(ii).

258.    The Senate Finance Committee Report on Physician Owned Distributorships noted that, "[o]verall, PODs operate in a very opaque environment and some PODs have taken steps to conceal their financial relationships."  (Exhibit B at pg. 24).

259.    The enmeshed relationships between Brannon, Garcia, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital were created in order to avoid or under report obligations created by The Physician's Payments Sunshine (Act 42 U.S.C. § 1320a-7h), The Anti-Kickback Statute (42 U.S.C. § 1320a-7b) and The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn).

260.    Such acts and omissions directly and proximately caused Plaintiff harm and also violated 18 U.S.C. § 1347, by willingly executing a scheme to defraud a healthcare benefit program, namely Plaintiff's Missouri Medicaid.

261.    As more fully described below, Brannon, Garcia, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital undertook a common scheme to syphon money from Missouri Medicaid under false pretenses that Plaintiff required an unusual and exorbitantly expensive procedure to correct a non-existent problem.

### *The Money-Laundering Scheme*

262.    Brannon and Garcia conspired to and did violate 18 U.S.C. § 1961, 18 U.S.C. § 21 and 21 C.R.F. 1306.04(a) by writing narcotic prescriptions for Plaintiff that lacked a legitimate medical purpose and outside the usual course of their practice.

263.    The prescriptions were fraudulent because they lacked a legitimate purpose.

264.    Because the prescriptions were fraudulent, billing to Plaintiff and Plaintiff's Missouri Medicare was also fraudulent.

265.     Doctors Hospital and Pain Center conspired with Brannon and Garcia and did submit fraudulent bills to Plaintiff and Plaintiff's Missouri Medicaid for the pain management care.

266.      PatientFirst oversaw the allocation and directed the distribution of the funds received from Plaintiff and Plaintiff's Missouri Medicaid for payment for the unnecessary medical treatment.

267.     Brannon, Garcia, Doctors Hospital, Pain Center and PatientFirst reinvested and knowingly conducted financial transactions with the proceeds received from Plaintiff and Plaintiff's Missouri Medicaid to continue to operate the common scheme of defrauding Plaintiff and Plaintiff's Missouri Medicaid.

268.     But for this reinvestment of proceeds, Brannon, Garcia, Doctors Hospital, Pain Center and PatientFirst would not have been able to continue to the next phase of their collective scheme to defraud Plaintiff and Plaintiff's Missouri Medicaid.

269.     Upon information and belief, Brannon, Garcia, Doctors Hospital, Pain Center and PatientFirst perpetrated this fraud on patients before and after the treatment provided to Plaintiff and reinvested those proceeds to continue to operate the fraudulent scheme on Plaintiff and other patients.

270.     But for this reinvestment of proceeds from unnecessary medical treatment of other patients beyond Plaintiff, Brannon, Garcia, Doctors Hospital, Pain Center and PatientFirst would not have been able to continue to operate and enlist other unsuspecting patients into their scheme, including Plaintiff.

271.     OSI sold the BGSS directly to Plaintiff through its sales representative, Brannon.

272.     Doctors Hospital and Pain Center billed Plaintiff and Plaintiff's Missouri Medicaid for the cost of the BGSS

273.     Plaintiff paid for the BGSS and other OSI supplies and devices directly through his co-pays and Missouri Medicaid paid the balance remaining.

274.     Doctors Hospital and Pain Center billed Plaintiff and Plaintiff's Missouri Medicaid for the cost of services (the surgery itself) provided by Brannon, JPI, Doctors Hospital and PatientFirst.

275.     Payments by Plaintiff and Missouri Medicaid for the cost of services (the surgery itself) were made to Doctors Hospital and Pain Center.

276.     The payments made by Plaintiff and Missouri Medicaid for both the joint preservation surgery procedure and the OSI supplies and devices was predominantly distributed to JPI.

277.     Plaintiff paid for the cost of services (the surgery itself) provided by Brannon, JPI, Doctors Hospital and PatientFirst directly through his co-pays and Missouri Medicaid paid the remaining balance.

278.     The proceeds from the unnecessary medical treatment were received by Doctors Hospital and Pain Center

279.     Doctors Hospital and Pain Center knowingly conducted a financial transaction(s) involving the proceeds of the fraud by permitting PatientFirst to distribute the proceeds to Brannon, Garcia, OSI, JPI, Doctors Hospital and Pain Center.

280.     Doctors Hospital, Pain Center and PatientFirst knowingly conducted a financial transaction(s) involving the proceeds of the fraud by distributing the proceeds of the fraud to JPI.

281.     PatientFirst knowingly conducted a financial transaction involving the proceeds of the fraud by distributing the proceeds to Brannon, Garcia, OSI, JPI, Doctors Hospital and Pain Center.

282.     JPI knowingly conducted a financial transaction(s) involving the proceeds of the fraud by distributing its proceeds back to Brannon.

283.     JPI knowingly conducted a financial transaction(s) involving the proceeds of the fraud by distributing the proceeds to OSI.

284.    OSI then distributed its proceeds to Brannon in the form of a "loan."

285.    OSI knowingly conducted a financial transaction involving the proceeds of the fraud by characterizing its illicit payment back to Brannon as a "loan."

286.    The artifice of a "loan" from OSI to Brannon was created to obfuscate, from Plaintiff and Plaintiff's Missouri Medicaid, the fact that Brannon receives substantially all of the proceeds from the BGSS surgery.

287.    Brannon and JPI receive direct payment as the surgeon and practice group for both the surgical services and the OSI supplies and devices.

288.    Brannon and Garcia receive indirect payment as owners of PatientFirst, Doctors Hospital and Pain Center.

289.    Brannon also receives indirect payment as the seller of the BGSS in the form of a "loan" from OSI back to himself.

290.    All defendants conducted or attempted to conduct financial transactions which in fact involves the proceeds of specified unlawful activity; specifically moving money from one individual/organization to another individual/organization for the purpose of concealing the source of the funds which were proceeds collected from Plaintiff and Plaintiff's Missouri Medicaid for unnecessary medical treatment.

291.    The federal reporting guidelines are put in place to prevent physician self-dealing and kick-backs.

292.    These elaborate transactions are designed to avoid federal reporting requirements and in doing so the Defendants each knowingly conducted a financial transaction, or series of financial transactions involving the proceeds from the frauds described herein.

293.     Brannon, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst reinvested and knowingly conducted financial transactions with the proceeds received from Plaintiff and Plaintiff's Missouri Medicaid to continue to operate the common scheme of defrauding Plaintiff and Plaintiff's Missouri Medicaid.

294.     But for this reinvestment of proceeds, Brannon, Garcia, Doctors Hospital, Pain Center and PatientFirst would not have been able to continue to the next phase of their collective scheme to defraud Plaintiff and Plaintiff's Missouri Medicaid.

295.     Upon information and belief, Brannon, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst perpetrated this fraud on patients before and after the treatment provided to Plaintiff and reinvested those proceeds to continue to operate the fraudulent scheme on Plaintiff and other patients.

296.     But for this reinvestment of proceeds from other patients which received unnecessary medical treatment, Brannon, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst would not have been able to continue to operate and enlist other unsuspecting patients into their scheme.

### *The Physician's Payments Sunshine Act (42 U.S.C. § 1320a-7h)*

297.     The Physician's Payments Sunshine Act requires medical device manufacturers that are covered under Medicare, Medicaid or the Children's Health Insurance Program (CHIP) to report to CMS any payments made to physicians.

298.     Upon information and belief Brannon has failed to fully report his interests and ownership of OSI and/or payments received from OSI.

299.     Brannon has categorized himself as an employee of OSI as opposed to 90% owner.

300.     For 2015 (the year of Plaintiff's surgery), Brannon disclosed three separate payments from OSI totaling $315,093.21.  CMS Open Payments Data (Exhibit I).

      a.   On December 15, 2015 Brannon disclosed a payment of $50,689.73 from OSI for Travel and Lodging. (Exhibit J)

b. On December 30, 2015 Brannon disclosed a payment of $143,851.61 from OSI which stated, "Dr. Brannon is a bona fide employee of OSI he is CEO [sic]. Dr. Brannon is not a Covered Recipient. Nevertheless, OSI has publically reported his salary and benefits as CEO as a payment or other transfer of value since he is also a physician, owner and investor. OSI has made a reasonable determination that the nature of the payment is most appropriately categorized as Compensation for Services Other than Consulting. (Exhibit K).

c. Also on December 30, 2015 Brannon disclosed a payment of $120,551.87 from OSI which stated, "Repayable loan from Orthopedic Sciences, Inc. to Dr. James K. Brannon, the President and CEO of Orthopedic Sciences." The entry does not indicate if the loan was repaid. (Exhibit L).

301. For reference, CMS lists Brannon's received payments as $311,921.35 above the national mean for all physicians and $299,585.43 above the national mean for his specialty. (Exhibit M).

302. Paradoxically, Brannon's total <u>number</u> of transactions (5) is 13 below the national mean for all physicians and 8 below the national mean for his specialty. *Id.*

303. Brannon disclosed his total investment in OSI as $1,790.00 which earned him a total value of interest of $273,870.00 in 2015. *Id.*

304. OSI and Brannon knowingly covered up the true nature of the funds paid by OSI to Brannon to avoid the transaction reporting requirements required under the CMS reporting requirements under the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h.).

305. Such a cover ups are violations of 18 U.S.C. § 1956(a)(1)(B)(ii) and qualify as predicate acts under the RICO statutes, 18 U.S.C. § 1962 (a) & (c) and 18 U.S.C. § 1961.

306. The "loan" from OSI to Brannon is a financial transaction involving the proceeds obtained from Plaintiff and Plaintiff's Missouri Medicaid.

307. OSI and Brannon knowingly conducted this financial transaction with the proceeds of the fraud of unnecessary medical treatment.

308.    Plaintiff was directly and proximately harmed by these predicate acts and by the omissions of required disclosures by Brannon and OSI.

309.    Had Plaintiff known that Brannon and OSI were so intertwined he would have sought a second opinion regarding the appropriateness of treatment offered by Brannon, JPI, OSI, PatientFirst and Doctors Hospital.

310.    As such, Brannon and OSI's obfuscation of the true nature of their relationship by omission in public reporting duties under The Physician's Payments Sunshine Act 42 U.S.C. § 1320a-7h and by Brannon's direct omissions to Plaintiff misled Plaintiff into the belief that the recommended care provided by Brannon was free of inherent conflicts of interest as described above.

311.    Upon information and belief bills submitted to Missouri Medicaid and their insureds for the unnecessary joint preservation surgeries of Plaintiff as well as other similarly situated patients were paid to Doctors Hospital and Pain Center.

312.    Upon information and belief these payments would then distribute through JPI and PatientFirst to Brannon.

313.    Upon information and belief, Brannon would reinvest these payments into OSI.  OSI would then redistribute the payments back to Brannon in the form of loans.

314.    Plaintiff relied upon these representations and omissions and directly and proximately harmed.

### *The Anti-Kickback Statute (42 U.S.C. § 1320a-7b)*

315.    The Senate Finance Committee Report (*supra*) characterized the Anti-Kickback Statue with relation to PODs as follows:

> The Anti-Kickback Statute (AKS) prohibits offering, paying, soliciting, or receiving anything of value to induce or reward referrals or generate federal health care program business. The prohibition applies not only to traditional forms of remuneration, such as cash payments, but also to

> indirect payments, which could include investment opportunities, especially when terms of the investment are extremely advantageous for a physician, or where the physician-investor has a financial interest in generating business for the company. Criminal, civil, and administrative remedies may be imposed for violations of the AKS. Changes to the AKS in 2010 clarify that any "claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

Staff of S. Finance Committee, Report on Physician Owned Distributorships: An Update on Key Issues and Areas of Congressional Concern (February 2016)(citing HHS OIG, OIG Advisory Op., No. 97-5 (Oct. 6, 1997); HHS OIG, Special Advisory Bulletin: Contractual Joint Ventures, 68 Fed. Reg. 23,148, 23,150 (Apr. 30, 2003) and 42 U.S.C. § 1320-a-7b(g).

316.    The Anti-Kickback Statute prohibits illegal remunerations, specifically it states: "(b) Illegal remunerations (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320(b)(1)(A).

317.    The HHS OIG Special Fraud Alert on Physician-Owned Entities reiterated HHS's "longstanding position that the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute. OIG views PODs as inherently suspect under the anti-kickback statute."  (Exhibit A at pg. 4).

318.    OSI, JPI and Brannon knowingly covered up the true the relationship between OSI and Brannon and concealed such facts from Plaintiff and Missouri Medicaid.

319.     Payments received by Brannon from OSI were both directly and indirectly furnished by the cost of Plaintiff's joint preservation surgery and the culmination of the fraud perpetrated upon Plaintiff and Plaintiff's Missouri Medicaid.

320.     A majority of the cost of the hip surgery was paid from a Federal healthcare program, namely Missouri Medicaid which is supported, in part, by Federal dollars.

321.     The money paid to OSI for Plaintiffs implantable hip product, which ultimately funneled back to Brannon, can be characterized an impermissible kickback under the Anti-Kickback Law, 42 U.S.C. § 1320(b)(1)(A).

322.     Plaintiff was directly and proximately harmed by these predicate acts and by the kickbacks received by Brannon from OSI for using the OSI manufactured hip product in Plaintiff's surgery.

323.     Had Plaintiff known that Brannon was receiving impermissible kickbacks from OSI he would have sought a second opinion regarding the appropriateness of treatment offered by Brannon, OSI and Doctors Hospital.

324.     Brannon and OSI's obfuscation of the true nature of their relationship violated the Anti-Kickback Law, 42 U.S.C. § 1320(b)(1)(A).

325.     Such kickbacks are violations of 18 U.S.C. § 1956(a)(1)(B)(ii) and qualify as predicate acts under the RICO statutes, 18 U.S.C. § 1962 (a) & (c) and 18 U.S.C. § 1961.

326.     Doctors Hospital, Pain Center, PatientFirst, Garcia, and JPI were all complicit and participated in Brannon and OSI's violation of the Anti-Kickback Law.

327.     JPI received payments for the surgeries and the devices which were in turn provided to OSI and back to Brannon in the form of "loans."

328.    As such, all Defendants knowingly conducted financial transactions involving the proceeds from the fraud of unnecessary medical treatment.

*The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn)*

329.    Senate Finance Committee Report characterized the Stark Law with relation to PODs as follows:" The Physician Self-Referral Law (42 U.S.C. § 1395nn), also known as the Stark Law, prohibits a physician from referring Medicare patients for designated health services to an entity with which the physician (or immediate family member) has a financial relationship, unless an exception applies. It also prohibits the designated health services entity, often a hospital, from submitting claims to Medicare for services resulting from a prohibited referral."  (Exhibit B at pg. 4).

330.    The Stark Law prohibits physicians from making referrals to entities for which the physician has a financial relationship, specifically it states:

> Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then--
>
>> (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>>
>> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a).

331.    Brannon had complete control over Plaintiff regarding the choice of hip implant to use during Plaintiff's surgery.

332.    Brannon referred Plaintiff to OSI's BGSS, for which, Brannon received compensation as the inventor and as OSI's 90% owner and president.

333.     Such conflicts of interest were not disclosed to Plaintiff and/or Brannon did not fully apprise Plaintiff regarding the extent that such a relationship created an inherent conflict of interest and in violation of 42 U.S.C. § 1395nn(a).

334.     Plaintiff was directly and proximately harmed by these predicate acts and by the self-referral payments received by Brannon from OSI for using the OSI manufactured hip product in Plaintiff's surgery.

335.     Had Plaintiff known that Brannon was receiving impermissible self-referral payments from OSI he would have sought a second opinion regarding the appropriateness of treatment offered by Brannon, OSI, PatientFirst and Doctors Hospital.

336.     Brannon and OSI knowingly violated The Stark Law (also known as the Physician Self-Referral Law)(42 U.S.C. § 1395nn) and billed a third party payer, namely Missouri Medicaid, for the purchase and use of the BGSS.

337.     Brannon, JPI, Doctors Hospital and Pain Center knowingly violated The Stark Law (also known as the Physician Self-Referral Law)(42 USC §1395nn) and billed a third party payer, namely Missouri Medicaid, for the joint preservation surgery without reporting the nature of the relationship or the transaction to Missouri Medicaid.

338.     These violations of the Stark Law and obfuscations of the nature of the transaction between Brannon and OSI was not reported to Missouri Medicaid or Plaintiff, both of whom ultimately paid for the BGSS.

339.     These violations of the Stark Law are violations of 18 U.S.C. § 1956(a)(1)(B)(ii) and qualify as predicate acts under the RICO statutes, 18 U.S.C. § 1962 (a) & (c) and 18 U.S.C. § 1961.

340.     Doctors Hospital, Pain Center, PatientFirst, Garcia, and JPI were all complicit and participated in Brannon and OSI's violation of the Stark Law.

341.    As such, all Defendants knowingly conducted financial transactions involving the proceeds from the fraud of unnecessary medical treatment.

### G. Damages

342.    Plaintiff has been economically damaged by Defendants violation of the RICO statute and is entitled to treble damages of his economic injuries.

343.    Plaintiff's RICO allegation damages are strictly limited to the money that he directly paid out-of-pocket to Brannon, Garcia, OSI, JPI, Doctors Hospital, Pain Center and PatientFirst for unnecessary medical treatment.

344.    Plaintiff's economic damages include, but are not limited to, co-pays, out-of-pocket medical costs for unnecessary medical treatment, and other economic damages paid to Defendants which can be proved at trial.

345.    Plaintiff seeks his attorney's fees for this action pursuant to the RICO statute.

**WHEREFORE,** Plaintiff prays for judgment in Count III against All Defendants for treble economic damages, to be proved at trial, for his attorney's fees as allowed under the RICO statute, and for such other relief as the Court deems just and proper under the circumstances.

### COUNT IV – CIVIL CONSPIRACY
#### (Against All Defendants)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

346.    Upon information and belief Defendants acted with a full meeting of the minds, and with the object of violating the False Claims Act, the Anti-Kickback Statute and Stark's Law, as well as the various RICO violations laid out above, and with the object of violating the KCPA as laid out below by using Brannon and Garcia's positions of power and influence to prescribe and provide

unnecessary medical treatment for the purpose of creating fraudulent and unconscionable medical bills for unnecessary treatment, and being paid for the same.

347.    On information and belief, Defendants' conduct transcended their interactions with Plaintiff, and extended to a systematic and widespread course of conduct which involved other patients across the country as more fully set forth above.

348.    Defendants acted in order to accomplish the object of financially profiting from the unnecessary and inappropriate medical treatment and did in fact profit from it.

349.    As a direct result of Defendant's conspiracy, and the overt unlawful acts committed in furtherance of it, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, co-pays, out-of-pocket expenses, hospital expenses, prescription medication expenses, and other expenses to be proven at trial..

**WHEREFORE**, Plaintiff prays for judgment in Count IV against Defendants Brannon, Garcia, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

### COUNT V – FRAUD
**(Against all Defendants)**

Subsumed in Medical Malpractice (Count I) and Informed Consent (Count II) claims.

### COUNT VI – KANSAS CONSUMER PROTECTION ACT
**(Against Defendants Brannon, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital)**

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

350.   Defendant Brannon, as the inventor of the Titanium Hip Tool Locking Plate Bone Graft Stabilization System (BGSS) engaged in the manufacture, sale and distribution of products within the state of Kansas and elsewhere.  Defendant Brannon, individually and through his various entities including OSI, JPI, PatientFirst, Pain Center and Doctors Hospital manufactured, marketed and ultimately sold to Plaintiff its BGSS product as well as the joint preservation surgery to install the BGSS.

351.   These defendants, with respect to their interactions and transactions with Plaintiffs, were "suppliers" under K.S.A. 50-624(l).

352.   Defendant OSI sold the BGSS directly to Plaintiff by and through its agent, employee and majority owner, Brannon. Brannon, the creator of the BGSS, and the 90% owner of OSI, was in the room directly convincing Plaintiff he needed this unnecessary surgery using this unnecessary device for the financial benefit of Brannon and OSI.

353.   Defendant JPI sold the joint preservation procedure directly to Plaintiff by and through its agent, employee and owner, Brannon.  Brannon, the creator of the joint preservation surgery, and the sole owner of JPI, was in the room directly convincing Plaintiff to have the unnecessary joint preservation surgery for the financial benefit of Brannon and JPI.

354.   Defendants Doctors Hospital, PatientFirst, Garcia, Brannon, and Pain Center had knowledge of the relationship between Brannon and OSI as well as the relationship between Brannon and JPI.  Upon information and belief Defendants Doctors Hospital, PatientFirst, Garcia, Brannon and Pain Center had knowledge that Brannon was acting on behalf of OSI and JPI while selling the joint preservation surgery and the BGSS to Plaintiff, and other similarly situated patients, and did nothing to advise Plaintiff, or other similarly situated patients, about the relationships between Brannon and OSI and JPI or the one-sided nature of the transaction.

355.    Defendants engaged in one or more deceptive acts or practices in connection with their consumer transactions with Plaintiff, including but not limited to:

a.   Brannon and OSI willfully made representations that the Hip Tool and BGSS were priced comparably to hip replacement surgery, knowingly or with reason to know, that such representations were exaggerated and false. (See Kansas City Business Journal article dated April 23, 2006, Ex N).

b.   All Defendants willfully failed to state material facts, and/or willfully concealed, suppressed or omitted material facts including but not limited to the following:

i.   Defendant Brannon had created a Physician Owned Distributorship (aka a "POD") consisting of the remaining defendants which created conflicts that he did not disclose nor that Plaintiff could fully understand.

ii.   That PODs, such as the very one created by Dr. Brannon, are the subject of investigation and extreme concern by The Department of Health and Human Services Office of Inspector General (HHS OIG) and the subject of a Special Fraud Alert from the HHS OIG.

iii.   That the creation of his POD allowed Dr. Brannon the opportunity to grant himself a steady stream of income by increasing the use of his invented products manufactured, distributed and/or sold by entities he completely owns, creating an inherent conflict of interest that could put his medical judgment at odds with plaintiff's best interests.

iv.   That the OIG Special Fraud Alert states that "we do not believe that disclosure to a patient of the physician's financial interest in a POD is sufficient to address these concerns."

v. That the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he generates business, could constitute illegal remuneration under the anti-kickback statute, as specially stated in the Special Fraud Alert.

vi. That the creation of the POD created a financial motivation to perform as many joint preservation surgeries as possible, and motivated the performance of unnecessary joint preservation surgeries.

vii. That JPI, owned by Brannon, had contracted specifically to perform joint preservation surgeries at Doctors Hospital and Pain Center, and to be compensated differently for joint preservation surgeries than for any other treatment he provided.

viii. That this contract to perform joint preservation surgeries created a financial motivation for JPI and Brannon to perform unnecessary joint preservation surgeries.

ix. In other respects not specifically listed, but which may arise throughout the course of discovery.

c. That Plaintiff, and other similarly situated patients, would be billed for unnecessary medical treatment, specifically joint preservation surgeries.

d. That Plaintiff, and other similarly situated patients, were specifically sought out for joint preservation surgery due to their Missouri Medicaid health insurance.

e. Pursuant to KSA 50-627(b)(2), the price of the BGSS products and procedure charged by the Defendants grossly exceeded the price at which similar products and/or procedures were obtainable in similar transactions by similar consumers

f.  In addition, Plaintiff was unable to receive a material benefit from the subject of the sale of the BGSS to him.

356.  Defendants' conduct constituted "unconscionable acts and practices" under K.S.A. 50-627, in that:

a.  Defendants took advantage of Plaintiff's inability to reasonably protect his interests due to Plaintiff's physical and mental condition, ignorance and/or other similar factors;

b.  Defendants Doctors Hospital and Pain Center billed excessive and unconscionable amounts for the treatment provided, and said amounts were far in excess of comparable treatment elsewhere which constitutes an unconscionable billing practice;

c.  Defendants PatientFirst, JPI, OSI and Brannon had knowledge the amounts being billed to Plaintiff, and similarly situated patients, were far in excess of the cost of comparable treatment elsewhere which constitutes an unconscionable billing practice;

d.  Defendants Doctors Hospital and Pain Center billed Plaintiff and other similarly situated patients for unnecessary medical treatment which constitutes an unconscionable billing practice;

e.  Defendants JPI, OSI, Brannon and PatientFirst had knowledge that Doctors Hospital and Pain Center were billing Plaintiff, and other similarly situated patients, for unnecessary medical treatment which constitutes an unconscionable billing practice.

  f. The transaction wherein Brannon, individually and as agent and sales representative for OSI and JPI, and with the knowledge of Doctors Hospital, Pain Center and PatientFirst, sold the BGSS and the joint preservation surgery to Plaintiff was excessively one sided in favor of the supplier as defendants were the only parties to the transaction with the skills and resources to determine the surgery was unnecessary; and

  g. Defendants made misleading statements of opinion on which Plaintiff was likely to rely to his detriment.

357. As a result of Defendants' deceptive and unconscionable acts and practices, defendants unfairly and improperly profited at the expense of Plaintiff who was forced to pay co-pays, medical costs, and other out-of-pocket expenses  Pursuant to K.S.A. 50-634(b) plaintiff is entitled to the greater of damages sustained by plaintiff as determined by the jury or a civil penalty as provided by 50-636(a) each defendant is liable to plaintiff for the payment of civil penalties in a sum to be set by the court in an amount up to $10,000.00 per violation per defendant and under either provision defendants must pay all of plaintiff's attorney's fees and expenses.

358. Plaintiff is not asserting this cause of action against Dr. Brannon personally for personal injuries alleged to have resulted from medical negligence but is restricting this claim to those damages arising from the sale of the Product not sounding in personal injury (i.e. price gouging, etc). To the extent Dr. Brannon was acting as an employee and/or agent of the other defendants, however, plaintiff is seeking all damages against the other defendants to which he is entitled under the Kansas Consumer Protection Act.

  **WHEREFORE**, Plaintiff prays for judgment in Count VI against Defendants Brannon, OSI, JPI, PatientFirst, Pain Center and Doctors Hospital for damages in excess of Seventy-Five Thousand

Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT VII – BREACH OF IMPLIED WARRANTY OF FITNESS
### (Against Defendants Brannon and OSI)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

359.     Brannon, in his individual capacity as a sales representative made material misrepresentations to Plaintiff regarding the fitness of the BGSS.

360.     OSI is vicariously liable for the material misrepresentations made by its sales representative and agent, Brannon, to Plaintiff.

361.     At the time of the transaction between OSI and Plaintiff, which involved, among other things, the sale of the subject surgical products, OSI knew or had reason to know of the particular purpose for which the products were required.

362.     Sales representative Brannon and his employer OSI knew or had reason to know that Plaintiff was relying on sales representative Brannon's skill or judgment to select or furnish suitable products for such particular purpose.

363.     At the time of the transaction between OSI and Plaintiff on March 4, 2015, Brannon was acting individually, and as an agent and sales representative of OSI.

364.     Brannon did not disclose his relationship with OSI at any time.

365.     Upon information and belief Brannon was a 90% owner of OSI on March 4, 2015.

366.     Upon information and belief, Brannon, as the 90% owner and agent of OSI, had a direct financial interest in selling the BGSS to Plaintiff on March 4, 2015.

367.     Upon information and belief, Brannon, as the 90% owner and agent of OSI, sold the BGSS to Plaintiff by focusing on its potential benefits and only focusing on the potential detriments of any other options presented.

368.     Upon information and belief, no other employees, representatives, consultants or salespeople were consulted by Brannon regarding the BGSS being sold to Plaintiff.

369.     Upon information and belief, no other employees, representatives, consultants or salespeople were contacted or consulted by Brannon prior to the installation of the BGSS.

370.     Upon information and belief, sales representative Brannon was the only contact between Doctors Hospital/Pain Center/JPI/PatientFirst and OSI.

371.     Upon information and belief, Brannon held himself out to providers, including, but not limited to, Doctors Hospital, Pain Center, PatientFirst, and JPI as an agent of OSI.

372.     Because Brannon was working as an agent and salesperson for OSI at the time of the transaction, OSI is vicariously liable for the misrepresentations Brannon made to Plaintiff.

373.     Brannon and OSI' actions and conduct created an implied warranty that the products would be suitable and fit for such purpose.

374.     The products were not suitable for such purpose, and as a result, Brannon and OSI breached such warranty.

375.     As a direct result of this breach, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for judgment in Count VII against Defendants Brannon, and OSI for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys'

fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT VIII – STRICT LIABILITY FAILURE TO WARN
### (Against Defendants Brannon and OSI)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

376.   Brannon, in his individual capacity as a sales representative made material misrepresentations to Plaintiff regarding the fitness of the BGSS.

377.   OSI is vicariously liable for the material misrepresentations made by its sales representative and agent, Brannon, to Plaintiff.

378.   OSI BGSS in a defective condition that was unreasonably dangerous to Plaintiff and caused physical harm to Plaintiff.

379.   OSI was and is in the business of making, selling, and marketing the BGSS.

380.   OSI expected that the product would, and the BGSS did in fact, reach Plaintiff, the consumer, without substantial change in the condition in which it was sold.

381.   The BGSS was defective due to inadequate warnings, and such defect existed at the time it left OSI' hands.  Lack of warnings include, but are not limited to, failing to warn that the use of the BGSS is contraindicated for individuals as follows:

   a.   Individuals over the age of 50

   b.   Any medical or surgical condition which would preclude the potential benefit of core decompression/debridement of the femoral head with bone grafting and bone graft stabilization, such as advance arthritis….

     c.   Any case not needing core decompression/debridement of the femoral head and neck followed by bone grafting.

     d.   Mental, physical or neurological conditions which may impair the patient's ability to cooperate with the postoperative regimen.

382.    The BGSS was used by Plaintiff in an ordinary manner considering the product's characteristics and common usage, yet was dangerous to an extent beyond which would be contemplated by an ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics.

383.    The BGSS failed of its intended purpose and Plaintiff was required to undergo a full hip replacement. As a result of the sale of OSI's defective and unreasonably dangerous product, and its failure, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

384.    At the time of the transaction between OSI and Plaintiff on March 4, 2015, Brannon was acting individually, and as an agent and sales representative of OSI.

385.    Brannon did not disclose his relationship with OSI at any time.

386.    Upon information and belief Brannon was a 90% owner of OSI on March 4, 2015.

387.    Upon information and belief, Brannon, as the 90% owner and agent of OSI, had a direct financial interest in selling the BGSS to Plaintiff on March 4, 2015.

388.    Upon information and belief, Brannon, as the 90% owner and agent of OSI, sold the BGSS to Plaintiff by focusing on its potential benefits and only focusing on the potential detriments of any other option presented.

389.     Upon information and belief, no other employees, representatives, consultants or salespeople were consulted by Brannon regarding the BGSS being sold to Plaintiff.

390.     Upon information and belief, no other employees, representatives, consultants or salespeople were contacted or consulted by Brannon prior to the installation of the BGSS.

391.     Upon information and belief, Brannon was the only contact between Doctors Hospital/Pain Center/JPI/PatientFirst and OSI.

392.     Upon information and belief, Brannon held himself out to providers, including, but not limited to, Doctors Hospital, Pain Center, PatientFirst, and JPI as an agent of OSI.

393.     Because Brannon was working as an agent and salesperson for OSI at the time of the transaction, OSI is vicariously liable.

**WHEREFORE**, Plaintiff prays for judgment in Count VIII against Defendants Brannon, and OSI for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

### COUNT IX:  VICARIOUS LIABILITY
**(Against Defendants OSI, JPI, and PatientFirst)**

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

394.     At all relevant times, Dr. Brannon was acting individually and as an agent, employee and/or representative of Defendants OSI, JPI, and PatientFirst. The acts and/or omissions committed by Dr. Brannon arose out of the course and scope of his agency or employment with Defendants OSI, JPI, PatientFirst, Pain Center and Doctors Hospital.

395.    As a direct and proximate result of such acts and/or omissions set forth in more detail elsewhere in this Complaint, for which Defendants OSI, JPI and PatientFirst are vicariously liable, Plaintiff suffered and incurred both past and future economic and non-economic damages, including but not limited to medical expenses, hospital expenses, prescription medication expenses, pain, suffering and disability.

**WHEREFORE**, Plaintiff prays for in Count IX against Defendants OSI, JPI and PatientFirst, for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive damages to punish and deter any such conduct in the future and for any such other relief as the Court deems just and proper under the circumstances.

## COUNT X: ALTER EGO LIABILITY
### (Against Defendant PatientFirst Healthcare Alliance, P.A.)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

396.    At all relevant times mentioned in this complaint defendant PatientFirst Healthcare Alliance, P.A. controlled and dominated its wholly-owned subsidiaries, defendants Pain Center and Doctors Hospital, through multiple means, including but not limited to (a) ownership of 100% of control of both The Headache & Pain Center, P.A. and Doctors Hospital, L.L.C. (b) sharing the same location at 7800 College Blvd, Overland Park, KS 66210 as The Headache & Pain Center, P.A.; (c) upon information and belief, failure to observe corporate formalities, such as sharing common employees.

397.    Upon information and belief, at all relevant times mentioned in this complaint, defendants The Pain Center, and Doctor's Hospital, were mere instrumentalities or agents of defendant PatientFirst.

88

398.   At all relevant times mentioned in this complaint defendant PatientFirst Healthcare Alliance, P.A. exercised such complete domination and control over defendants The Headache & Pain Center, P.A. and Doctor's Hospital, L.L.C., who were an enterprise and/or associations-in-fact engaged in predicate acts of racketeering activity.

399.   Defendant PatientFirst Healthcare Alliance, P.A.'s control and breach of duty proximately caused the injuries and unjust losses complained of in this case.

400.   Accordingly, the Court should disregard the formal corporate structures in this case and treat defendant PatientFirst Healthcare Alliance, P.A. as the alter ego of its subsidiaries and affiliates, including defendants The Headache & Pain Center, P.A. and Doctor's Hospital, L.L.C.

**WHEREFORE,** Plaintiff prays for an award of damages against defendant PatientFirst Healthcare Alliance, P.A. as the alter ego of defendants The Headache & Pain Center, P.A. and Doctor's Hospital, L.L.C., in an amount in excess of $75,000 to be determined by the jury, and for punitive damages, together with interest and costs of suit and for such other relief as is just and proper.

## COUNT XI – PUNITIVE DAMAGES
### (Against All Defendants)

Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

401.   Defendants' conduct herein was willful, wanton, fraudulent, grossly negligent and/or malicious, justifying the imposition of punitive or exemplary damages to punish Defendants and to deter them, and others, from engaging in like conduct.

**WHEREFORE**, Plaintiff prays for judgment in Count XI against All Defendants for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, for costs incurred, for prejudgment and post-judgment interest, for reasonable attorneys' fees, for punitive

damages to punish and deter any such conduct in the future and for any such other relief as the Court

deems just and proper under the circumstances.

### DESIGNATION FOR PLACE OF TRIAL AND JURY DEMAND

Plaintiff hereby requests a jury trial in the United States District Court for the District

of Kansas at Kansas City, Kansas, Wyandotte County.

Respectfully Submitted,

**PETERSON & ASSOCIATES, P.C.**


 /s/ David M. Peterson

| | |
|---|---|
| David M. Peterson | #70317 |
| Nick A. Brand | #27748 |
| Brian E. Tadtman | #78734 |
| Nicholas S. Clevenger | #78230 |

dmp@petersonlawfirm.com
nab@petersonlawfirm.com
bet@petersonlawfirm.com
nsc@petersonlawfirm.com
801 W. 47th Street, Suite 107
Kansas City, Missouri 64112
(816) 531-4440
Fax: (816) 531-0660

**ATTORNEYS FOR PLAINTIFF**